1  WEILAND GOLDEN GOODRICH LLP
   Jeffrey I. Golden, State Bar No. 133040
2  jgolden@lwgfllp.com
   Faye Rasch, State Bar No. 253838
3  frasch@lwgfllp.com
   650 Town Center Drive, Suite 950
4  Costa Mesa, California 92626
   Telephone 714-966-1000
5  Facsimile 714-966-1002

6
   Attorneys for Wellgen Standard, LLC
7
                    **UNITED STATES BANKRUPTCY COURT**
8
                    **CENTRAL DISTRICT OF CALIFORNIA**
9
                        **LOS ANGELES DIVISION**
10
   In re:                          ) Case No. 2:18-bk-15829-NB
11                                  )
   PHILIP JAMES LAYFIELD,           ) Chapter 7
12                                  )
                Debtor.             ) Hon. Neil W. Bason
13                                  )
14                                  ) **WELLGEN STANDARD,**
                                    ) **LLC'S RESPONSE TO**
15                                  ) **ALLEGED DEBTOR**
                                    ) **PHILIP JAMES LAYFIELD'S**
16                                  ) **MOTION TO DISMISS**
                                    ) **INVOLUNTARY CASE**
17
18                                  DATE: October 24, 2018
                                    TIME: 10:00 A.M.
19                                  CTRM: 1545
                                        255 E. Temple Street
20                                      Los Angeles, California 90012
21
22 _____

   TO THE    HONOR  ABLE NEIL W    . BASON,    UNITED STATES
23
   BANKRUPTCY COURT JUDGE, THE    O FFICE OF THE UNITED STATES
24
   TRUSTEE, THE DEBTOR AND PARTIES IN INTEREST:
25
26
27
28

1         Wellgen Standard, LLC ("Wellgen"), successor in interest to Advocate Capital,

2  Inc. ("Advocate"), files this Response ("Response") to Alleged Debtor  Philip J ames

3  Layfield's Motion to D ismiss Involuntary Case  (the "Motion to Dism iss").  In support

4  of its Response, W    ellgen subm its the    following Memorandum  of Points and

5  Authorities.

# TABLE OF CONTENTS

I.     PROCEDURAL BACKGROUND ................................................................. 1

II.    ARGUMENT ............................................................................................. 3

    A.  Mr. Layfield's Failure to Timely Comply with Rules 1011(b), 1018
        and 7005 of the Federal Rules of Bankruptcy Procedure Entitles the
        Petitioning Creditors to the Entry of an Order for Relief ............................ 3

    B.  The Petitioning Creditors' Claims Are Not the Subject of a *Bona
        Fide* Dispute, and, therefore, the Petitioning Creditors Are Entitled
        to the Entry of an Order for Relief. .............................................................. 3

    C.  *Bona Fide* Dispute. ...................................................................................... 4

    D.  Wellgen's Claim ............................................................................................ 6

    E.  The L&B's Trustee's Claim. ......................................................................... 9

    F.  Alliance's Claim ........................................................................................... 12

III.   CONCLUSION .......................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baldwin v. Marina City Properties, Inc.,*
 79 Cal.App.3d 393, 145 Cal.Rptr. 406 (Cal. App., 2d Dist. 1978) ...........................10

*Campo v. American Corrective Counseling Services, Inc.,*
 2009 WL 10673198 (C.D. Cal. 2009) ....................................................................7

*Chicago Title Ins. Co., v. Seko Investment, Inc.,*
 156 F.3d 1005 (9th Cir. 1998)...............................................................................9

*In re Clignett,*
 567 B.R. 583 (Bankr. C.D. Cal. 2017) ...................................................................5

*In re Fernandez,*
 227 B.R. 174 (9th Cir. BAP 1998) .........................................................................4

*Focus Media, Inc. v. Nat'l Broad. Co. Inc.,*
 378 F.3d 916 (9th Cir. 2004).................................................................................5

*Gruntz v. County of Los Angeles (In re Gruntz),*
 202 F.3d 1074 (9th Cir.2000)................................................................................7

*Ingersoll–Rand Financial Corp. v. Miller Mining Co.,*
 817 F.2d 1424 (9th Cir. 1987). This District Court Action.........................................7

*Key Mechanical Inc. v. BDC 56 LLC (In re BDC LLC),*
 330 F.3d 111 (2d Cir.2003)...................................................................................5

*In re Lindsey,*
 2016 WL 1122243 (9th Cir. BAP Mar. 21, 2016) ....................................................4

*In re Marciano,*
 446 B.R. 407 (Bankr. C.D. Cal. 2010), *aff'd,* 708 F.3d 1123 (9th Cir.
 2013) ..................................................................................................................5

*Meehan v. Ocwen Loan Servicing, LLC (In re Meehan),*
 2014 WL 4801328 (9th Cir. BAP 2014) .................................................................8

*In re Mountain Dairies, Inc.,*
 372 B.R. 623 (Bankr. S.D.N.Y. 2007) ...................................................................5

*In re O'Neil,*
 1997 WL 615661 (Bankr. Minn. 1997)..................................................................10

*Parker v. Bain,*
 68 F.3d 1131 (9th Cir. 1995).................................................................................7

*Platinum Fin. Servs. Corp. v. Byrd (In re Byrd)*,
 357 F.3d 433 (4th Cir.2004) ......................................................................5

*Reed v. Federal National Mortgage Ass'n*,
 2014 WL 12639135 (C.D. Cal. Dec. 5, 2014) ...........................................8

*Rimell v. Mark Twain Bank (In re Rimell)*,
 946 F.2d 1363 (8th Cir.1991) ....................................................................5

*In re Rothery*,
 143 F.3d 546 (9th Cir. 1998) ...................................................................3, 4

*In re Rubin*,
 769 F.2d 611 (9th Cir. 1985) .....................................................................1

*Shalant v. State Bar of California*,
 699 Fed.Appx. 724 (9th Cir. 2017) ..........................................................10

*In re Stoll*,
 252 B.R. 492 (9th Cir. BAP 2000) .............................................................8

*Valencia-Alvarez v. Gonzalez*,
 469 F.3d 1319 (9th Cir. 2006) ....................................................................6

*In re Vortex Fishing Systems, Inc.*,
 277 F.3d 1057 (9th Cir. 2002) ....................................................................5

**Statutes**

11 U.S.C § 303 .......................................................................................1, 5, 9

11 U.S.C. § 323 ...........................................................................................8

11 U.S.C. § 362(a)(1) ..................................................................................7

11 U.S.C. § 553(a)(2)(A) ...........................................................................11

Cal. Bus. & Prof. Code § 6083(a) .............................................................10

Cal. Bus. & Prof. Code § 6084(a) .............................................................10

**Other Authorities**

Fed. R. Bankr. Pro. 1011 ...................................................................2

Fed. R. Bankr. Pro. 1018 ................................................................2, 3

Fed. R. Bankr. Pro. 1013(b) ...............................................................3

Fed. R. Bankr. Pro. 7005 ................................................................2, 3

Fed. R. Civ. Pro. 12(a) ......................................................................1

Fed. R. Civ. Pro. 12(b) ......................................................................2

Fed. R. of Civ. Pro. 60(b) ................................................................6,7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PROCEDURAL BACKGROUND

On May 21, 2018, W ellgen, Alliance Legal Solutions, LLC   ("Alliance"), and

Richard M. Pachulski, Chapter 11 Trust  ee of Layf ield & Barre tt, APC (the "L&B

Trustee") filed an invo luntary p etition (the "Involuntary Petition") ag ainst th e alleg ed

debtor Mr. Philip James Layfield ("Layfield").  Wellgen, Alliance and the L&B Trustee

(the "Petitioning Creditors") filed the Involuntary Petition pursuant to Section 303(b)(1)

of the Bankruptcy Code, which provides as follows:

> An involuntary case against a person is commenced by the filing with the
> bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each  of wh ich is either a ho lder of a claim
> against such person that is not contingent as to liability or the subject of a
> bona fide dispute as to liability    or am ount, or an indenture trustee
> representing such a holder, if su   ch noncontingent, undisputed claim  s
> aggregate at least $15,775 m ore than the value of any lien on property of
> the debto r s ecuring such claim s held by the holders of such claim  s ....

11 U.S.C § 303(b).[1]

On May 23, 2018, W  ellgen m oved for the appointm ent of an interim  trustee

pursuant to 11 U.S.C. § 303(g).  (Docket N o. 5.)  On May 30, 2018,  this Court granted

Wellgen's motion, and Mr. W  esley H. Avery   was appointed the interim  trustee (the

"Interim Trustee"). (Docket Nos. 13 and 15.)

Due to delays in    service caused by Mr  . L ayfield's incarc eration, subsequent

release on bond and now house arrest in Dela      ware, Mr. Layfield's response to the

Involuntary Petition was not due until Sept ember 14, 2018. Mr. Layfield was required

to properly file and serve an answ    er under  Rule 12(a) of the Federal Rules of Civil

---

[1] Con trary to  Mr. Lay field's assertion s in  his M otion to D ismiss, Sectio n 303 's r equirements ar e no t
subject matter jurisdictional. *See In re Rubin*, 769 F.2d 611, 614 (9th Cir. 1985).

Procedure or a m otion in accord ance with Rule 12(b) of the Federal Rules of Ci    vil

Procedure. Fed. R. Bankr. Pr o. 1011(b).  Moreover, when f iling his answer or m otion,

Mr. Layfield was required to comply w    ith Rule 7005 of the Federal Rules of

Bankruptcy Procedure. Fed. R. Bankr. Pro. 1018.

     Rather than tim ely and properly filing    and serving an answ  er or m otion as

required by Rules 1011(b),    1018 and 7005, Mr. Layfield m    ailed his Declaration in

Support of Motion to Dism    iss Involuntary   Case (the "Declaration") to W    ellgen's

counsel.  A copy of the Declaration is att    ached hereto as Exhibit A.  Although the

Declaration referred to a m otion to dism iss, the Declaration was not accom panied by a

motion to dism iss.  No certificate of serv    ice was attached to the D    eclaration, and

Wellgen is unsure whether Mr. Layfield provid ed a copy of the Decla ration to any one

other than Wellgen.  Mr. Layfield purported to set a hearing on his im aginary motion to

dismiss on October 22, 2018.

     This Court conducted a status conferen ce in this case on Septem ber 18, 2018, at

which Mr. Layfield appeared    telephonically.  This Court    directed Mr. Layfield to

properly file and serve his m    otion to dism iss and the Declaration, and scheduled a

hearing for October 24, 2018.  On October    1, 2018, Mr. Layfield filed the Motion to

Dismiss.  The Motion to Dism    iss relies on   the Declaration and the various Exhibits

attached thereto.  Desp ite this Court's direct ion, Mr. Layfield did not properly file and

serve the Motion to Dismiss and/or the Declaration.    (Docket No. 56.)

2

## II.    ARGUMENT

### A.    Mr. Layfield's Failure to Timely Comply with Rules 1011(b), 1018 and 7005 of the Federal Rules of Bankruptcy Procedure Entitles the Petitioning Creditors to the Entry of an Order for Relief.

Mr. Layfield's failure to timely file an answer or motion as required by Rules 1011(b), 1018 and 7005 entitles the Petitioning Creditors to the entry of an order for relief. Rule 1013(b) of the Federal Rules of Bankruptcy Procedure provides that "[i]f no pleading or other defense to a petition is filed within the time provide by Rule 1011, the Court, on the next day, or as soon thereafter as practicable, shall enter an order for relief requested in the petition." Here, there is no dispute that Mr. Layfield failed to timely file and serve an answer or motion. Moreover, even after being instructed by the Court to do so, Mr. Layfield still has not filed and properly served the Motion to Dismiss and/or the Declaration. Thus, the Petitioning Creditors are entitled to the entry of an order for relief. Fed. R. Bankr. P. 1013(b).

### B.    The Petitioning Creditors' Claims Are Not the Subject of a Bona Fide Dispute, and, therefore, the Petitioning Creditors Are Entitled to the Entry of an Order for Relief.

Were this Court to excuse Mr. Layfield's failure to timely comply with 1011(b), 1018 and 7005, this Court should treat the Motion to Dismiss and the Declaration as a motion for summary judgment and enter summary judgment in favor of the Petitioning Creditors. The Ninth Circuit Court of Appeals did just that in *In re Rothery*, 143 F.3d 546 (9th Cir. 1998). There, one petitioning creditor filed an involuntary petition. The alleged debtor filed a motion to dismiss claiming that she had more than 12 creditors. The petitioning creditor filed a response including numerous documents and declarations to establish that the alleged debtor did not have more than 12 creditors.

The Bankruptcy Court converted the alleged debtor's motion to dismiss to one for summary judgment and entered summary judgment for the petitioning creditor *sua sponte*.

The Ninth Circuit affirmed the Bankruptcy Court's decision holding that summary judgment was appropriate because the alleged debtor had a full opportunity to "ventilate" the issues raised in the motion to dismiss and the alleged debtor's unsupported allegations that she had more than 12 creditors were insufficient to withstand summary judgment. *Rothery*, 143 F.3d at 549; *see also In re Fernandez*, 227 B.R. 174, 180 (9th Cir. BAP 1998) (court may sua sponte grant summary judgment without notice if the losing party has had a full and fair opportunity to ventilate the issues involved in the motion); *In re Lindsey*, 2016 WL 1122243, *7 (9th Cir. BAP Mar. 21, 2016) (same).

Like the alleged debtor in *Rothery*, Mr. Layfield's Motion to Dismiss and Declaration allege that the claim of each Petitioning Creditor is the subject of a *bona fide* dispute and attaches a plethora of documents. As set forth below, Mr. Layfield's assertions that the Petitioning Creditors' claims are the subject of a *bona fide* dispute are frivolous, and, insufficient to withstand summary judgment. Moreover, Mr. Layfield does not deny that he is not "generally paying his debts as they become due." Indeed, it is undisputed that Mr. Layfield is not paying his debts as they become due. Mr. Layfield has not paid the Petitioning Creditors and has not paid any of the amounts he was ordered to pay by the California State Bar Court.

C. **Bona Fide Dispute**.

The burden is on the petitioning creditors to make a *prima facie* showing that their claims are not the subject of a *bona fide* dispute as to liability or amount. *In re*

4

*Marciano*, 446 B.R. 407, 422 (Bankr. C.D. Cal. 2010),    *aff'd*, 708 F.3d 1123 (9th Cir.

2013)); see also *In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2002);

*In re Mountain Dairies, Inc.*, 372 B.R. 623, 633–34 (Bankr. S. D.N.Y. 2007).  Once the

petitioning creditors meet their burden, the      burden shifts to the alleged debtor to

demonstrate that a *bona fide* dispute exists as to either liability or amount.  *Marciano*,

446 B.R. at 422; *see also Platinum Fin. Servs. Corp. v. Byrd (In re Byrd)*, 357 F.3d 433,

438 (4th Cir.2004);  *Key Mechanical Inc. v. BDC 56 LLC (In re BDC LLC)*, 330 F.3d

111, 118 (2d Cir.2003); *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365

(8th Cir.1991).

      The term "*bona fide* dispute" is not  defined by the Bankruptcy Code.  The

primary purpose of the § 303(b) eligibility requirements is to prevent a creditor from

using the involuntary petition as a club to coerce a debtor  to pay debts even when the

debtor's reason for not paying is a legitimate dispute as to its liability.  The Ninth

Circuit has adopted a standard that requires the Court to "determine whether there is an

objective basis for either a factual or legal dispute as to the validity of the debt."

*Vortex*, 277 F.3d at 1064 ( *quoting In re Busick*, 831 F.2d 745, 750 (7th Cir.1987)).

Moreover, to constitute a *bona fide* dispute, a dispute "as to liability must affect whether

the claim amount is above or below the statutory requirement" of $15,775.   *In re

Clignett*, 567 B.R. 583, 589 (Bankr. C.D. Cal. 2017);      *see also Focus Media, Inc. v.

Nat'l Broad. Co. Inc.*, 378 F.3d 916, 926 (9th Cir. 2004).  Because the standard is an

objective one, a debtor's subjective intent or belief is irrelevant, and the mere or

conclusory denial of a claim's validity or amount is not sufficient to create a *bona fide*

dispute. *See BDC 56 LLC*, 330 F.3d at 118; *Rimell*, 946 F.2d at 1365.

**D.    Wellgen's Claim.**

Mr. Layfield claims that Wellgen's claim is the subject of a *bona fide* dispute because he recently moved to set aside Wellgen's judgment against Mr. Layfield. (Declaration ¶ 5.) The facts surrounding Wellgen's judgment are not in dispute. On September 18, 2017, Advocate filed an action against Mr. Layfield in the United States District Court for the Central District of California, Case No. SACV 17-01628 AG (DFM) (the "District Court Action"). On December 12, 2017, Advocate obtained a default judgment against Mr. Layfield in the amount of $4,488,153.80 (the "Judgment"). Advocate later assigned the Judgment to Wellgen. (District Court Action, Docket No. 52.)

On February 6, 2018, Mr. Layfield filed his Motion to Set Aside Judgment under Rule 60(b) of the Federal Rules of Civil Procedure (the "First Rule 60(b) Motion") claiming that he had not been properly served with the Complaint in the District Court Action. (District Court Action, Docket No. 41.) On April 27, 2018, the District Court denied the First Rule 60(b) Motion on the merits. (District Court Action, No. 50.) Mr. Layfield did not appeal the denial of his First Rule 60(b) Motion. The District Court's denial of Mr. Layfield's First Rule 60(b) motion is final and non-appealable and bars any claim by Mr. Layfield that he was not properly served. The District Court's denial of the First Rule 60(b) Motion constitutes a final order on the merits of Mr. Layfield's claims regarding service of process, and, therefore, Mr. Layfield's claims regarding service of process are barred by *res judicata*. *See, e.g., Valencia-Alvarez v. Gonzalez*, 469 F.3d 1319, 1323-1324 (9th Cir. 2006) (final judgment on the merits in separate action is entitled to *res judicata* effect).

6

Subsequent to the filing of the Invol untary Petition, Mr. La yfield again m oved the District Court to set aside the Judg ment under Rule 60(b) based on the sam e arguments he raised in his First Rule 60(b) Motion (the "Second Ru le 60(b) Motion"). (District Court Action, Docket No. 53). The Second Rule 60(b) Motion c onstitutes a blatant violation of the autom atic stay. Under Section 362(a)(1 ), the filing of an involuntary petition stays the commencem ent or continuation of any action against the debtor that was or could have been comm enced prior to the filing of the involuntary petition. 11 U.S.C. § 362(a)(1); *see also Ingersoll–Rand Financial Corp. v. Miller Mining Co.*, 817 F.2d 1424, 1426 (9th Cir. 1987). Th is District Court Action is against Mr. Layfield and it was commenced prior to the filing of the involuntary petition against Mr. Layfield. Thus, the District Court Action is stayed.

The fact that Mr. Layfield, rather th an W ellgen, filed the Second Rule 60(b) Motion and is seeking relief m akes no difference. "'[W ]hether a case is subject to the automatic stay m ust be determ ined at it s inception. That determ ination should not change depending on the particular stage of the litiga tion at which the f iling of the petition in bankruptcy occurs.'" *Ingersoll–Rand Financial*, 817 F.2d at 1426 ( *quoting Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60, 62 (6th Cir.1983)); *see also Parker v. Bain*, 68 F.3d 1131, 1135 (9th Ci r. 1995) (section 362(a)(1) stays appeal by the debtor where the underlying action is against the debtor).

Because Mr. Layfield filed his Second Ru le 60(b) Motion in violatio n of the automatic stay, it is a n ullity. Lega l proceedings in vio lation of the autom atic stay are void. *See Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1082 (9th Cir.2000) ("actions tak en in violation of the autom atic stay are vo id"); *Campo v.*

7

*American Corrective Counseling Services, Inc.*, 2009 W L 10673198, *7 (C.D. Cal. 2009) (same).

Even if the District Court Action we re not stayed, Mr. Layfield had no standing to prosecute or seek any relief in the Distri ct Court Action. Only the Interim Trustee in this case has standing to prosecute or seek relief in the District Court Action. *See* 11 U.S.C. § 323. The Interim Trus tee is the legal representative of Mr. Layfield's bankruptcy estate and only the Interim Trustee has the capacity to sue an d be sued. *Id.*; *see also In re Stoll*, 252 B.R. 492, 495 (9th Cir. BAP 2000); *Meehan v. Ocwen Loan Servicing, LLC (In re Meehan)*, 2014 WL 4801328 (9th Cir. BAP 2014). The Interim Trustee has taken no action to contest or set aside the Judgment.

Mr. Layfield m akes the extraord inary statement that, even if W ellgen's judgment is valid, "the amounts claimed are disputed due to offsets, improper allocation of interest accruals and paym ents and a failure to account for atto rney fees and costs." (Declaration ¶ 22.) Mr. Layfield also allege s, without any support, that Advocate failed to mitigate its dam ages, failed to exercise reasonable diligence in the f ace of a pending default on its loan and failed to protect its lien. (Motion to Dismiss at p. 15.) Although Mr. Layfield was recently disb arred, he is undoubtedly familiar with the doctrine of *res judicata* or claim preclusion. Claim preclusion is applicable to default judgm ents and bars all claim s and defenses to recovery regardless of whether they were ra ised or determined in the prior action. *See, e.g., Reed v. Federal National Mortgage Ass'n*, 2014 WL 12639135, *8 (C.D. Cal. Dec. 5, 2014).

Mr. Layfield speculates that W ellgen m ay have received paym ents since the entry of the Judgm ent that would reduce the am ount of the Judgm ent. Attached hereto as <u>Exhibit B is</u> the D eclaration of Dan A. Taussig, which sets forth all payments

8

received by Advocate and/or W ellgen since th e entry of the Judgm ent. Even if these

payments were applied to the face amount of the Judgment, rather than atto rney's fees,

post-judgment interest and other costs of collection, the am ount outstanding under the

Judgment far exceeds the $15,775 required under Section 303(b)(1).

Mr. Layfield makes the patently ridiculous and wholly unsubstantiated assertion

that he h as "claims against Advocate and consp irators that r esulted in [his] indictment

and illegal detention," and that su ch cl aims exceed any claim s that W ellgen, as

successor to Advocate, m ay ha ve. (Declaration ¶ 22.) Mr . Layfield's assertion is

limited to th is single sen tence, and o ffers nothing more regarding these alleged claims .

Mr. Layfield's assertion is frivolous. Mr. La yfield's assertion that Advocate is part of

some grand conspiracy is also irrelevant. Wellgen's Judgment arises out of Advocate's

loan to Layfield & Barrett, APC ("L&B" ) and Mr. Barrett. (D istrict Court Action,

Docket No. 1.) On the other hand, Mr. Layfield's alleged claims against Advocate arise

from an alleged conspiracy to cause the United States government to indict and illegally

detain Mr. Layfield. Any claim that Mr. Layfield m ay have does not arise from the

same transaction o r occurrence as Wellgen's Judgm ent, and, theref ore, does not give

rise to a *bona fide* dispute regarding Wellgen's claim . *See Chicago Title Ins. Co., v.
Seko Investment, Inc.*, 156 F.3d 1005, 1008-1009 (9 th Cir. 1998) (counterclaim arising

out of a tran saction or occurrence other than the transaction or occurrence on which the

petitioning creditor's claim is based, cannot be relied on to create a *bona fide* dispute).

### E.    The L&B's Trustee's Claim.

Mr. Layfield's Declaration denies that the L&B Trustee has a claim against him

but offers no explanation, support or evid ence to support his denial. The L&B' s

Trustee's claim arises from Mr. Layfield 's conversion of funds from L&B's trust

accounts. The elements of a cause of action for conversion are (i) the plaintiff's ownership or right to possession of the property, (2) the defendant's conversion by a wrongful act or disposition of property rights, and (3) damages. *See, e.g., Baldwin v. Marina City Properties, Inc.*, 79 Cal.App.3d 393, 145 Cal.Rptr. 406 (Cal. App., 2d Dist. 1978). Here, these elements are easily satisfied as a matter of law.

On May 18, 2018, the State Bar Court of California found that Mr. Layfield had misappropriated funds from L&B's trust accounts. A copy of that decision is attached hereto as Exhibit C. L&B was entitled to possession of the funds in its trust accounts, and, as the State Bar Court found, Mr. Layfield wrongfully misappropriated and disposed of those funds. (*Id.*) L&B suffered damages in the form of L&B's liability to its clients for the amounts Mr. Layfield misappropriated. *See In re O'Neil*, 1997 WL 615661 (Bankr. Minn. 1997) (lawyer that misappropriated client funds liable to law firm for amounts misappropriated under doctrines of conversion, indemnity and implied contract).

Mr. Layfield had 60 days to file a petition for review with the California Supreme Court. *See* Cal. Bus. & Prof. Code § 6083(a). Mr. Layfield did not file such a petition, and, therefore, the State Bar Court's decision is final, enforceable and entitled to *res judicata* effect. *See* Cal. Bus. & Prof. Code § 6084(a); *Shalant v. State Bar of California*, 699 Fed.Appx. 724 (9th Cir. 2017). In *Shalant*, the Ninth Circuit explained held:

> The district court properly dismissed Shalant's action as barred by the doctrine of *res judicata* because Shalant's equal protection claim was raised in a prior California State Bar Court proceeding that resulted in a final judgment on the merits. *See* Cal. Bus. & Prof. Code § 6084(a) ("When no petition to review or to reverse or modify has been filed by either party within the time allowed therefor ... the decision or order of the State Bar

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Court shall be final and enforceab.e."); *Wehrli v. County of Orange*, 175 F.3d 692, 694 (9th Cir. 1999) (accord ing preclusive effect to ad ministrative proceed ings "where judicial rev iew of the adm inistrative adjudication was available but unused"); *see also Holcombe v. Hosmer*, 477 F.3d 1094, 1097 (9th Cir. 2007) (federal courts m ust apply state law regarding res ju dicata to s tate cou rt judgments); *DKN Holdings LLC v. Faerber*, 61 Cal.4th 813, 189 Cal.Rptr.3d 809, 352 P.3d 378, 382 n.1, & 386-87 (2015) (setting forth require ments for res judicata, or claim preclusion, defining prim ary rights doctrine, and discussing privity).

*Id.*

Mr. Layfield's Declaration also ass erts that he recen tly acquired various Proofs of Clai m that Maxim um Legal Holdings , LLC, Maxim um Legal Services, LLC, 855 TrialLawyers.com KPO, Ltd. and Layfield V, LLC filed against L&B (the "Acquired Claims") and that h e is entitled to a setoff against L&B's claim against Mr. Layfield. (Declaration ¶¶ 6-14.) The Bar Date in the L&B case was February 5, 2018. (L &B Bankr., Docket No. 133.) A quick review of the Claim s Regist er i n t he L& B case shows that all the Acquired Claims were filed after the Bar Date. (Proofs of Claim Nos. 304, 306 and 307.) M oreover, even if the Acquired Claim s had been tim ely filed, which they were not, setoff of these clai ms is barred under 11 U.S.C. § 553(a)(2)(A), which prohibits setoff of claims acquired after the commencement of the case.

Mr. Layfield also asserts that he has claims for breach of contract again st L&B. (Declaration ¶¶ 15-17.) Like the Acquired Cl aims, Mr. Layfield's Proof of Claim was filed long after the Bar Date. (Proof of Clai m No. 305.) Moreover, Mr. Layfield's alleged claim for breach of contract ag ainst L&B does not arise from the sam e transaction or occurrence as the L &B Truste e's conversion claim . Thus, even if Mr. Layfield had tim ely filed his Proof of Claim , which he di d not, that Proof of Cl aim would not give rise to a *bona fide* dispute. *See Seko Investment, Inc.*, 156 F.3d at 1008-

11

1009 (counterclaim arising out of a transaction or occurrence other than the transaction or occurrence on which the petitioning credit or's claim is based, cannot be relied on to create a bona fide dispute).

**F.    Alliance's Claim.**

Mr. Layfield's Declaration does not deny that he is indebted to Alliance. Instead, Mr. Layfield makes the conclusory and indecipherable statement that Alliance "is partially responsible for any losses th    at incur and form the basis of a good faith defense." (Declaration ¶ 23.)  Mr. Layfield also asserts th at the amount he owes to Alliance is unclear because Alliance may have received payments of which he is not aware.  Mr. Layfield's conclusory statements regarding the amount of Alliance's claim do not give rise to a *bona fide* dispute.  Attached here to as <u>Exhibit D</u> is the Declaration of Cheryl Kaufm an, refuting Mr. Layfield    's speculation regarding the am    ount of Alliance's claim.

**III.    CONCLUSION**

For the reasons set forth above, W ellgen prays that this Court enter the order for relief requested in the Involuntary Petition a nd grant such further relief as it deems just and proper.

Dated: October 11 , 2018          WEILAND GOLDEN GOODRICH LLP


By:  /s/ FAYE C. RASCH
          Faye C. Rasch
          Attorneys for Wellgen Standard LLC

Philip J. Layfield, Pro Se
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20006
Telephone: (202) 904-4409
phil@maximum.global

Alleged Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

In re:

      v.

Philip James Layfield,

    Debtor

Case No.: 2:18-bk-15829-NB

Chapter 7

Assigned to: Hon. Neil Bason

**ALLEGED DEBTOR PHILIP J. LAYFIELD'S DECLARATION IN SUPPORT OF MOTION TO DISMISS INVOLUNTARY CASE**

**HEARING DATE: OCTOBER 22, 2018**
**HEARING TIME: 8:30 AM**
**COURTROOM:    1545**

I, Philip J. Layfield, hereby Declare as follows:

1.    I am the alleged debtor in this involuntary bankruptcy case and am appearing pro se.

2.    I have personal knowledge of the facts stated herein.

3.    If called upon to testify, I could and would testify to the facts stated to herein.

4.    To the extent necessary, I reaffirm and incorporate by reference the truth of all statements I have made in my previous declarations filed with this Court.

1

EXHIBIT A  PAGE  13

5.    On September 5, 2018, I filed an Objection to the Appointment of an Interim Trustee and Employment of Jeffrey Golden's law firm via Docket # 37.  Attached as an Exhibit to that Objection is the Motion for Reconsideration to Set Aside the Fraudulently Obtained Default Judgment of Advocate Capital who later assigned the void judgment to its alter ego and parent company Wellgen.

6.    Attached as Exhibit 1 is a true and correct copy of the Proof of Claim (based in large part upon an executory contract) filed in my individual capacity against L&B valued at $35,000,000.

7.    Attached as Exhibit 2 is a true and correct copy of the Proof of Claim filed on behalf of Maximum Legal Holdings, LLC valued at $1,250,000, which was subsequently assigned to me personally.

8.    Attached as Exhibit 3 is a true and correct copy of the Proof of Claim filed on behalf of Maximum Legal Services, LLC (based in large part upon an executory contract) valued at $175,000 and subsequently assigned to me personally.

9.    Attached as Exhibit 4 is a true and correct copy of the Proof of Claim filed on behalf of 855 TrialLawyers.com KPO, Ltd. (based in large part upon an executory contract) valued at $6,486,370 and subsequently assigned to me personally.

10.    Attached as Exhibit 5 is a true and correct copy of the Proof of Claim filed on behalf of Layfield V, LLC (based in large part upon an executory contract) valued at $360,000 and subsequently assigned to me personally.

11.    Attached as Exhibit 6 is a true and correct copy of the Transfer of Claim assigning the Maximum Legal Holdings, LLC Proof of Claim to me personally.

12.    Attached as Exhibit 7 is a true and correct copy of the Transfer of Claim assigning the Maximum Legal Services, LLC Proof of claim to me personally.

13.    Attached as Exhibit 8 is a true and correct copy of the Transfer of Claim assigning the 855 TrialLawyers.com KPO, Ltd. Proof of Claim to me personally.

14.    Attached as Exhibit 9 is a true and correct copy of the Transfer of Claim assigning the Layfield V, LLC Proof of Claim to me personally.

2

1    15.   Attached as Exhibit 10 is a true and correct copy of my Employment Contract

2    with L&B entitling me to $1,000,000 per year in guaranteed compensation.

3    16.   Attached as Exhibit 11 is a true and correct copy of my Indemnification

4    Agreement with L&B.

5    17.   Attached as Exhibit 12 is a true and correct copy of my request for

6    indemnification to Pachulski which has thus far not only been ignored, but has

7    resulted in Pachulski deliberately trying to harm me as a former officer, director and

8    owner rather than conduct an appropriate investigation into whether indemnification

9    should have been provided.

10    18.   Attached as Exhibit 13 is the termination letter provided to L&B's former IT

11    Director demonstrating that he was terminated and advised to comply with his

12    obligations to provide passwords and return property and further advised of his

13    continuing obligations. This is the same individual that Aveis attempted to use

14    during my bond hearing to claim that I was a danger to the community. This ex-

15    employee also illegally hacked into our computer network and downloaded a video

16    that was illegally obtained fo the purpose of engaging in an overt act to further

17    violoated my civil rights by keeping me illegally detained.

18    19.   Attached as Exhibit 14 is a true and correct copy of an email to Pachulski

19    advising him of the steps needing to be taken in order to preserve the value of the

20    L&B assets, which to date has gone largely ignored. Pachulski's decision to fire all

21    clients with the consent and insistence of Advocate Capital/Wellgen have further

22    exacerbated the losses to L&B and its clients.

23    20.   Attached as Exhibit 15 is a true and correct copy of an Opposition filed to the

24    Employment of Richard Pachulski and his law firm showing that Pachulski is

25    willing to sacrifice the interests of his clients for his own personal financial gain.

26    21.   At the time of the Involuntary Petition being filed against me, I had no less

27    than 15 creditors.

28

3

1      22.   At the time of the Involuntary Petition being filed against me, the amount

2      owed under the Advocate Capital Judgment was disputed as to validity and as to the

3      amount of the claim. Since the underlying judgment was obtained due to lack of

4      service and fraud, the underlying judgment is void as a matter of law and subject to

5      being set aside. Even if the judgment were valid, the amounts claimed are disputed

6      due to offsets, improper application of interest accruals and payments and a failure

7      to properly account for attorney fees and costs. Furthermore, my claims against

8      Advocate and co-conspirators that resulted in my indictment and illegal detention,

9      which is based in large part upon false and misleading information provided, forms

10      the basis for a multi-million claim against those alleged wrongdoers which far

11      exceeds the value of any potential claim advocate may claim.

12      23.   At the time of the Involuntary Petition being filed against me, the amount

13      owed under the Alliance Legal Solutions, LLC claim is under dispute as well as the

14      validity of their claim. Alliance is partially responsible for any losses that incur and

15      form the basis for a good faith defense against any claim by Alliance. Furthermore,

16      it is unclear as to whether monies have come in from the cases subject to the lien and

17      whether a proper allocation of proceeds has been made with respect to interest,

18      principal, default interest and fees.

19      24.   At the time of the Involuntary Petition being filed against me, Richard

20      Pachulski had no viable claims against me personally and had no judgments against

21      me for any monetary value. In fact, rather than being a debtor of Layfield & Barrett

22      or Pachulski, I am the largest creditor of Layfield & Barrett. Furthermore, as a result

23      of Pachulski's misconduct along with the rest of his law firm, who are his agents, I

24      have significant claims against him personally which far exceeds any fictitiou claim

25      he purports to have perfected against me personally. Any claim Pachulski attempts

26      to raise will be proven to have no basis in law, fact and certainly could never be

27      classified as not being subject to a bona fide dispute..

28

4

EXHIBIT A PAGE 16

1    I declare under penalty of perjury under the laws of the United States that the
foregoing is true and correct to the best of my knowldedge, information and belief.

2

3    Dated this 8th day of September 2018 at Millsboro, DE.

4

5

6                                    By:/s/ Philip J. Layfield

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

EXHIBIT A  PAGE  17

# EXHIBIT 1

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Layfield & Barrett, APC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 2:17-bk-19548-NB |

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | **Philip J. Layfield** | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☑ No | |
| | ☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Philip Layfield** | |
| | Name | Name |
| | **1875 K Street N.W.** | |
| | Number    Street | Number    Street |
| | **Washington DC        20006** | |
| | City    State    ZIP Code | City    State    ZIP Code |
| | Contact phone **(202) 904-4409** | Contact phone |
| | Contact email **philip.layfield@icloud.com** | Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | – – – – – – – – – – – – – – – – – – – – – – – – – – | |
| 4. Does this claim amend one already filed? | ☑ No | |
| | ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No | |
| | ☐ Yes. Who made the earlier filing? _____ | |

EXHIBIT A  PAGE  19

**Part 2:   Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |
| 7. How much is the claim? | $_____ 35,000,000.00. Does this amount include interest or other charges?<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>unpaid wages, money loaned, etc.  See Attachment A _____ |
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>Nature of property:<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>Basis for perfection: _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:                     $_____<br>Amount of the claim that is secured:   $_____<br><br>Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition:   $_____<br><br>Annual Interest Rate (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____ |
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

EXHIBIT A  PAGE  20

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use: 11 U.S.C. § 507(a)(7). | $_____ |
| ☑ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $   12,475.00 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/14/2018
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

Name         Philip              James              Layfield
             First name          Middle name        Last name

Title        _____

Company      _____
             Identify the corporate servicer as the company if the authorized agent is a servicer.

Address      1875 K Street N.W.
             Number    Street
             Washington    DC                          20006
             City                          State    ZIP Code

Contact phone  (202) 904-4409              Email _____

EXHIBIT A  PAGE  21

# EXHIBIT 2

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Layfield & Barrett, APC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 2:17-bk-19548-NB |

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Maximum Legal Holdings, LLC <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor |
| 2. Has this claim been acquired from someone else? | ☐ No <br> ☐ Yes. From whom? |
| 3. Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Philip Layfield <br> Name <br> 1875 K Street N.W. <br> Number      Street <br> Washington DC            20006 <br> City            State            ZIP Code <br><br> Contact phone (202) 904-4409 <br><br> Contact email  philip.layfield@icloud.com <br><br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> | **Where should payments to the creditor be sent? (if different)** <br><br> Name <br><br> Number      Street <br><br> City            State            ZIP Code <br><br> Contact phone <br><br> Contact email |
| 4. Does this claim amend one already filed? | ☐ No <br> ☐ Yes.  Claim number on court claims registry (if known) _____      Filed on _____ <br> MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☐ No <br> ☐ Yes.  Who made the earlier filing? _____ |

Official Form 410                    Proof of Claim                    page 1

EXHIBIT A  PAGE  23

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☐ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___  ___  ___  ___ |

| | |
|---|---|
| 7. How much is the claim? | $_____1,250,000.00____ Does this amount include interest or other charges?<br>☐ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>legal fees owed pursuant to Pineda settlement |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☐ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>Nature of property:<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>Basis for perfection: _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:                          $_____<br>Amount of the claim that is secured:     $_____<br><br>Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition:   $_____<br><br>Annual Interest Rate (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☐ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☐ No<br>☐ Yes. Identify the property: _____ |

EXHIBIT A  PAGE  24

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | Amount entitled to priority |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/14/2018
                  MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Philip | James | Layfield |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Manager

Company    Maximum Legal Holdings, LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    1875 K Street N.W.
           Number    Street
           Washington    DC    20006
           City    State    ZIP Code

Contact phone    (202) 904-4409    Email phil@maximum.global

| Print | Save As... | Add Attachment | | Reset |
|---|---|---|---|---|

Official Form 410    Proof of Claim    page 3

EXHIBIT A  PAGE  25

# EXHIBIT 3

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor 1</td><td>Layfield & Barrett, APC</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Central District of California</td></tr>
<tr><td>Case number</td><td>2:17-bk-19548-NB</td></tr>
</table>

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

**1. Who is the current creditor?**
Maximum Legal Holdings, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**
☐ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Philip Layfield
Name

1875 K Street N.W.
Number    Street

Washington DC          20006
City          State          ZIP Code

Contact phone (202) 904-4409

Contact email philip.layfield@icloud.com

Where should payments to the creditor be sent? (if different)

Name

Number    Street

City          State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**
☐ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☐ No
☐ Yes. Who made the earlier filing? _____

EXHIBIT A  PAGE  27

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____ 1,250,000.00 . Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

legal fees owed pursuant to Pineda settlement _____

**9. Is all or part of the claim secured?**

☐ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:  $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____ 108,000.00

**11. Is this claim subject to a right of setoff?**

☐ No

☐ Yes. Identify the property: _____

EXHIBIT A  PAGE  28

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ❏ No. | | Amount entitled to priority |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ❏ Yes. *Check one:* | | |
| | ❏ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ❏ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ❏ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ❏ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ❏ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ❏ Other. Specify subsection of 11 U.S.C. § 507(a)(_2_) that applies. | | $_____100,000.00 |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3: Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b). If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:* <br><br> ❏ I am the creditor. <br> ❏ I am the creditor's attorney or authorized agent. <br> ❏ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. <br> ❏ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. <br><br> I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. <br><br> I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. <br><br> I declare under penalty of perjury that the foregoing is true and correct. <br><br> Executed on date  08/14/2018 <br>          MM / DD / YYYY <br><br> _____ <br> Signature <br><br> Print the name of the person who is completing and signing this claim: |

| | | | |
|---|---|---|---|
| Name | Phillip | James | Layfield |
| | First name | Middle name | Last name |
| Title | Manager | | |
| Company | Maximum Legal Holdings, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1875 K Street N.W. | | |
| | Number    Street | | |
| | Washington   DC | 20006 | |
| | City | State   ZIP Code | |
| Contact phone | (202) 904-4409 | Email phill@maximum.global | |

| Print | Save As... | Add Attachment | | Reset |
|---|---|---|---|---|

Official Form 410                     Proof of Claim                     page 3

EXHIBIT A  PAGE  29

# EXHIBIT 4

**Fill in this information to identify the case**

| | |
|---|---|
| Debtor 1 | Layfield & Barrett, APC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 2:17-bk-19548-NB |

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

**Part 1:    Identify the Claim**

| | | |
|---|---|---|
| 1. Who is the current creditor? | 855TrialLawyers.com KPO, Ltd. | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☐ No | |
| | ☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | 855 TrialLawyers.com c/o MLS, LLC | |
| | Name | Name |
| | 382 N.E. 191st Street, #42308 | |
| | Number        Street | Number        Street |
| | Miami              FL        33179 | |
| | City              State      ZIP Code | City              State      ZIP Code |
| | Contact phone 866.820.9690 | Contact phone |
| | Contact email info@maximumlegalservices.com | Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| 4. Does this claim amend one already filed? | ☐ No | |
| | ☐ Yes. Claim number on court claims registry (if known) | Filed on _____ MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☐ No | |
| | ☐ Yes. Who made the earlier filing? | |

Official Form 410                                          Proof of Claim                                          page 1

EXHIBIT A  PAGE  31

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed.**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. How much is the claim?    $_____6,486,370.00  Does this amount include interest or other charges?
    ☐ No
    ☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>Services Performed from September 2016 through June 2017</u>

9. Is all or part of the claim secured?

☒ No
☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

Basis for perfection: _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____
Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured:    $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed) _____%
☐ Fixed
☐ Variable

10. Is this claim based on a lease?

☒ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

11. Is this claim subject to a right of setoff?

☒ No
☐ Yes. Identify the property: _____

EXHIBIT A  PAGE  32

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/21/2108
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Philip | James | Layfield |
| | First name | Middle name | Last name |
| Title | Director | | |
| Company | c/o Maximum Legal Services, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 382 NE 191st Street, #42308 | | |
| | Number    Street | | |
| | Miami | FL | 33179 |
| | City | State | ZIP Code |
| Contact phone | 866.820.9690 | Email info@maximumlegalservices.com | |

Official Form 410                             Proof of Claim                             page 3

EXHIBIT A  PAGE  33

855TrialLawyers.com KPO, Ltd.
Supporting Schedules for Proof of Claim

| | |
|---|---|
| Amount Due as of June 1, 2017 | $1,686,370.00 |
| 2 year termination provision (Approximate $200,000 per month) | $4,800,000.00 |
| Total | **$6,486,370.00** |

# EXHIBIT 5

**Fill in this information to identify the case:**

Debtor 1    Layfield & Barrett, APC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number    2:17-bk-19548-NB

Official Form 410

# Proof of Claim                                                      12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Maximum Legal Holdings, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☐ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Philip Layfield
Name

1875 K Street N.W.
Number      Street

Washington DC          20006
City          State          ZIP Code

Contact phone (202) 904-4409

Contact email philip.layfield@icloud.com

**Where should payments to the creditor be sent? (if different)**

Name

Number      Street

City          State          ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____
                                                                     MM / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☐ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410                        Proof of Claim                        page 1

EXHIBIT A  PAGE  36

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6.  Do you have any number you use to identify the debtor? | ☐ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |
| 7.  How much is the claim? | $_____1,250,000.00. Does this amount include interest or other charges?<br>☐ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8.  What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>legal fees owed pursuant to Pineda settlement |
| 9.  Is all or part of the claim secured? | ☐ No<br>☐ Yes.   The claim is secured by a lien on property.<br>Nature of property:<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe:  _____<br><br>Basis for perfection:  _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:                            $_____<br>Amount of the claim that is secured:    $_____<br>Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition:  $_____<br><br>Annual Interest Rate (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |
| 10. Is this claim based on a lease? | ☐ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.    $          108,000.00 |
| 11. Is this claim subject to a right of setoff? | ☐ No<br>☐ Yes. Identify the property: _____ |

EXHIBIT A  PAGE  37

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ **Yes.** *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_2_) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/14/2018
MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Philip | James | Layfield |
| | First name | Middle name | Last name |
| Title | Manager | | |
| Company | Maximum Legal Holdings, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1875 K Street N.W. | | |
| | Number    Street | | |
| | Washington    DC | | 20006 |
| | City | State | ZIP Code |
| Contact phone | (202) 904-4409 | Email phil@maximum.global | |

| Print | Save As... | Add Attachment | Reset |
|---|---|---|---|

Official Form 410                    Proof of Claim                    page 3

EXHIBIT A  PAGE  38

# EXHIBIT 6

B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

### Central District of California

In re LAYFIELD & BARRETT, APC                    ,          Case No.  2:17-bk-19548-NB

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| | |
|---|---|
| Philip James Layfield | Maximum Legal Holdings, LLC |
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee
should be sent:
  1875 Connecticut Avenue N.W., 10th Floor
  Washington DC 20009

Court Claim # (if known): _____
Amount of Claim: ___$1,250,000.00___
Date Claim Filed: ___08/14/2018___

Phone: _2029044409_
Last Four Digits of Acct #: ___8140___

Phone: _2029404409_
Last Four Digits of Acct. #: _____

Name and Address where transferee payments
should be sent (if different from above):

Phone: _____
Last Four Digits of Acct #:_____

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____          Date: 09/04/2018 _____
    Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

EXHIBIT A  PAGE  40

# EXHIBIT 7

B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

Central District of California

In re LAYFIELD & BARRETT, APC _____,                    ·                Case No. 2:17-bk-19548-NB

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee
hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other
than for security, of the claim referenced in this evidence and notice.

| | |
|---|---|
| Philip James Layfield | Maximum Legal Services, LLC |
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee
should be sent:
    1875 Connecticut Avenue N.W., 10th Floor
    Washington DC 20009

Court Claim # (if known): _____
Amount of Claim:    $175,000.00
Date Claim Filed:    09/01/2018

Phone: 2029044409
Last Four Digits of Acct #:      8140

Phone: 2029404409
Last Four Digits of Acct. #: _____

Name and Address where transferee payments
should be sent (if different from above):

Phone: _____
Last Four Digits of Acct #:_____

I declare under penalty of perjury that the information provided in this notice is true and correct to the
best of my knowledge and belief.

By:_____        Date: 09/04/2018_____
    Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

EXHIBIT A  PAGE  42

# EXHIBIT 8

B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

Central District of California

In re LAYFIELD & BARRETT, APC                                    Case No. 2:17-bk-19548-NB

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| | |
|---|---|
| Philip James Layfield | 855 Triallawyers.com KPO |
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee
should be sent:
  1875 Connecticut Avenue N.W., 10th Floor
  Washington DC 20009

Court Claim # (if known): _____
Amount of Claim:    $6,486,370.00
Date Claim Filed:     09/01/2018

Phone: 2029044409
Last Four Digits of Acct #:        8140

Phone: 2029404409
Last Four Digits of Acct. #: _____

Name and Address where transferee payments
should be sent (if different from above):

Phone: _____
Last Four Digits of Acct #: _____

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____          Date: 09/04/2018
     Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

EXHIBIT A  PAGE  44

# EXHIBIT 9

B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

### Central District of California

In re LAYFIELD & BARRETT, APC                            ,            Case No. 2:17-bk-19548-NB

### TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

Phillip James Layfield
Name of Transferee

Name and Address where notices to transferee should be sent:
1875 Connecticut Avenue N.W., 10th Floor
Washington DC 20009

Phone: 2029044409
Last Four Digits of Acct #:      8140

Name and Address where transferee payments should be sent (if different from above):

Layfield V, LLC.
Name of Transferor

Court Claim # (if known):
Amount of Claim:     $360,000.00
Date Claim Filed:      09/01/2018

Phone: 2029404409
Last Four Digits of Acct. #:

Phone:
Last Four Digits of Acct #:

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By:                                              Date: 09/04/2018
        Transferee/Transferee's Agent

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.*

# EXHIBIT 10

**LAYFIELD & BARRETT, APC**

525 S. Douglas Suite 280
El Segundo, CA

December 11, 2015

Philip J. Layfeld
31142 Via Colinas
Coto de Caza, CA 92679

Dear Mr. Layfeld:

Layfield & Barrett, APC, a California professional corporation (the "Company"), is pleased to offer you continued employment with the Company on the terms described below.

1.    Position. You will remain your full-time position as CEO, Managing Partner and Director with no reporting supervisor. Your primary duties will be managing the firm's overall operations and lead trial attorney. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company.

2.    Compensation and Employee Benefits. You will be paid a salary at the rate of $1,000,000 per year, payable on the Company's regular payroll dates. As a regular employee of the Company you will be eligible to participate in a number of Company-sponsored benefits, which are described in our online employee portal.

(a) Car Allowance. You will be provide a monthly car allowance of $2,500 per month.

(b) Association Dues. You will be reimbursed for all bar association dues and other related organizations

3.    Employment Relationship. Employment with the Company is for one year and automatically renews for an additional year unless terminated in writing prior to the expiration of the current year. If you are terminated without cause or you resign for cause, then a severance payment of 24 months will be due and payable as regular salary payments for 24 months following your separation.

4.    Outside Activities. While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company.

5.    Taxes, Withholding and Required Deductions. All forms of compensation referred to in this letter are subject to all applicable taxes, withholding and any other deductions required by applicable law.

6.    **Miscellaneous.**

(a) <u>Governing Law.</u>  The validity, interpretation, construction and performance of this letter, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of state of California, without giving effect to principles of conflicts of law.

(b) <u>Entire Agreement.</u>  This letter sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) <u>Counterparts.</u>  This letter may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

(d) <u>Electronic Delivery.</u>  The Company may, in its sole discretion, decide to deliver any documents or notices related to this Agreement, securities of the Company or any of its affiliates or any other matter, including documents and/or notices required to be delivered to you by applicable securities law or any other law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means.  You hereby consent to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agree to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

*[Signature Page Follows]*

-2-

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. This offer, if not accepted, will expire at the close of business on December 15, 2015.

We look forward to having you join us no later than immediately.

Very truly yours,

LAYFIELD & BARRETT, APC

By: _____
                              (Signature)

Name: Philip Layfield
_____

Title: Director
_____

ACCEPTED AND AGREED:

_____
(Signature)

_____
Date

Anticipated Start Date: December 11, 2015

-3-

# EXHIBIT 11

Layfield & Barrett, APC

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement (this "Agreement") is made as of December 11, 2015, by and between Layfield & Barrett, APC, a California professional corporation (the "Company"), and Philip Layfield ("Indemnitee").

### RECITALS

The Company and Indemnitee recognize the increasing difficulty in obtaining liability insurance for directors, officers and key employees, the significant increases in the cost of such insurance and the general reductions in the coverage of such insurance. The Company and Indemnitee further recognize the substantial increase in corporate litigation in general, subjecting directors, officers and key employees to expensive litigation risks at the same time as the availability and coverage of liability insurance has been severely limited. Indemnitee does not regard the current protection available as adequate under the present circumstances, and Indemnitee may not be willing to continue to serve in Indemnitee's current capacity with the Company without additional protection. The Company desires to attract and retain the services of highly qualified individuals, such as Indemnitee, and to indemnify its directors, officers and key employees so as to provide them with the maximum protection permitted by law.

### AGREEMENT

In consideration of the mutual promises made in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and Indemnitee hereby agree as follows:

1.    **Indemnification.**

     (a) **Third-Party Proceedings.** To the fullest extent permitted by applicable law, as such may be amended from time to time, the Company shall indemnify Indemnitee, if Indemnitee was, is or is threatened to be made, a party to or a participant (as a witness or otherwise) in any Proceeding (other than a Proceeding by or in the right of the Company to procure a judgment in the Company's favor), against all Expenses, judgments, fines and amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld) actually and reasonably incurred by Indemnitee in connection with such Proceeding if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal Proceeding, had no reasonable cause to believe Indemnitee's conduct was unlawful as charged or threatened to be charged.

(b) <u>Proceedings By or in the Right of the Company</u>. To the fullest extent permitted by applicable law, the Company shall indemnify Indemnitee, if Indemnitee was, is or is threatened to be made a party to or a participant (as a witness or otherwise) in any Proceeding by or in the right of the Company to procure a judgment in the Company's favor, against all Expenses actually and reasonably incurred by Indemnitee in connection with such Proceeding if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudicated by court order or judgment to be liable to the Company unless and only to the extent that the Court of Chancery or the court in which such Proceeding is or was pending shall determine upon application that, in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c) <u>Success on the Merits</u>. To the fullest extent permitted by applicable law and to the extent that Indemnitee has been successful on the merits or otherwise in defense of any Proceeding referred to in Section 1(a) or Section 1(b) or the defense of any claim, issue or matter therein, in whole or in part, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee in connection therewith. Without limiting the generality of the foregoing, if Indemnitee is successful on the merits or otherwise as to one or more but less than all claims, issues or matters in a Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee in connection with such successfully resolved claims, issues or matters to the fullest extent permitted by applicable law. If any Proceeding is disposed of on the merits or otherwise (including a disposition without prejudice), without (i) the disposition being adverse to Indemnitee, (ii) an adjudication that Indemnitee was liable to the Company, (iii) a plea of guilty by Indemnitee, (iv) an adjudication that Indemnitee did not act in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and (v) with respect to any criminal Proceeding, an adjudication that Indemnitee had reasonable cause to believe Indemnitee's conduct was unlawful, Indemnitee shall be considered for the purposes hereof to have been wholly successful with respect thereto.

(d) <u>Witness Expenses</u>. To the fullest extent permitted by applicable law and to the extent that Indemnitee is a witness or otherwise asked to participate in any Proceeding to which Indemnitee is not a party, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee in connection with such Proceeding.

2.    <u>Indemnification Procedure</u>.

(a) <u>Advancement of Expenses</u>. To the fullest extent permitted by applicable law, the Company shall advance all Expenses actually and reasonably incurred by Indemnitee in connection with a Proceeding within thirty (30) days after receipt by the Company of a statement requesting such advances from time to time,

-2-

whether prior to or after final disposition of any Proceeding. Such advances shall be unsecured and interest free and shall be made without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement. Indemnitee shall be entitled to continue to receive advancement of Expenses pursuant to this Section 2(a) unless and until the matter of Indemnitee's entitlement to indemnification hereunder has been finally adjudicated by court order or judgment from which no further right of appeal exists. Indemnitee hereby undertakes to repay such amounts advanced only if, and to the extent that, it ultimately is determined that Indemnitee is not entitled to be indemnified by the Company under the other provisions of this Agreement. Indemnitee shall qualify for advances upon the execution and delivery of this Agreement, which shall constitute the requisite undertaking with respect to repayment of advances made hereunder and no other form of undertaking shall be required to qualify for advances made hereunder other than the execution of this Agreement.

(b) **Notice and Cooperation by Indemnitee.** Indemnitee shall promptly notify the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter for which indemnification will or could be sought under this Agreement. Such notice to the Company shall include a description of the nature of, and facts underlying, the Proceeding, shall be directed to the Chief Executive Officer of the Company and shall be given in accordance with the provisions of Section below. In addition, Indemnitee shall give the Company such additional information and cooperation as the Company may reasonably request. Indemnitee's failure to so notify, provide information and otherwise cooperate with the Company shall not relieve the Company of any obligation that it may have to Indemnitee under this Agreement, except to the extent that the Company is adversely affected by such failure.

(c) **Determination of Entitlement.**

(i) **Final Disposition.** Notwithstanding any other provision in this Agreement, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

(ii) **Determination and Payment.** Subject to the foregoing, promptly after receipt of a statement requesting payment with respect to the indemnification rights set forth in Section 1, to the extent required by applicable law, the Company shall take the steps necessary to authorize such payment in the manner set forth in Section 145 of the Delaware General Corporation Law. The Company shall pay any claims made under this Agreement, under any statute, or under any provision of the Company's Certificate of Incorporation or Bylaws providing for indemnification or advancement of Expenses, within thirty (30) days after a written request for payment thereof has first been received by the Company, and if such claim is not paid in full within such thirty (30) day-period, Indemnitee may, but need not, at

-3-

any time thereafter bring an action against the Company in the Delaware Court of Chancery to recover the unpaid amount of the claim and, subject to Section 12, Indemnitee shall also be entitled to be paid for all Expenses actually and reasonably incurred by Indemnitee in connection with bringing such action. It shall be a defense to any such action (other than an action brought to enforce a claim for advancement of Expenses under Section 2(a)) that Indemnitee has not met the standards of conduct which make it permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement and the Company shall have the burden of proof to overcome that presumption with clear and convincing evidence to the contrary. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, or, in the case of a criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful. In addition, it is the parties' intention that if the Company contests Indemnitee's right to indemnification, the question of Indemnitee's right to indemnification shall be for the court to decide, and neither the failure of the Company (including its Board of Directors, any committee or subgroup of the Board of Directors, independent legal counsel, or its stockholders) to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct required by applicable law, nor an actual determination by the Company (including its Board of Directors, any committee or subgroup of the Board of Directors, independent legal counsel, or its stockholders) that Indemnitee has not met such applicable standard of conduct, shall create a presumption that Indemnitee has or has not met the applicable standard of conduct. If any requested determination with respect to entitlement to indemnification hereunder has not been made within ninety (90) days after the final disposition of the Proceeding, the requisite determination that Indemnitee is entitled to indemnification shall be deemed to have been made.

(iii)  **Change of Control**. Notwithstanding any other provision in this Agreement, if a Change of Control has occurred, any person or body appointed by the Board of Directors in accordance with applicable law to review the Company's obligations hereunder and under applicable law shall be Independent Counsel selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld). Such counsel, among other things, will render its written opinion to the Company and Indemnitee as to whether and to what extent Indemnitee would be entitled to be indemnified hereunder under applicable law and the Company agrees to abide by such opinion. The Company agrees to pay the reasonable fees of the Independent Counsel referred to above and to indemnify fully such counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto. Notwithstanding

-4-

any other provision of this Agreement, the Company shall not be required to pay Expenses of more than one Independent Counsel in connection with all matters concerning a single Indemnitee, and such Independent Counsel shall be the Independent Counsel for any or all other Indemnitees unless (i) the Company otherwise determines or (ii) any Indemnitee shall provide a written statement setting forth in detail a reasonable objection to such Independent Counsel representing other indemnitees under agreements similar to this Agreement.

(d) **Payment Directions.** To the extent payments are required to be made hereunder, the Company shall, in accordance with Indemnitee's request (but without duplication), (i) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses.

(e) **Notice to Insurers.** If, at the time of the receipt of a notice of a claim pursuant to Section 2(b) hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies. The Company shall provide to Indemnitee: (i) copies of all potentially applicable directors' and officers' liability insurance policies, (ii) a copy of such notice delivered to the applicable insurers, and (iii) copies of all subsequent correspondence between the Company and such insurers regarding the Proceeding, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(f) **Defense of Claim and Selection of Counsel.** In the event the Company shall be obligated under Section 2(a) hereof to advance Expenses with respect to any Proceeding, the Company, if appropriate, shall be entitled to assume the defense of such Proceeding, with counsel reasonably acceptable to Indemnitee, upon the delivery to Indemnitee of written notice of its election so to do, and upon Indemnitee providing signed, written consent to such assumption, which shall not be unreasonably withheld. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same Proceeding, provided that (i) Indemnitee shall have the right to employ counsel in any such Proceeding at Indemnitee's expense; and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of any such defense or (C) the Company shall not, in fact, have employed counsel to assume the defense of such Proceeding, then the fees and expenses of Indemnitee's counsel shall be at the expense of the Company. In addition, if there exists a potential, but not an actual, conflict of interest between the Company and Indemnitee, the actual and reasonable legal fees and expenses incurred by Indemnitee for separate counsel retained by Indemnitee to monitor the Proceeding

-5-

(so that such counsel may assume Indemnitee's defense if the conflict of interest between the Company and Indemnitee becomes an actual conflict of interest) shall be deemed to be Expenses that are subject to indemnification hereunder. The existence of an actual or potential conflict of interest, and whether such conflict may be waived, shall be determined pursuant to the rules of attorney professional conduct and applicable law. The Company shall not be required to obtain the consent of Indemnitee for the settlement of any Proceeding the Company has undertaken to defend if the Company assumes full and sole responsibility for each such settlement; provided, however, that the Company shall be required to obtain Indemnitee's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant Indemnitee a complete release of liability, (2) would impose any penalty or limitation on Indemnitee, or (3) would admit any liability or misconduct by Indemnitee.

3.    **Additional Indemnification Rights.**

(a) **Scope.** Notwithstanding any other provision of this Agreement, the Company hereby agrees to indemnify Indemnitee to the fullest extent permitted by law, notwithstanding that such indemnification is not specifically authorized by the other provisions of this Agreement, the Company's Certificate of Incorporation, the Company's Bylaws or by statute. In the event of any change, after the date of this Agreement, in any applicable law, statute, or rule which expands the right of a Delaware corporation to indemnify a member of its board of directors or an officer, such changes shall be deemed to be within the purview of Indemnitee's rights and the Company's obligations under this Agreement. In the event of any change in any applicable law, statute or rule which narrows the right of a Delaware corporation to indemnify a member of its board of directors or an officer, such changes, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement shall have no effect on this Agreement or the parties' rights and obligations hereunder.

(b) **Nonexclusivity.** The indemnification provided by this Agreement shall not be deemed exclusive of any rights to which Indemnitee may be entitled under the Company's Certificate of Incorporation, its Bylaws, any agreement, any vote of stockholders or disinterested members of the Company's Board of Directors, the Delaware General Corporation Law, or otherwise, both as to action in Indemnitee's official capacity and as to action in another capacity while holding such office.

(c) **Interest on Unpaid Amounts.** If any payment to be made by the Company to Indemnitee hereunder is delayed by more than ninety (90) days from the date the duly prepared request for such payment is received by the Company, interest shall be paid by the Company to Indemnitee at the legal rate under Delaware law for amounts which the Company indemnifies or is obligated to indemnify for the period commencing with the date on which Indemnitee actually incurs such Expense or pays such judgment, fine or amount in settlement and ending with the date on which such payment is made to Indemnitee by the Company.

-6-

**(d) Third-Party Indemnification.** The Company hereby acknowledges that Indemnitee has or may from time to time obtain certain rights to indemnification, advancement of expenses and/or insurance provided by one or more third parties (collectively, the "Third-Party Indemnitors"). The Company hereby agrees that it is the indemnitor of first resort (*i.e.*, its obligations to Indemnitee are primary and any obligation of the Third-Party Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by Indemnitee are secondary), and that the Company will not assert that the Indemnitee must seek expense advancement or reimbursement, or indemnification, from any Third-Party Indemnitor before the Company must perform its expense advancement and reimbursement, and indemnification obligations, under this Agreement. No advancement or payment by the Third-Party Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing. The Third-Party Indemnitors shall be subrogated to the extent of such advancement or payment to all of the rights of recovery which Indemnitee would have had against the Company if the Third-Party Indemnitors had not advanced or paid any amount to or on behalf of Indemnitee. If for any reason a court of competent jurisdiction determines that the Third-Party Indemnitors are not entitled to the subrogation rights described in the preceding sentence, the Third-Party Indemnitors shall have a right of contribution by the Company to the Third-Party Indemnitors with respect to any advance or payment by the Third-Party Indemnitors to or on behalf of the Indemnitee.

**4.    Partial Indemnification.** If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the Expenses, judgments, fines or amounts paid in settlement, actually and reasonably incurred in connection with a Proceeding, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such Expenses, judgments, fines and amounts paid in settlement to which Indemnitee is entitled.

**5.    Director and Officer Liability Insurance.**

**(a) D&O Policy.** The Company shall, from time to time, make the good faith determination whether or not it is practicable for the Company to obtain and maintain a policy or policies of insurance with reputable insurance companies providing the directors and officers of the Company with coverage for losses from wrongful acts, or to ensure the Company's performance of its indemnification obligations under this Agreement. Among other considerations, the Company will weigh the costs of obtaining such insurance coverage against the protection afforded by such coverage. In all policies of director and officer liability insurance, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of the Company's directors, if Indemnitee is a director; or of the Company's officers, if Indemnitee is not a director of the Company but is an officer; or of the Company's key employees, if Indemnitee is not an officer or director but is a key employee.

-7-

Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain such insurance if the Company determines in good faith that such insurance is not reasonably available, if the premium costs for such insurance are disproportionate to the amount of coverage provided, if the coverage provided by such insurance is limited by exclusions so as to provide an insufficient benefit, or if Indemnitee is covered by similar insurance maintained by a parent or subsidiary of the Company.

(b) **Tail Coverage.** In the event of a Change of Control or the Company's becoming insolvent (including being placed into receivership or entering the federal bankruptcy process and the like), the Company shall maintain in force any and all insurance policies then maintained by the Company in providing insurance (directors' and officers' liability, fiduciary, employment practices or otherwise) in respect of Indemnitee, for a period of six years thereafter.

6.    **Severability.** Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. If this Agreement or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify Indemnitee to the full extent permitted by any applicable portion of this Agreement that shall not have been invalidated, and the balance of this Agreement not so invalidated shall be enforceable in accordance with its terms.

7.    **Exclusions.** Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement:

(a) **Claims Initiated by Indemnitee.** To indemnify or advance Expenses to Indemnitee with respect to Proceedings initiated or brought voluntarily by Indemnitee and not by way of defense, except with respect to Proceedings brought to establish, enforce or interpret a right to indemnification under this Agreement or any other statute or law or otherwise as required under Section 145 of the Delaware General Corporation Law, but such indemnification or advancement of Expenses may be provided by the Company in specific cases if the Board of Directors finds it to be appropriate; provided, however, that the exclusion set forth in the first clause of this subsection shall not be deemed to apply to any investigation initiated or brought by Indemnitee to the extent reasonably necessary or advisable in support of Indemnitee's defense of a Proceeding to which Indemnitee was, is or is threatened to be made, a party;

(b) **Lack of Good Faith.** To indemnify Indemnitee for any Expenses incurred by Indemnitee with respect to any Proceeding instituted by Indemnitee to establish, enforce or interpret a right to indemnification under this Agreement or any other statute or law or otherwise as required under Section 145 of the Delaware General Corporation Law, if a court of competent jurisdiction determines that each of

-8-

the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous;

(c) **Unlawful Payments.** To indemnify Indemnitee for Expenses to the extent it is determined by a final court order or judgment by a court of competent jurisdiction, to which all rights of appeal have either lapsed or been exhausted, that such indemnification is unlawful;

(d) **Certain Conduct.** To indemnify Indemnitee for Expenses on account of Indemnitee's conduct that is established by a final court order or judgment by a court of competent jurisdiction, to which all rights of appeal have either lapsed or been exhausted, as knowingly fraudulent;

(e) **Insured Claims.** To indemnify Indemnitee for Expenses to the extent such Expenses have been paid directly to Indemnitee by an insurance carrier under an insurance policy maintained by the Company; or

(f) **Certain Exchange Act Claims.** To indemnify Indemnitee in connection with any claim made against Indemnitee for (i) an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act or any similar successor statute or any similar provisions of state statutory law or common law, or (ii) any reimbursement of the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act); provided, however, that to the fullest extent permitted by applicable law and to the extent Indemnitee is successful on the merits or otherwise with respect to any such Proceeding, the Expenses actually and reasonably incurred by Indemnitee in connection with any such Proceeding shall be deemed to be Expenses that are subject to indemnification hereunder.

8.    **Contribution Claims.**

(a) If the indemnification provided in Section 1 is unavailable in whole or in part and may not be paid to Indemnitee for any reason other than those set forth in Section 7, then in respect to any Proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such Proceeding), to the fullest extent permitted by applicable law, the Company, in lieu of indemnifying Indemnitee, shall pay, in the first instance, the entire amount incurred by Indemnitee, whether for Expenses, judgments, fines or amounts paid in settlement, in connection with any Proceeding without requiring Indemnitee to contribute to such payment, and the

-9-

Company hereby waives and relinquishes any right of contribution it may have at any time against Indemnitee.

(b) Without diminishing or impairing the obligations of the Company set forth in the preceding Section 8(a), if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any Expenses, judgment or settlement in any Proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such Proceeding), the Company shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Proceeding arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c) With respect to a Proceeding brought against directors, officers, employees or agents of the Company (other than Indemnitee), to the fullest extent permitted by applicable law, the Company shall indemnify Indemnitee from any claims for contribution that may be brought by any such directors, officers, employees or agents of the Company (other than Indemnitee) who may be jointly liable with Indemnitee, to the same extent Indemnitee would have been entitled to such indemnification under this Agreement if such Proceeding had been brought against Indemnitee.

9. **No Imputation.** The knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Company or the Company itself shall not be imputed to Indemnitee for purposes of determining any rights under this Agreement.

10. **Determination of Good Faith.** For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or the Board

-10-

of Directors of the Enterprise or any counsel selected by any committee of the Board of Directors of the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser, investment banker, compensation consultant, or other expert selected with reasonable care by the Enterprise or the Board of Directors of the Enterprise or any committee thereof. The provisions of this Section 10 shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct. Whether or not the foregoing provisions of this Section are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company.

11.    **Defined Terms and Phrases.** For purposes of this Agreement, the following terms shall have the following meanings:

(a) "Beneficial Owner" and "Beneficial Ownership" shall have the meanings set forth in Rule 13d-3 promulgated under the Exchange Act as in effect on the date hereof.

(b) "Change of Control" shall be deemed to occur upon the earliest of any of the following events:

(i)    Acquisition of Stock by Third Party. Any Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing [50]% or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors, unless (1) the change in the relative Beneficial Ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding shares of securities entitled to vote generally in the election of directors, or (2) such acquisition was approved in advance by the Continuing Directors and such acquisition would not constitute a Change of Control under part (iii) of this definition.

(ii)    Change in Board of Directors. Individuals who, as of the date of this Agreement, constitute the Company's Board of Directors (the "Board"), and any new director whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two thirds of the directors then still in office who were directors on the date of this Agreement (collectively, the "Continuing Directors"), cease for any reason to constitute at least a majority of the members of the Board.

(iii)    Corporate Transaction. The effective date of a reorganization, merger, or consolidation of the Company (a "Business Combination"), in each case, unless, following such Business Combination: (1) all or substantially all of the individuals and entities who were the Beneficial Owners of securities entitled to vote generally in the election of directors immediately prior to such Business Combination beneficially own, directly or

-11-

indirectly, more than 51% of the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors resulting from such Business Combination (including a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the securities entitled to vote generally in the election of directors and with the power to elect at least a majority of the Board or other governing body of the surviving entity; (2) no Person (excluding any corporation resulting from such Business Combination) is the Beneficial Owner, directly or indirectly, of 15% or more of the combined voting power of the then outstanding securities entitled to vote generally in the election of directors of such corporation except to the extent that such ownership existed prior to the Business Combination; and (3) at least a majority of the Board of Directors of the corporation resulting from such Business Combination were Continuing Directors at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination.

(iv)     _Liquidation_. The approval by the Company's stockholders of a complete liquidation of the Company or an agreement or series of agreements for the sale or disposition by the Company of all or substantially all of the Company's assets, other than factoring the Company's current receivables or escrows due (or, if such approval is not required, the decision by the Board to proceed with such a liquidation, sale or disposition in one transaction or a series of related transactions).

(v)     _Other Events_. There occurs any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or a response to any similar item or any similar schedule or form) promulgated under the Exchange Act whether or not the Company is then subject to such reporting requirement.

(c) "_Company_" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that if Indemnitee is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of any other enterprise, Indemnitee shall stand in the same position under the provisions of this Agreement with respect to the resulting or surviving corporation as Indemnitee would have with respect to such constituent corporation if its separate existence had continued.

(d) "_Enterprise_" means the Company and any other enterprise that Indemnitee was or is serving at the request of the Company as a director, officer,

-12-

partner (general, limited or otherwise), member (managing or otherwise), trustee, fiduciary, employee or agent.

(e) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(f) "Expenses" shall include all direct and indirect costs, fees and expenses of any type or nature whatsoever, including all attorneys' fees and costs, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, fees of private investigators and professional advisors, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payment under this Agreement (including taxes that may be imposed upon the actual or deemed receipt of payments under this Agreement with respect to the imposition of federal, state, local or foreign taxes), fax transmission charges, secretarial services and all other disbursements, obligations or expenses in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settlement or appeal of, or otherwise participating in a Proceeding. Expenses also shall include any of the forgoing expenses incurred in connection with any appeal resulting from any Proceeding, including the principal, premium, security for, and other costs relating to any costs bond, supersedes bond, or other appeal bond or its equivalent. Expenses also shall include any interest, assessment or other charges imposed thereon and costs incurred in preparing statements in support of payment requests hereunder. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g) "Independent Counsel" means an attorney or firm of attorneys, selected in accordance with the provisions of Section 2(c)(iii), who will not have otherwise performed services for the Company or Indemnitee within the last three years (other than with respect to matters concerning the rights of Indemnitee under this Agreement, or of other indemnitees under similar indemnity agreements).

(h) "Person" shall have the meaning as set forth in Section 13(d) and 14(d) of the Exchange Act as in effect on the date hereof; provided, however, that "Person" shall exclude: (i) the Company; (ii) any direct or indirect majority owned subsidiaries of the Company; (iii) any employee benefit plan of the Company or any direct or indirect majority owned subsidiaries of the Company or of any corporation owned, directly or indirectly, by the Company's stockholders in substantially the same proportions as their ownership of stock of the Company (an "Employee Benefit Plan"); and (iv) any trustee or other fiduciary holding securities under an Employee Benefit Plan.

(i) "Proceeding" shall include any actual, threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by a third party, a government agency, the

-13-

Company or its Board of Directors or a committee thereof, whether in the right of the Company or otherwise and whether of a civil (including intentional or unintentional tort claims), criminal, administrative, legislative or investigative (formal or informal) nature, including any appeal therefrom, in which Indemnitee was, is, will or might be involved as a party, potential party, non-party witness or otherwise by reason of the fact that Indemnitee is or was a director, officer, employee or agent of the Company, by reason of any action (or failure to act) taken by Indemnitee or of any action (or failure to act) on Indemnitee's part while acting as a director, officer, employee or agent of the Company, or by reason of the fact that Indemnitee is or was serving at the request of the Company as a director, officer, partner (general, limited or otherwise), member (managing or otherwise), trustee, fiduciary, employee or agent of any other enterprise, in each case whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement or advancement of expenses can be provided under this Agreement.

(j) In addition, references to "other enterprise" shall include another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or any other enterprise; references to "fines" shall include any excise taxes assessed on Indemnitee with respect to an employee benefit plan; references to "serving at the request of the Company" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by Indemnitee with respect to an employee benefit plan, its participants, or beneficiaries; and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement; references to "include" or "including" shall mean include or including, without limitation; and references to Sections, paragraphs or clauses are to Sections, paragraphs or clauses in this Agreement unless otherwise specified.

12.    Attorneys' Fees. In the event that any Proceeding is instituted by Indemnitee under this Agreement to enforce or interpret any of the terms hereof, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee in connection with such Proceeding, unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee as a basis for such Proceeding were not made in good faith or were frivolous. In the event of a Proceeding instituted by or in the name of the Company under this Agreement or to enforce or interpret any of the terms of this Agreement, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee in connection with such Proceeding (including with respect to Indemnitee's counterclaims and cross-claims made in such action), unless a court of competent jurisdiction determines that each of Indemnitee's material defenses to such action were made in bad faith or were frivolous.

-14-

EXHIBIT A  PAGE  65

13.    <u>Miscellaneous</u>.

(a) <u>Governing Law</u>. The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b) <u>Entire Agreement; Binding Effect</u>. Without limiting any of the rights of Indemnitee described in Section 3(b), this Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions and supersedes any and all previous agreements between them covering the subject matter herein. The indemnification provided under this Agreement applies with respect to events occurring before or after the effective date of this Agreement, and shall continue to apply even after Indemnitee has ceased to serve the Company in any and all indemnified capacities.

(c) <u>Amendments and Waivers</u>. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) <u>Successors and Assigns</u>. This Agreement shall be binding upon the Company and its successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company) and assigns, and inure to the benefit of Indemnitee and Indemnitee's heirs, executors, administrators, legal representatives and assigns. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(e) <u>Notices</u>. Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually

-15-

agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h) **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(i) **No Employment Rights.** Nothing contained in this Agreement is intended to create in Indemnitee any right to continued employment.

(j) **Company Position.** The Company shall be precluded from asserting, in any Proceeding brought for purposes of establishing, enforcing or interpreting any right to indemnification under this Agreement, that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all the provisions of this Agreement and is precluded from making any assertion to the contrary.

(k) [**Injunctive Relief.** The Company and the Indemnitee agree herein that a monetary remedy for breach of this Agreement, at some later date, may be inadequate, impracticable and difficult of proof, and further agree that such breach may cause the Indemnitee and the Company irreparable harm. Accordingly, the parties hereto agree that the parties may enforce this Agreement by seeking injunctive relief and/or specific performance hereof, without any necessity of showing actual damage or irreparable harm and that by seeking injunctive relief and/or specific performance, they shall not be precluded from seeking or obtaining any other relief to which they may be entitled. The Company and the Indemnitee further agree that they shall be entitled to such specific performance and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bonds or other undertaking in connection therewith. The Company and the Indemnitee acknowledge that in the absence of a waiver, a bond or undertaking may be required by the Chancery Court of the State of Delaware, and they hereby waive any such requirement of such a bond or undertaking.]

(l) **Subrogation.** Subject to Section 3(d), in the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all

-16-

documents required and shall do all acts that may be necessary to secure such rights and to enable the Company to effectively bring suit to enforce such rights.

*[Signature Page Follows]*

-17-

The parties have executed this Indemnification Agreement as of the date first set forth above.

**THE COMPANY:**

LAYFIELD & BARRETT, APC.

By: _____

(Signature)

Name:Philip Layfield _____

Title:Director _____

AGREED TO AND ACCEPTED:

**INDEMNITEE:**

_____ PHILIP LAYFIELD

_____ (Signature)

Address:
31142 Via Colinas _____
Coto de Caza, CA 92679Email:p@layfieldbarrett.com

-1-

# EXHIBIT 12

Message 1 of 2

Sent at: 8/29/2017 10:19:07 AM

# Re: Mandatory Indemnification of Philip Layfield

From:  Stella Havkin <stella@havkinandshrago.com>
  To:  Philip Layfield <phil@maximumlegalservices.com>
  Cc:  Tina M. Talarchyk, Esq. <tmt@palmbeachbk11.com>

I will notify the trustee.

Sent from Stella Havkin's iPhone

On Aug 29, 2017, at 7:15 AM, Philip Layfield <phil@maximumlegalservices.com> wrote:

[Quoted text hidden]

---

Message 2 of 2

Sent at: 8/29/2017 2:41:05 PM

# Re: Mandatory Indemnification of Philip Layfield

From:  Stella Havkin <stella@havkinandshrago.com>
  To:  Philip Layfield <phil@maximumlegalservices.com>
  Cc:  Tina M. Talarchyk, Esq. <tmt@palmbeachbk11.com>

I will notify the trustee.

From: Philip Layfield <phil@maximumlegalservices.com>
Sent: Tuesday, August 29, 2017 7:15:44 AM
To: Stella Havkin
Cc: Tina M. Talarchyk, Esq.
Subject: Mandatory Indemnification of Philip Layfield

Stella:

I am making a demand on Layfield & Barrett pursuant to section 317 of the CA corporations code for indemnification regarding the following claims:

1. Threatened Lawsuits and Proceedings by Maximum Legal (California), LLP against me personally. I must be defended in that bankruptcy case as a result of the false accusations being made and the false narrative being perpetrated by the lawyers for the estate;
2. For the State Bar Investigation that is currently pending against me;
3. For the Lawsuit of Josephine Nguyen v. Layfield & Barrett, et. al.;
4. For the Lawsuit of Anaheim Ducks v. Layfield & Barrett, et. al.;
5. For the Lawsuit of Zolekhian v. Layfield & Barrett, et. al.;
6. For the investigation being conducted by the Chapter 11 Trustee against me personally; and
7. For the matters of Finton v. Layfield & Barrett, et. al. pending in Florida.

All actions I have taken were in the best interest of the corporation and I am entitled to indemnification. Today, I had to pay personal funds to hire bar counsel because I have deadlines coming up to respond to the bar inquiries. I requested over 10 days ago to have my request for counsel approved and no action has been taken.

I am requesting that Tina be appointed as my counsel in several of these matters and she must be paid under the indemnification provisions. As counsel for the estate, you must act on this request: I am giving a 48 hour deadline to respond before we take further action.


Philip Layfield | CEO, Maximum Legal Services

Ph: (786) 607-7243
phil@maximumlegalservices.com
www.maximumlegalservices.com
Maximum Legal Services, LLC •382 NE 191st St. #42308 •Miami • FL •  33179• United States

This message is confidential. It may also be privileged or otherwise protected by the work product doctrine or other legal rules. If you have received it by mistake, please let us know by e-mail reply, and delete it from your system. You may not copy this message or disclose its contents to anyone.The integrity and security of this message cannot be guaranteed on the Internet.

# EXHIBIT 13



January 5, 2018

Mr. Rohit Mishra

Via Hand Delivery

Re:  Termination of Services Being Performed for Maximum Legal Services, LLC

Dear Mr. Mishra:

Effective on January 2, 2018, you are terminated for cause pursuant to the Agreement you entered into with Maximum Legal Services, LLC.  Maximum Legal Services, LLC ("MLS") requested that you perform services on behalf of the company, which is a Delaware Limited Liability Company with a business address of 382 NE 191st Street, #42308, Miami, Florida 33179.  Maximum Legal Services, LLC performs outsourcing services for a variety of related and unrelated companies.  You were asked to assist MLS and its principals with the set-up of a computer network in Costa Rica and for the home networking services for the owners.  You were to be paid a monthly stipend of $3,800 per month.  One of the conditions of your Agreement was to provide all of the network passwords to the principal of MLS.  You were repeatedly asked for that information and you refused until mid-December, when you provided an incomplete list of passwords.  Due to your refusal to provide passwords, your Agreement was terminated.  As part of your Agreement, an express term of your Agreement was that if you refused to provide passwords and caused the company to engage another IT professional to unblock the system, as liquidated damages, any amounts the company may or may not have owed you, would be forfeited.

At this time, despite repeated requests, you have refused to provide the passwords to the firewalls and switches.  The conduct has forced the computer to engage in the complete wiping of the firewalls and factory resets.  As a result, you have forfeited any monies that may be due to you pursuant to our liquidated damages clause.  You will be receiving no further compensation from MLS or any other affiliated entity.

We also are aware that you have misappropriated company property and have refused to return your company issued laptop and two cell phones.  If you do not return those items by Wednesday, January 10, 2018 by 5pm Costa Rican time, we will take appropriate legal action.  You may return the property to the offices of our lawyers at Quatro Legal, attn:  Marcela Acosta, Guachipelin, Latitud Norte Building, 3rd Floor.

You are hereby prohibited from entering company property or any client of MLS or from accessing any internal networks, systems or other accounts.  Any action will be considered a Cyber Crime and we will prosecute under the Computer Fraud and Abuse Act 18 U.S. Code Section 1830.

I also understand that you have told people that you plan to return to the U.S. on a work visa that was issued by Layfield & Barrett.  Please be advised that we have informed the State Department that you had

# EXHIBIT 14

Sent at: 8/29/2017 10:17:03 AM

# Re: urgent message to the Trustee

From:  Stella Havkin <stella@havkinandshrago.com>
   To:  Philip Layfield <phil@maximumlegalservices.com>, Tina M. Talarchyk, Esq. <tmt@palmbeachbk11.com>

They did not call me so there was nothing to tell you. I will respond later as I am on my way to court.

From: Philip Layfield <phil@maximumlegalservices.com>
Sent: Tuesday, August 29, 2017 5:44:34 AM
To: Tina M. Talarchyk, Esq.; Stella Havkin
Subject: urgent message to the Trustee

Stella:

By 10am pst, I want the following message delivered to the Trustee. If my lawyers won't deliver the message, then I will do it myself. I have wasted enough time. Nobody is looking out for MLS and my employees and the firm clients. I was told that Stella was speaking to the Trustee yesterday and she promised to contact me after the conversation. Again, I received no phone call. I want to know that the Trustee is on notice of these issues because I will probably end up suing him later if he fails to act. I have sat around long enough. Please feel free to modify this message and send me a proposed draft. I am sending this message at 10am pst today one way or another. Yes, I am going rogue, but I don't trust this process right now. Also, unless I start seeing some cooperation I will file a motion to dismiss the trustee based on lack of authority. Stella entered into a stipulation without consulting with me and I find that very disturbing. I am considering my options right now. I understand that Stella is not my lawyer, but she needed my written authority. I am really pissed off about this and unless I start seeing some positive action, I am going to exercise my rights. I also need everyone to confirm that you had a trustee appointed without my authority or agreement. I only would have agreed to it in the conttext of an agreement with advocate for employment of me, employment of MLS, consolidation of the ML bankruptcy and dismissing of barrett and wakefield along with cash collateral. you completely blew it and screwed me over.

Dear Mr. Puchalski:

I am the principal of Layfield & Barrett and also the CEO of Maximum Legal Services. For the last 2 months, my team at MLS has mobilized to stabilize the firm in the wake of the failure of ML (i.e, Todd Wakefield and Joe Barrett) to honor their Agreements with me personally and with L&B. We have organized a team of 10 key individuals to move cases along, deal with clients that ML is neglecting or rejecting and organizing the missing or deleted data that L&B has suffered at the hands of Todd Wakefield and others.

Our team has done the following in the last 60 days:

1. created a list of active cases both in prelit and litigation and developed a plan to move each case forward to settlement. This involves over 75 active cases.
2. worked within the case management system to update and calendar all critical deadlines for cases that ML has utterly failed to address;
3. Travelled to Utah and restarted all systems that were intentionally unplugged by Todd Wakefield and attempted to retrieve all data.

4. Hired an accountant to prepare 2017 financial statements, update Accounts Payable and begin trust account reconciliations (we have also had to purchase out of pocket the accounting software needed);

5. Our team has also begun rebuilding our websites, generated market plans to bring new cases in and we are ready to launch our marketing campaigns next week.

6. We have identified critical vendors necessary for the smooth operation of the business. In many cases, I am having to personally pay these vendors to keep operations running smoothly.

7. I have deployed IT professionals to maintain the data and the services of L&B so that we can properly work our cases. Previously, this was outsourced to a third party vendor and the cost was over $15,000 per month.

8. Our team is processing mail as it comes in, calendaring deadlines, preparing motions, notices and attending depositions and mediations on our active cases;

9. We have also settled several cases in the last 7 days and anticipate settling two more this week.

The problem we face is that MLS is owed over $1.5 million from L&B and we have an invoice from July of just over $50,000 and another invoice for January of $50,000. We are doing everything we can to maximize the value of the estate and also serve the L&B clients. I am personally owed over $2.5 million in back salary and expense reimbursements. Rather than cooperate with me, I have learned that your office has been secretly contacting my MLS employees in an attempt to interview them. Please vie advised that MLS, its employees and I am represented by Tina Talarchyk. Nobody is to be contacted without our knowledge.

The bottom line is that you need to act and you need to act fast. I can turn this situation around and generate $10 million in revenue over the next 12 months, but I am not going to continue to fund the L&B operations with MLS money or personal money for another day. On Thursday, August 31st, all services will cease and I will not perform any other services on behalf of L&B. I have tried to be patient and reasonable, but my cooperation is ending quickly. If you choose to convert this case into a Chapter 7, the results will be that only clients get paid and Advocate Capital will end up with nothing from the L&B estate. All clients will defect and everyone will be pointing fingers. The ML bankruptcy needs to be consolidated and we need to hire some additional attorneys to work the cases. I know how to find people and I know how to get them up to speed on these cases.

Attached is the MLS contract and the most recent invoice. Let's have a conversation and get this resolved. A failure to act is going to get everybody sued by the current clients. If you are not going to protect the firm's clients, then I will have not choice but to resign.

Everyone has a duty to protect this estate, but Tina's obligations are different. They are to me personally and to MLS and its employees.

I hope everyone understands what's happening here and where this will end up if MLS is not retained and I am not employed.

Philip Layfield | CEO, Maximum Legal Services

Ph: (786) 607-7243
phil@maximumlegalservices.com
www.maximumlegalservices.com
Maximum Legal Services, LLC •382 NE 191st St. #42308 •Miami • FL •  33179• United States

This message is confidential. It may also be privileged or otherwise protected by the work product doctrine or other legal rules. If you have received it by mistake, please let us know by e-mail reply, and delete it from your system. You may not copy this message or disclose its contents to anyone.The integrity and security of this message cannot be guaranteed on the Internet.

# EXHIBIT 15

1  JON L.R. DALBERG (State Bar No. 128259)
   jdalberg@lgbfirm.com
2  RODGER LANDAU (State Bar No. 151456)
   rlandau@lgbfirm.com
3  MONICA RIEDER (State Bar No. 263250)
   mrieder@lgbfirm.com
4  LANDAU GOTTFRIED & BERGER LLP
   1801 Century Park East, Suite 700
5  Los Angeles, California 90067
   Telephone: (310) 557-0050
6  Facsimile: (310) 557-0056

7  Attorneys for Debtors and Debtors in Possession

8

9                  UNITED STATES BANKRUPTCY COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                 SAN FERNANDO VALLEY DIVISION

12
13  In re                              Case No. 1:13-15929-AA

14  KSL MEDIA, INC., *et al.*,          Jointly Administered with Case Nos.
                                        1:13-15930-AA and 1:13-15931-AA
15                    Debtors.
                                        Chapter 11
16
    ☐ Affects KSL Media, Inc.           DEBTORS' INITIAL OPPOSITION TO,
17                                      AND REQUEST FOR HEARING ON,
                                        APPLICATION FOR AN ORDER
18  ☐ Affects T.V. 10's, LLC            AUTHORIZING AND APPROVING THE
                                        EMPLOYMENT OF PACHULSKI STANG
19                                      ZIEHL & JONES LLP AS COUNSEL FOR
    ☐ Affects Fulcrum 5, Inc.           THE OFFICIAL COMMITTEE OF
20                                      UNSECURED CREDITORS *NUNC PRO
                                        TUNC* TO OCTOBER 10, 2013;
21  ☒ Affects All Debtors               DECLARATION OF RODGER M.
                                        LANDAU IN SUPPORT THEREOF
22

23

24

25

26

27

28

1    Debtors and debtors in possession KSL Media, Inc., T.V. 10's, LLC, and Fulcrum 5, Inc.

2    (the "Debtors"), hereby submit their initial opposition to, and request for hearing on, the

3    *Application for an Order Authorizing and Approving the Employment of Pachulski Stang Ziehl &*

4    *Jones LLP as Counsel for the Official Committee of Unsecured Creditors Nunc Pro Tunc to*

5    *October 10, 2013* (the "Pachulski Application"), which seeks authorization for Pachulski Stang

6    Ziehl & Jones LLP (the "Pachulski Firm") to serve as counsel for the Official Committee of

7    Unsecured Creditors (the "Committee") in the above-captioned cases.

8        Facts recently have come to the Debtors' attention demonstrating that the Pachulski Firm

9    has an interest adverse to the interests of its purported client and of the Debtors' bankruptcy

10   estates, rendering the Pachulski Firm ineligible for employment under 11 U.S.C. § 327. The

11   Debtors are filing this initial opposition to provide immediate notice to the Court, the United

12   States Trustee, the Committee members, and other parties in interest of the conflict of interest that

13   exists and the potential damage to the estates that could result if the Pachulski Application were

14   approved. The Debtors shortly will file a fuller opposition setting forth in detail the grounds on

15   which the Pachulski Firm is ineligible for employment. In the meantime, many of the relevant

16   facts are set forth in the e-mail exchanges attached as Exhibits "1" and "2" to the accompanying

17   Declaration of Rodger M. Landau.

18       The Debtors request that the Court hear the opposition promptly to minimize any potential

19   harm to the estates from Pachulski's role in the cases and to permit the Committee to obtain

20   replacement counsel as soon as possible. The Debtors will, of course, make all reasonable

21   accommodations to permit the Committee's new counsel to come up to speed and ensure that the

22   Committee is not prejudiced by the change of counsel.

23   Date: November 11, 2013                    LANDAU GOTTFRIED & BERGER LLP

24

25

26                                              RODGER M. LANDAU
                                                Attorneys for Debtors and Debtors in Possession

27

28

1

## DECLARATION OF RODGER M. LANDAU

I, Rodger M. Landau, hereby declare as follows:

1.  I am the managing partner of Landau Gottfried & Berger LLP, which serves as general bankruptcy counsel to debtors and debtors in possession KSL Media, Inc., T.V. 10's, LLC, and Fulcrum 5, Inc. (the "Debtors"), in their jointly administered Chapter 11 cases.

2.  I submit this declaration in support of the Debtors' initial opposition to the *Application for an Order Authorizing and Approving the Employment of Pachulski Stang Ziehl & Jones LLP as Counsel for the Official Committee of Unsecured Creditors Nunc Pro Tunc to October 10, 2013*, which seeks authorization for Pachulski Stang Ziehl & Jones LLP (the "Pachulski Firm") to serve as counsel for the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned cases.

3.  Attached hereto as Exhibits "1" and "2" are true and correct copies of e-mail exchanges among Richard Pachulski (of the Pachulski Firm), Jeffrey Dulberg (of the Pachulski Firm), John Roussey (the chairman of the Committee), and myself.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2013, at Los Angeles, California.

_____
Rodger M. Landau

2

EXHIBIT A  PAGE 81

# EXHIBIT 1

| | |
|---|---|
| From: | Rodger M. Landau |
| Sent: | Sunday, November 10, 2013 12:25 PM |
| To: | 'Roussey, John (NBCUniversal)' |
| Cc: | Richard Pachulski (rpachulski@pszjlaw.com); Jeffrey Dulberg (jdulberg@pszjlaw.com); Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg |
| Subject: | Committee Request Relating to Delay of Reconstruction |

Hi John:

As an accommodation to your Committee, the Debtor suspended its reconstruction efforts so that your Committee purportedly could evaluate the utility of the Debtor's financial reconstruction (see emails below). My understanding of the Committee's concerns from you were that it wanted to address whether the reconstruction is necessary in light of the estate's tax reporting issues and potential avoidance action issues. My understanding is that the Committee was evaluating those issues and, concurrently, the Debtor has been working on a memorandum to address these concerns (which has cost a lot of time and money). The purported nature of the concerns were discussed between us as well as addressed in the email below. I will try to get you the memorandum that my firm has been working on this week.

On Friday, Rich Pachulski – in a meeting attended by a number of people including you and me -- explained that the issue is not whether the reconstruction should occur but who should do it. Obviously, that was not the purported reason for your request to suspend the reconstruction. Mr. Pachulski explained that he believes that the Liquidating Trustee (who might be appointed in six months) should choose the financial advisor who performs the reconstruction. Other than redirecting the work to a different professional, I do not understand this rationale and that rationale certainly was never discussed between us. The reconstruction is approximately 45% done (approximately $450K is needed to complete the project) and I cannot imagine a rationale for bringing in a different professional to start over. It likely would turn a 45% complete project likely to be completed prior to confirmation into a potential $2.0 million one year post-confirmation fiasco. Mr. Grobstein is one of the best bankruptcy accountants I know and I simply cannot imagine a competent Liquidating Trustee deciding not to rely on the reconstruction that he completes.

If the Committee had possessed a real concern about whether the reconstruction should occur, then the Debtor would have been receptive to that concern. The Committee's concern about whether Grobstein Teeple should do the reconstruction – given that they already are 45% done – just does not make sense to the Debtor. The prospect that the reconstruction should be halted so that it can be delayed and potentially cost four or five times more to re-do (there is approximately $450K of work left – higher priced alternative providers may well charge over $2 million to do it over) simply does not make sense in the context of a procedure that should be focused on minimizing cost and time for the benefit of unsecured creditors. If the Debtor had known that the nature of the concern was not the reconstruction's utility (as we discussed and could reasonably be debated), the Debtor likely never would have agreed to any suspension.

Consistent with my promise to you and your counsel, the Debtor will not re-commence the reconstruction without first informing you and your counsel (I will be discussing this issue with my client on Monday). The Debtor's concern is that the issue no longer appears to be resolution of whether the reconstruction should occur (the reason the reconstruction was delayed) but instead who accomplishes the reconstruction (an issue with which the Debtor does not believe can be reasonably debated).

Rodger

1

EXHIBIT 1
3

Rodger Landau
Attorney

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail: rlandau@lgbfirm.com
Web: www.lgbfirm.com

Please consider the environment before printing.

This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

From: Roussey, John (NBCUniversal) [mailto:John.Roussey@nbcuni.com]
Sent: Thursday, October 31, 2013 11:28 AM
To: Rodger M. Landau
Cc: Richard Pachulski (rpachulski@pszjlaw.com); Jeffrey Dulberg (jdulberg@pszjlaw.com); Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg
Subject: Re: Committee request relating to reconstruction and other issues

Rodger,

Thanks for the meeting Tuesday, the lunch, and agreeing to have Howard put the reconstruction work on hold. The Committee will be meeting this Friday to discuss the potential benefits or pitfalls relating to the continuation of the reconstruction work, and would like to have Paul available to report to the Committee Friday with his recommendations as to whether or not to move forward. We also appreciate the offer/plan presented to continue the reconstruction work and cap Howard's fees. Jeff, Rich and I will also discuss that with the Committee during tomorrow's call.

Thank you for providing names of potential Liquidating Trustees - this will be another discussion point for the Committee call tomorrow.

Finally, the Committee would like to get in front of some housekeeping issues.  Specifically employment and benefit issues.

Per review of the employee list, there are a number of persons that should most likely be put on a contract/hourly basis (NY employees), as well as some in LA and help through the reconciliation. I do not have the specific names in front of me as I am out of the office today; however, we can discuss tomorrow if necessary.

Secondly, in light of the accounting firm holding the 401(k) plan audit hostage for 2012, and knowing a similar situation will most likely arise in 2013, the Committee believes that it may be prudent to discontinue the 401(k) plan to

2

EXHIBIT 1
4

employees as soon as possible - especially before 2014 starts as we do not believe it would be prudent to have the plan operating in 2014 (and have to have an audit for 2014 as well.

Nevertheless, the Committee greatly appreciates the temporary halt to the reconstruction process, and will get back to everyone next week to discuss the possibility of continuing the reconstruction work.

Please let me know if you have any questions or concerns.

John Roussey

Sent from my iPad

On Oct 30, 2013, at 12:35 PM, "Rodger M. Landau" <RLandau@LGBFirm.com> wrote:

Hi John:

As to your request that Grobstein Teeple put their pencils down on their reconstruction efforts until Friday, the Debtors will do as you request. Janet is comfortable with that accommodation and Howard (who is cc'd) already has provided that instruction to his people.

The Debtors have been evaluating the Committee's request to cease the reconstruction and, quite frankly, the Debtors are not even done with their own analysis. The prospect of having incomplete books raises a number of very difficult issues for the Debtors. I raised some of the issues with you and provided you with a preliminary analysis yesterday in hopes of getting the ball moving. The Debtors are concerned about the tax issues (both prospective $1M penalties and potentially breached fiduciary obligations) and avoidance action facilitation (preference and fraudulent transfer liability and defenses). If your Committee does not alter its instruction, the Debtors likely will come to you with a more complete description of their concerns and ask your Committee to evaluate the situation yet again.

I understood one of the issues was the prospective cost of the endeavor. As I informed you yesterday, Howard Grobstein likely would be willing to cap his firm's fees related to the reconstruction from November 1, 2013 through completion at $450K. This may address Rich's concerns about the costs spiraling out of control. Any such agreement – even if voluntary – likely would need, at minimum, to be disclosed to the Court.

Per your request, I will provide you with a name or two of potential Liquidating Trustees that your Committee may want to consider along with Mr. Kravitz (who I do not know well but about whom I have heard only good things). Obviously, whomever your Committee chooses as their choice or choices (if there were more than one acceptable alternative, that likely would show some flexibility in the process) would need to be interviewed by the Debtor in the context of a proposing a joint plan of reorganization.

Rodger

3

EXHIBIT 1
5

EXHIBIT A  PAGE  85

Rodger Landau
Partner

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail: rlandau@lgbfirm.com
Web: www.lgbfirm.com

Please consider the environment before printing.

This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

From: Roussey, John (NBCUniversal) [mailto:John.Roussey@nbcuni.com]
Sent: Wednesday, October 30, 2013 10:06 AM
To: Rodger M. Landau
Cc: Richard Pachulski (rpachulski@pszjlaw.com); Jeffrey Dulberg (jdulberg@pszjlaw.com)
Subject: Committee request relating to reconstruction and other issues

Rodger—

On behalf of the whole Committee, I want to extend my appreciation for yesterday's lunch and for welcoming Province to the KSL offices. It is tremendously important to the Committee that, after a thorough review of the situation, Province report back quickly on its outlook for the wind down.

It was informative to hear your reasoning for continuing the reconstruction of the books and records. We will consider your arguments on the potential taxes and penalties owed (or not), the preference analysis reasoning, and forensics as we need time, and information, to determine whether to support the reconstruction. That said, the reconstruction is expensive and I am still under instruction from the Committee to ask that you halt it pending our review. Therefore, I am reiterating our request that Howard's team put their pencils down while the Committee considers how best to proceed. We have a Committee meeting scheduled for Friday afternoon and my goal is to have the Committee's take on the reconstruction resolved by then but, either way, the Committee believes that we need the meter to stop while we consider the matter. Please let me know whether you will stop the work until we have reviewed the matter.

Please let us know by the end of today if this program of action will be implemented.

John Roussey

4

EXHIBIT 1
6

# EXHIBIT 2

From:            Richard Pachulski <rpachulski@pszjlaw.com>
Sent:            Monday, November 11, 2013 7:49 AM
To:              Rodger M. Landau
Cc:              Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg; John
                 Roussey; Jeffrey Dulberg
Subject:         Re: Committee Request Relating to Delay of Reconstruction

Roger, while you are a slimeball, I guess you agree with my reference to you as unprofessional.

Sent from my BlackBerry 10 smartphone.
From: Rodger M. Landau
Sent: Monday, November 11, 2013 7:36 AM
To: Richard Pachulski
Cc: Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg; John Roussey; Jeffrey Dulberg
Subject: RE: Committee Request Relating to Delay of Reconstruction


Rich:

I try to do my best for my clients.

Please do not refer to me as a "slimeball." It's not nice.

Rodger

P.S. The Debtors' recent proposal contemplates that neither of our firms would be employed postconfirmation (thereby eliminating the issue that you claim is secretly my goal).


Rodger Landau
Attorney

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail: rlandau@lgbfirm.com
Web: www.lgbfirm.com
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.
Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and

1

EXHIBIT 2
7

cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

-----Original Message-----
From: Richard Pachulski [mailto:rpachulski@pszjlaw.com]
Sent: Monday, November 11, 2013 7:06 AM
To: Rodger M. Landau
Cc: Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg; John Roussey; Jeffrey Dulberg
Subject: Re: Committee Request Relating to Delay of Reconstruction

Roger I will not dignify your rant and babble with a response other than if I think it is necessary to hurt a relationship with a member of a Committee to stop a bad deal with an unprofessional slimeball like yourself I will do that. We all know your goal is to find a position in the case so you can sue everyone and rip off this estate as you have done so often in the past. That will not happen on my watch.

Sent from my BlackBerry 10 smartphone.
From: Rodger M. Landau
Sent: Monday, November 11, 2013 5:06 AM
To: Richard Pachulski
Cc: Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg; John Roussey; Jeffrey Dulberg
Subject: RE: Committee Request Relating to Delay of Reconstruction

Rich:

Wow, I believe you should stop emailing using smart-phones.

By "burying (your) relationship with Roussey," were you referring to Mr. John Roussey (who presumably was inadvertently cc'd on your email); an executive of NBC/Universal and the chairman of the Committee that your firm represents? Does your firm's ability to make money in the KSL case really trump its interest in acting respectfully and honestly with Mr. Roussey and NBC/Universal? Your words, and your approach, are remarkable – even if intended to be a private email from you to your partner, Jeff Dulberg.

As to your claim that "you can get the votes," did you mean that you have the political ability to manipulate the Committee politics so that you can subvert the reasonable approach of your Committee chairperson (presumably for the benefit of Mr. Peter Kravitz, a person who regularly hires your firm postpetition)? John is a smart and honest man. You should be happy to have him as a client (as well as NBC/Universal). I believe you and your firm owe him (and his company) more respect than you are giving him (independent of your firm's ability to manipulate committees). His email from last night appeared productive to me – he suggested that the Committee should interview more than just Peter Kravitz as a potential Liquidating Trustee. That is not a reason for your firm to attack him, marginalize him, manipulate other committee members, etc. (I somehow suspect that the General Counsel of NBC/Universal will know how to handle this issue better than me).

By "letting Landau win," did you mean to imply that the most important thing to you is to "beat" me (or my firm) rather than to act for the benefit of creditors? I am a fiduciary and am counseling the Debtors to act for the benefit of creditors, not for the benefit of increasing professional fees. I regret that I have felt compelled to counsel my client to be adverse to the Committee in any way (because, at least theoretically, the interests are supposed to be exactly aligned).

Let's discuss how you plan to handle your and Jeff's errant emails later this morning. I am concerned about my own duties as a recipient of your email (I will be seeking separate counsel as to that issue). My suggestion is that John – as a

2

EXHIBIT 2
8

recipient of these emails and the Committee chairperson who you would not mind "buying" and around whom you believe you can manipulate -- should be included in our discussion.

Rodger

P.S., I again ask you to stop sending emails to people (including Associates at my firm for which I serve as Managing Partner) explaining your alleged view that I am a "complete idiot," and a "complete fool who lies" (I don't lie -- I leave it to others to decide how smart I am).


Rodger Landau
Attorney

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail: rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com>
Web: www.lgbfirm.com<http://www.lgbfirm.com/>
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.
Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

From: Richard Pachulski [mailto:rpachulski@pszjlaw.com]
Sent: Sunday, November 10, 2013 10:28 PM
To: Jeffrey Dulberg; Rodger M. Landau
Cc: Howard Grobstein (hgrobstein@gtfas.com); Monica Rieder; Jon L.R. Dalberg; John Roussey
Subject: RE: Committee Request Relating to Delay of Reconstruction

Remember that I can get the votes. I will bury our relationship with Roussey before I ever let Landau win.

From: Jeffrey Dulberg
Sent: Sunday, November 10, 2013 10:27 PM
To: Richard Pachulski; Rodger M. Landau
Cc: Howard Grobstein (hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com>); Monica Rieder; Jon L.R. Dalberg; John Roussey
Subject: Re: Committee Request Relating to Delay of Reconstruction

Just remember John is a dove

From: Richard Pachulski
Sent: Sunday, November 10, 2013 9:55 PM
To: Rodger M. Landau

3

EXHIBIT 2
9

Cc: Jeffrey Dulberg; Howard Grobstein (hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com>); Monica Rieder; Jon L.R. Dalberg; John Roussey
Subject: Re: Committee Request Relating to Delay of Reconstruction

Roger, you are a complete idiot! At no time did I ever hint that credit is an issue with regards to anything. Please stop sending me e-mails about what you believe, because I believe that you are a complete fool who lies and makes stuff up as you go. Getting credit for hiring Howard is a total joke. Have a nice evening.

Sent from my BlackBerry 10 smartphone.
From: Rodger M. Landau
Sent: Sunday, November 10, 2013 7:26 PM
To: Richard Pachulski
Cc: Jeffrey Dulberg; Howard Grobstein (hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com>); Monica Rieder; Jon L.R. Dalberg; John Roussey
Subject: RE: Committee Request Relating to Delay of Reconstruction

Rich:

I realize that people tend to hire/trust their own firms. That was not your point.

Your point was that we should stop the reconstruction so that a Liquidating Trustee can direct the business to themselves (or get credit for continuing to direct it to Mr. Grobstein). Even under your "clarification," the problem is not with Mr. Grobstein -- it's with who gets credit for hiring Mr. Grobstein (and your belief that we should delay the estate's business until they can obtain that credit).

I hereby assign all of the credit for Mr. Grobstein's hiring to you and your firm (I disavow all of it -- it's just not the way I do business). The reconstruction is 45% complete and needs to be completed. Having someone re-do it, or assume responsibility mid-stream for it, makes no sense to me (and I presume would not make sense to any Liquidating Trustee who is interested in fulfilling his/her fiduciary duties to creditors).

Rodger


Rodger Landau
Attorney

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail: rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com>
Web: www.lgbfirm.com<http://www.lgbfirm.com>
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.

4

EXHIBIT 2
10

EXHIBIT A  PAGE  91

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

-----Original Message-----
From: Richard Pachulski [mailto:rpachulski@pszjlaw.com]
Sent: Sunday, November 10, 2013 6:47 PM
To: Rodger M. Landau
Cc: Jeffrey Dulberg; Howard Grobstein (hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com>); Monica Rieder; Jon L.R. Dalberg; John Roussey
Subject: Re: Committee Request Relating to Delay of Reconstruction
Importance: High

Rodger just advise what your client's representative who operated a company without books and records for 9 years wants to do. The Committee can then formulate their response.

Just to be clear, what I said is that based on my experience liquidating trustees who have firms capable of reconstructing books and records will use their own firms. Since I haven't spoken to any of them I have no idea what they will actually do. As to Peter, I have no clue what he would do and said very clearly at the meeting that while Peter if retained may use Howard he may very well use someone else. Just because you decided to start by using Howard for the reconstruction does not make it the correct decision and the Committee has no intention of being bound by that decision. We will not allow a totally incompetent debtor to dictate to the Committee, plain and simple.

Sent from my BlackBerry 10 smartphone.
From: Rodger M. Landau
Sent: Sunday, November 10, 2013 6:35 PM
To: Richard Pachulski
Cc: Jeffrey Dulberg; Howard Grobstein (hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com>); Monica Rieder; Jon L.R. Dalberg; John Roussey
Subject: RE: Committee Request Relating to Delay of Reconstruction

Good Evening, Rich:

As you may recall, you explained on Friday – including in front of your own client (John) – that, if Brad Sharp were appointed Liquidating Trustee, he would want to hire his own firm to re-do the reconstruction; if Todd Nielsen were appointed Liquidating Trustee, he would hire his own firm to re-do it; if David Gottlieb were appointed Liquidating Trustee, he would hire his own firm to re-do it, etc. You further opined that, if Peter Kravitz were appointed Liquidating Trustee, that he likely would hire Howard Grobstein to complete the reconstruction (the implication was clear). When I suggested that I was uninterested in treating the needs of the estate as "graft" and simply wanted to make sure the estate's business gets done in an efficient and effective manner (by allowing Mr. Grobstein to complete the job assigned to him), you raised your voice and started to disparage Mr. Grobstein (I refrain from describing what you said about Mr. Grobstein). That's what you said – including in front of your own client, an executive of NBC/Universal (your words were loud and unequivocal).

Whether the Debtor hired Brad's firm, Todd's firm, David's firm or Howard's firm, my understanding is that the reconstruction would be done the same way (if the Committee has concerns about how the reconstruction is being done, it has not expressed those concerns). I am not trying to "help" Howard's firm – I am trying to make sure the estate's interests are addressed pursuant to the fiduciary duties of my client (whose prior financial mismanagement is unrelated to its hiring of Mr. Grobstein's firm). Please understand that the reconciliation began months before the

5

EXHIBIT 2
11

Committee was even created (and has been described to the Court throughout, including in the first papers filed with the Court).

Your rationale for suspending the reconstruction is contrary to the rationale that the Committee provided to the Debtor ten days ago when it successfully argued for a temporary suspension. The Debtor disagrees that the reconstruction needs to be re-done or done by someone else (the scope could be debated and we could discuss that). I plan to speak to my client tomorrow and invited John and you to provide me with your thoughts about the concerns contained in my email. If the Debtor recommences the reconstruction, I will ask Howard whether it would be efficient to restart it by first focusing on the later time period that you identify.

Have a good evening.

Rodger

P.S. I am neither a "liar" nor engaged in "psycho-babble." Just a lawyer with a migraine on a Sunday night.

Rodger Landau
Attorney

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail:
rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com%3Cmailto:rlandau@lgbfirm.com>>
Web: www.lgbfirm.com<http://www.lgbfirm.com/>
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.
Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

From: Richard Pachulski [mailto:rpachulski@pszjlaw.com]
Sent: Sunday, November 10, 2013 4:32 PM
To: Rodger M. Landau; John Roussey
Cc: Jeffrey Dulberg; Howard Grobstein [hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com>]; Monica Rieder; Jon L.R. Dalberg
Subject: RE: Committee Request Relating to Delay of Reconstruction

Rodger, please see my comments below:

From: Rodger M. Landau [mailto:RLandau@LGBFirm.com]<mailto:[mailto:RLandau@LGBFirm.com]>
Sent: Sunday, November 10, 2013 12:25 PM
To: John Roussey

6

EXHIBIT 2
12

EXHIBIT A  PAGE  93

Cc: Richard Pachulski; Jeffrey Dulberg; Howard Grobstein
(hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com%3Cmailto:hgrobstein@gtfas.com>
>); Monica Rieder; Jon L.R. Dalberg
Subject: Committee Request Relating to Delay of Reconstruction

Hi John:

As an accommodation to your Committee, the Debtor suspended its reconstruction efforts so that your Committee purportedly could evaluate the utility of the Debtor's financial reconstruction (see emails below). My understanding of the Committee's concerns from you were that it wanted to address whether the reconstruction is necessary in light of the estate's tax reporting issues and potential avoidance action issues. My understanding is that the Committee was evaluating those issues and, concurrently, the Debtor has been working on a memorandum to address these concerns (which has cost a lot of time and money). The purported nature of the concerns were discussed between us as well as addressed in the email below. I will try to get you the memorandum that my firm has been working on this week.

On Friday, Rich Pachulski – in a meeting attended by a number of people including you and me -- explained that the issue is not whether the reconstruction should occur but who should do it. RODGER THIS IS AN OUTRIGHT LIE. I TOLD YOU THAT THE COMMITTEE WAS EVALUATING WHETHER THE WORK SHOULD BE DONE, AND EVEN IF SO, TO WHAT EXTENT IT SHOULD BE DONE (e. g. SHOULD ALL YEARS BE DONE, OR JUST 2013). PLEASE TRY NOT TO DISTORT THE TRUTH AGAIN WHICH I KNOW IS VERY HARD FOR YOU) Obviously, that was not the purported reason for your request to suspend the reconstruction. Mr. Pachulski explained that he believes that the Liquidating Trustee (who might be appointed in six months) should choose the financial advisor who performs the reconstruction. I DID SAY THAT IF, AND TO THE EXTENT A RECONSTRUCTION SHOULD BE DONE THE LIQUIDATING TRUSTEE SHOULD DO THE RECONSTRUCTION WITH THE PROFESSIONALS OF HIS CHOOSING AND NOT THE DEBTOR WHO HOPELESSLY MISMANAGED THE COMPANY BEFORE THE FILING. THE PRINCIPAL OF THE DEBTOR CONFIRMED THAT MISMANAGEMENT OF THE DEBTOR AT OUR MEETING ON FRIDAY. THE DEBTOR SHOULD NOT BE INVOLVED IN THE RECONSTRUCTION WHEN THE PRINCIPALS OF THE DEBTOR WERE INVOLVED IN CREATING A SHAMBLES OF THE BOOKS. Other than redirecting the work to a different professional, I do not understand this rationale and that rationale certainly was never discussed between us. The reconstruction is approximately 45% done (approximately $450K is needed to complete the project) and I cannot imagine a rationale for bringing in a different professional to start over, BECAUSE THE COMMITTEE NEEDS TO EVALUATE WHETHER THE MONEY WAS WASTED AND A DIFFERENT SET OF CRITERIA SHOULD HAVE BEEN UTILIZED TO DO THE RECONSTRUCTION. I KNOW THAT YOU ARE TRYING TO HELP HOWARD WITH HIS NEW FIRM, BUT THAT IS NOT A GOOD ENOUGH REASON TO START THE RECONSTRUCTION PREMATURELY. It likely would turn a 45% complete project likely to be completed prior to confirmation into a potential $2.0 million one year post-confirmation fiasco. Mr. Grobstein is one of the best bankruptcy accountants I know and I simply cannot imagine a competent Liquidating Trustee deciding not to rely on the reconstruction that he completes. FORTUNATELY THE LIQUIDATING TRUSTEE WILL BE DOING THAT EVALUATION AND NOT YOU, AND WHETHER THERE HAS BEEN A BREACH OF THE DEBTOR'S FIDUCIARY DUTIES TRYING TO RECONCILE THE BOOKS BEFORE CONSULTING WITH THE COMMITTEE

If the Committee had possessed a real concern about whether the reconstruction should occur, then the Debtor would have been receptive to that concern. The Committee's concern about whether Grobstein Teeple should do the reconstruction – given that they already are 45% done – just does not make sense to the Debtor. The prospect that the reconstruction should be halted so that it can be delayed and potentially cost four or five times more to re-do (there is approximately $450K of work left – higher priced alternative providers may well charge over $2 million to do it over) simply does not make sense in the context of a procedure that should be focused on minimizing cost and time for the benefit of unsecured creditors. If the Debtor had known that the nature of the concern was not the reconstruction's utility (as we discussed and could reasonably be debated), the Debtor likely never would have agreed to any suspension.

Consistent with my promise to you and your counsel, the Debtor will not re-commence the reconstruction without first informing you and your counsel (I will be discussing this issue with my client on Monday). The Debtor's concern is that the issue no longer appears to be resolution of whether the reconstruction should occur (the reason the reconstruction

2

EXHIBIT 2
13

EXHIBIT A PAGE 94

was delayed) but instead who accomplishes the reconstruction (an issue with which the Debtor does not believe can be reasonably debated). RODGER, SEE MY REFERENCE TO YOUR LIES ABOVE. THE ISSUE IS WHETHER AND TO WHAT EXTENT THE RECONSTRUCTION SHOULD BE DONE AND WHO SHOULD DO IT. YOUR OPINION AS TO WHETHER AND WHO IS NOT WORTH THE CYBERSPACE YOUR E-MAIL ORIGINATED THROUGH.

P. S. AS COMPARED TO JEFF WHO HAS MORE PATIENCE THAN I DO, I DO NOT INTEND TO RESPOND TO YOUR COUNTLESS PSYCHO-BABBLE E-MAILS THAT WILL BE GENERATED BY YOU BASED ON MY COMMENTS ABOVE, AND LET'S JUST LEAVE IT THAT I FUNDAMENTALLY DISAGREE WITH YOUR POSITIONS RELATING TO HOW TO MANAGE THIS CASE.

Rodger

Rodger Landau
Attorney

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail:
rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com%3cmailto:rlandau@lgbfirm.com>>
Web: www.lgbfirm.com<http://www.lgbfirm.com>
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.
Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

From: Roussey, John (NBCUniversal) [mailto:John.Roussey@nbcuni.com]
Sent: Thursday, October 31, 2013 11:28 AM
To: Rodger M. Landau
Cc: Richard Pachulski
(rpachulski@pszjlaw.com<mailto:rpachulski@pszjlaw.com<mailto:rpachulski@pszjlaw.com%3cmailto:rpachulski@pszjlaw.com>>); Jeffrey Dulberg
(jdulberg@pszjlaw.com<mailto:jdulberg@pszjlaw.com<mailto:jdulberg@pszjlaw.com%3cmailto:jdulberg@pszjlaw.com>>); Howard Grobstein
(hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com<mailto:hgrobstein@gtfas.com%3cmailto:hgrobstein@gtfas.com>>); Monica Rieder; Jon L.R. Dalberg
Subject: Re: Committee request relating to reconstruction and other issues

Rodger,

Thanks for the meeting Tuesday, the lunch, and agreeing to have Howard put the reconstruction work on hold. The Committee will be meeting this Friday to discuss the potential benefits or pitfalls relating to the continuation of the reconstruction work, and would like to have Paul available to report to the Committee Friday with his recommendations

B

EXHIBIT 2
14

EXHIBIT A  PAGE 95

as to whether or not to move forward. We also appreciate the offer/plan presented to continue the reconstruction work and cap Howard's fees. Jeff, Rich and I will also discuss that with the Committee during tomorrow's call.

Thank you for providing names of potential Liquidating Trustees - this will be another discussion point for the Committee call tomorrow.

Finally, the Committee would like to get in front of some housekeeping issues. Specifically employment and benefit issues.

Per review of the employee list, there are a number of persons that should most likely be put on a contract/hourly basis (NY employees); as well as some in LA and help through the reconciliation. I do not have the specific names in front of me as I am out of the office today; however, we can discuss tomorrow if necessary.

Secondly, in light of the accounting firm holding the 401(k) plan audit hostage for 2012, and knowing a similar situation will most likely arise in 2013, the Committee believes that it may be prudent to discontinue the 401(k) plan to employees as soon as possible - especially before 2014 starts as we do not believe it would be prudent to have the plan operating in 2014 (and have to have an audit for 2014 as well.

Nevertheless, the Committee greatly appreciates the temporary halt to the reconstruction process, and will get back to everyone next week to discuss the possibility of continuing the reconstruction work.

Please let me know if you have any questions or concerns.


John Roussey


Sent from my iPad

On Oct 30, 2013, at 12:35 PM, "Rodger M. Landau"
<RLandau@LGBFirm.com<mailto:RLandau@LGBFirm.com><mailto:RLandau@LGBFirm.com%3cmailto:RLandau@LGBFirm
.com>>> wrote:
Hi John:

As to your request that Grobstein Teeple put their pencils down on their reconstruction efforts until Friday, the Debtors will do as you request. Janet is comfortable with that accommodation and Howard (who is cc'd) already has provided that instruction to his people.

The Debtors have been evaluating the Committee's request to cease the reconstruction and, quite frankly, the Debtors are not even done with their own analysis. The prospect of having incomplete books raises a number of very difficult issues for the Debtors. I raised some of the issues with you and provided you with a preliminary analysis yesterday in hopes of getting the ball moving. The Debtors are concerned about the tax issues (both prospective $1M penalties and potentially breached fiduciary obligations) and avoidance action facilitation (preference and fraudulent transfer liability and defenses). If your Committee does not alter its instruction, the Debtors likely will come to you with a more complete description of their concerns and ask your Committee to evaluate the situation yet again.

I understood one of the issues was the prospective cost of the endeavor. As I informed you yesterday, Howard Grobstein likely would be willing to cap his firm's fees related to the reconstruction from November 1, 2013 through completion at $450K. This may address Rich's concerns about the costs spiraling out of control. Any such agreement -- even if voluntary -- likely would need, at minimum, to be disclosed to the Court.

9

EXHIBIT 2
15

EXHIBIT A  PAGE  96

Per your request, I will provide you with a name or two of potential Liquidating Trustees that your Committee may want to consider along with Mr. Kravitz (who I do not know well but about whom I have heard only good things). Obviously, whomever your Committee chooses as their choice or choices (if there were more than one acceptable alternative, that likely would show some flexibility in the process) would need to be interviewed by the Debtor in the context of a proposing a joint plan of reorganization.

Rodger

Rodger Landau
Partner

Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct: 310-557-0051
Fax: 310-557-0056
E-mail:
rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com<mailto:rlandau@lgbfirm.com%3cmailto:rlandau@lgbfirm.com>>
Web: www.lgbfirm.com<http://www.lgbfirm.com/>
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.
Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

From: Roussey, John (NBCUniversal) [mailto:John.Roussey@nbcuni.com]<mailto:[mailto:John.Roussey@nbcuni.com]>
Sent: Wednesday, October 30, 2013 10:06 AM
To: Rodger M. Landau
Cc: Richard Pachulski
(rpachulski@pszjlaw.com<mailto:rpachulski@pszjlaw.com<mailto:rpachulski@pszjlaw.com%3cmailto:rpachulski@pszjla
w.com>>); Jeffrey Dulberg
(jdulberg@pszjlaw.com<mailto:jdulberg@pszjlaw.com<mailto:jdulberg@pszjlaw.com%3cmailto:jdulberg@pszjlaw.com>
>)
Subject: Committee request relating to reconstruction and other issues

Rodger—

On behalf of the whole Committee, I want to extend my appreciation for yesterday's lunch and for welcoming Province to the KSL offices. It is tremendously important to the Committee that, after a thorough review of the situation, Province report back quickly on its outlook for the wind down.

It was informative to hear your reasoning for continuing the reconstruction of the books and records. We will consider your arguments on the potential taxes and penalties owed (or not), the preference analysis reasoning, and forensics as we need time, and information, to determine whether to support the reconstruction. That said, the reconstruction is expensive and I am still under instruction from the Committee to ask that you halt it pending our review. Therefore, I am reiterating our request that Howard's team put their pencils down while the Committee considers how best to proceed. We have a Committee meeting scheduled for Friday afternoon and my goal is to have the Committee's take on the

10

EXHIBIT 2
18

EXHIBIT A  PAGE  97

reconstruction resolved by then but, either way, the Committee believes that we need the meter to stop while we consider the matter. Please let me know whether you will stop the work until we have reviewed the matter.

Please let us know by the end of today if this program of action will be implemented.


John Roussey

11

EXHIBIT 2
17

EXHIBIT A  PAGE  98

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Landau Gottfried & Berger LLP; 1801 Century Park East, Suite 700; Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): ***DEBTORS' INITIAL OPPOSITION TO, AND
REQUEST FOR HEARING ON, APPLICATION FOR AN ORDER AUTHORIZING AND APPROVING THE
EMPLOYMENT OF PACHULSKI STANG ZIEHL & JONES LLP AS COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS NUNC PRO TUNC TO OCTOBER 10, 2013; DECLARATION
OF RODGER M. LANDAU IN SUPPORT THEREOF*** will be served or was served (a) on the judge in chambers in the
form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling
General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On
(*date*) **November 11, 2013**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined
that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**
On (*date*) **November 11, 2013**, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first
class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge **will
be completed** no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state
method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **November 11, 2013**  I
served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in
writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a
declaration that personal delivery on, or overnight mail to, the judge **will be completed** no later than 24 hours after the
document is filed.

Honorable Alan M. Ahart
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

United States Trustee (SV)
Attn: S Margaux Ross
21051 Warner Ctr Ln Ste 115
Woodland Hills, CA 91367

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 11/11/2013 | Samuel J. Colen | *[signature]* |
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*              **F 9013-3.1.PROOF.SERVICE**

EXHIBIT A  PAGE  99

1. <u>TO BE SERVED BY THE COURT VIA NEF</u> (continued):

- Allison R Axenrod   allison@claimsrecoveryllc.com
- Wanda Borges   ecfcases@borgeslawllc.com
- Howard Camhi   hcamhi@ecjlaw.com, kanthony@ecjlaw.com
- Sara Chenetz   schenetz@perkinscoie.com, dlax@perkinscoie.com
- Jeff Cohen   JC@SouthpawAsset.com
- Natalie B. Daghbandan   natalie.daghbandan@bryancave.com,
  raul.morales@bryancave.com;theresa.macaulay@bryancave.com
- Jon L Dalberg   jdalberg@lgbfirm.com, ncereseto@lgbfirm.com;marizaga@lgbfirm.com;scolen@lgbfirm.com
- Ted A Dillman   Ted.dillman@lw.com
- Jeffrey W Dulberg   jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall   lekvall@wgllp.com, tjones@wgllp.com
- Mary L Fullington   lexbankruptcy@wyattfirm.com, pwest@wyattfirm.com
- Scott F Gautier   sgautier@peitzmanweg.com
- Paul R. Glassman   pglassman@sycr.com
- Eric D Goldberg   egoldberg@stutman.com
- Emil W Herich   eherich@kilpatricktownsend.com,
  acaviles@kilpatricktownsend.com;tmeyers@kilpatricktownsend.com;sramsey@kilpatricktownsend.com
- Marsha A Houston   mhouston@reedsmith.com
- Robbin L Itkin   ritkin@steptoe.com
- Lawrence M Jacobson   lmj@gfjlawfirm.com
- Ivan L Kallick   ikallick@manatt.com, ihernandez@manatt.com
- Jeffrey A Krieger   jkrieger@ggfirm.com,
  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;sgaeta@greenbergglusker.com
- Rodger M Landau   rlandau@lgbfirm.com, marizaga@lgbfirm.com;rmartin-patterson@lgbfirm.com;kalandy@lgbfirm.com
- Mary D Lane   mal@msk.com, mec@msk.com
- Paul J Laurin   plaurin@btlaw.com, tpearsall@btlaw.com
- Ira M Levee   ilevee@lowenstein.com, ehorn@lowenstein.com
- Richard M Lorenzen   RLorenzen@perkinscoie.com, KHardy@perkinscoie.com
- Scotta E McFarland   smcfarland@pszjlaw.com, smcfarland@pszjlaw.com
- Neeta Menon   nmenon@btlaw.com
- Vahid Naziri   vnaziri@anhlegal.com, matthew@anhlegal.com
- Matthew Ochs   mjochs@hollandhart.com, sjohnson@hollandhart.com
- Michael H Raichelson   mhr@cbbkattorney.com
- Thomas Rice   trice@coxsmith.com, phuffstickler@coxsmith.com
- Monica Rieder   mrieder@lgbfirm.com, rmartin-patterson@lgbfirm.com;scolen@lgbfirm.com
- Christopher O Rivas   crivas@reedsmith.com
- S Margaux Ross   margaux.ross@usdoj.gov
- Norman D Schoenfeld   lsi@liquiditysolutions.com
- David B Shemano   dshemano@peitzmanweg.com
- Jonathon Shenson   jshenson@shensonlawgroup.com
- Alan R Smith   mail@asmithlaw.com
- Tiffany Strelow Cobb   tscobb@vorys.com
- United States Trustee (SV)   ustpregion16.wh.ecf@usdoj.gov
- Sharon Z. Weiss   sharon.weiss@bryancave.com, raul.morales@bryancave.com
- Dennis J Wickham   wickham@scmv.com, nazari@scmv.com
- Robert G Wilson   rwilson@lgbfirm.com, kalandy@lgbfirm.com
- Bruce J Zabarauskas   bruce.zabarauskas@tklaw.com
- Amy A Zuccarello   azuccarello@sandw.com
- Roye Zur   rzur@lgbfirm.com, rmartin-patterson@lgbfirm.com;scolen@lgbfirm.com;kalandy@lgbfirm.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT A   PAGE  100

2. <u>SERVED BY UNITED STATES MAIL (Continued)</u>:

*<u>Committee Members</u>*
Fox Cable Network Services, LLC
c/o Barnes & Thornburg LLP
2029 Century Park East, Ste. 300
Los Angeles, CA 90067
Attn: Paul Laurin

MacDonald Media LLC
185 Madison Ave. 4th Floor
New York, NY 10016
Attn: Andrea MacDonald

Telebrands Corp.
One Telebrands Plaza
Fairfield, NJ 07004
Attn: Bob Barnett

TV Guide Networks, LLC
1800 N. Highland Ave., 7th Floor
Los Angeles, CA 90028
Attn: Kathy Sarrami

Valassis
235 Great Pond Drive
Windsor, CT 06095
Attn: Hal Manolan

Viacom Media Networks
1540 Broadway
New York, NY 10036
Attn: Ross Weston

3. <u>SERVED BY EMAIL (Continued)</u>:

*<u>Proposed Counsel</u>*
Pachulski Stang Ziehl & Jones LLP
Richard M. Pachulski: rpachulski@pszjlaw.com
Jeffrey W. Dulberg: jdulberg@pszjlaw.com

*<u>Committee Chair</u>*
John Roussey: John.Roussey@nbcuni.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                    **F 9013-3.1.PROOF.SERVICE**

WEILAND GOLDEN GOODRICH LLP
Jeffrey I. Golden, State Bar No. 133040
jgolden@lwgfllp.com
Faye Rasch, State Bar No. 253838
frasch@lwgfllp.com
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002

Attorneys for Wellgen Standard, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>PHILIP JAMES LAYFIELD,<br><br>               Debtor. | ) Case No. 2:18-bk-15829-NB<br>)<br>) Chapter 7<br>)<br>) Hon. Neil W. Bason<br>)<br>) **DECLARATION OF DAN A.**<br>) **TAUSSIG** |

Comes now Dan A. Taussig and states:

1.      I am a Member of Wellgen Standard, LLC ("Wellgen"), and Chairman of Advocate

Capital, Inc. ("Advocate"). I have personal knowledge of the matters stated herein. Advocate is

a wholly-owned subsidiary of Wellgen.

2.      The statements contained herein are based on my personal knowledge and records

kept by Wellgen and Advocate in the regular course of their business and made by or from

information transmitted by employees or representatives of Wellgen and Advocate with

knowledge of the acts, events, conditions or opinions recorded and whose regular practice was to

4849-0589-9126.2

make the record, and the record was made, at or near the time of the acts, events, conditions or opinions shown therein.

3.  On September 18, 2017, Advocate filed an action against the alleged debtor, Mr. Philip Layfield ("Mr. Layfield"), in the United States District Court for the Central District of California, Case No. SACV 17-01628 AG (DFM) (the "District Court Action").  On December 12, 2017, Advocate obtained a default judgment against Mr. Layfield in the amount of $4,488,153.80 (the "Judgment").  Advocate later assigned the Judgment to Wellgen. (*See* Exhibit A attached hereto).

4.  Since the entry of the Judgment on December 12, 2017, neither Wellgen nor Advocate has received any payments from Mr. Layfield.  Wellgen has received $78,871.49 from the office of Mr. Richard Pachulski, the Chapter 11 Trustee for Layfield & Barrett, APC.  Neither Wellgen nor Advocate has received any other payments from any source on the indebtedness evidenced by the Judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 8th day of October, 2018.


*Dan A. Taussig*

_____

Dan A. Taussig

2

**FILED**

MAY 18 2018

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

# PUBLIC MATTER

### STATE BAR COURT OF CALIFORNIA

### HEARING DEPARTMENT – LOS ANGELES

| | |
|---|---|
| In the Matter of | )   Case Nos. 17-O-04140 (17-O-04198; |
| | )              17-O-04754)-YDR |
| PHILIP JAMES LAYFIELD, | ) |
| | )   DECISION AND ORDER OF |
| A Member of the State Bar, No. 204836. | )   INVOLUNTARY INACTIVE |
| | )   ENROLLMENT |
| | ) |

      Respondent Philip James Layfield (Respondent) was charged with 12 counts of violations

of the Rules of Professional Conduct and the Business and Professions Code.[1] He failed to

appear at the trial of this case and his default was entered.  The Office of Chief Trial Counsel

(OCTC) filed a petition for disbarment under rule 5.85 of the Rules of Procedure of the State

Bar.[2]

      Rule 5.85 provides the procedure to follow when an attorney fails to appear at trial after

receiving adequate notice and opportunity.  The rule provides that, if an attorney's default is

entered for failing to appear at trial and the attorney fails to have the default set aside or vacated

---

[1] Unless otherwise indicated, all further references to section(s) refer to provisions of the
Business and Professions Code.

[2] Unless otherwise indicated, all references to rules are to this source.

kwiktag®    237 304 608

EXHIBIT C  PAGE 104

within 45 days, OCTC will file a petition requesting the court to recommend the attorney's disbarment.[3]

In the instant case, the court concludes that the requirements of rule 5.85 have been satisfied and, therefore, grants the petition and recommends that Respondent be disbarred from the practice of law.

## FINDINGS AND CONCLUSIONS

Respondent was admitted to practice law in California on December 7, 1999, and has been a member since then.

**Procedural Requirements Have Been Satisfied**

On September 26, 2017, OCTC properly filed and served a First Amended Notice of Disciplinary Charges (NDC) on Respondent. The NDC notified Respondent that his failure to appear at the State Bar Court trial would result in a disbarment recommendation.

Respondent filed a response to the NDC on October 31, 2017.

At a status conference on December 21, 2017, the trial was set to start on January 24, 2018. The December 21, 2017 order setting the trial date was served on Respondent at his membership records address by first-class mail, postage paid. (Rule 5.81(A).)

On January 24, 2018, OCTC appeared for trial but Respondent did not.

Finding that all of the requirements of rule 5.81(A) were satisfied, the court entered Respondent's default by order filed January 24, 2018. The order notified Respondent that, if he did not timely move to set aside his default, the court would recommend his disbarment. The order also placed Respondent on involuntary inactive status under section 6007, subdivision (e),

---

[3] If the court determines that any due process requirements are not satisfied, including adequate notice to the attorney, it must deny the petition for disbarment and take other appropriate action to ensure that the matter is promptly resolved. (Rule 5.85(F)(2).)

- 2 -

EXHIBIT C  PAGE 105

effective three days after service of the order, and he has remained inactively enrolled since that time.

Respondent did not seek to have his default set aside or vacated. (Rule 5.83(C)(2) [attorney has 45 days after order entering default is served to file motion to set aside default].)

On March 21, 2018, OCTC properly filed and served the petition for disbarment on Respondent at his official membership records address. As required by rule 5.85(A), OCTC reported in the petition that: (1) there has been no contact with Respondent since his default was entered, except in connection with Respondent's inquiries whether OCTC would stipulate to setting aside his default and whether OCTC would grant him a 30-day extension to file a motion to set aside the default, in two separate emails from Respondent through his wife dated March 9, 2018;[4] (2) there are 91 investigations pending against Respondent; (3) Respondent has no record of prior discipline; and (4) the Client Security Fund (CSF) has not paid any claims as a result of Respondent's misconduct.

Respondent has not responded to the petition for disbarment or moved to set aside or vacate the default.[5] The case was submitted for decision on April 25, 2018.

**The Admitted Factual Allegations Warrant the Imposition of Discipline**

Upon entry of Respondent's default, the factual allegations in the NDC are deemed admitted and no further proof is required to establish the truth of such facts. (Rule 5.82.) As set forth below in greater detail, the factual allegations in the NDC support the conclusion that

---

[4] OCTC declined Respondent's requests. In the email, Respondent stated that he was "aware that a default was entered" against him. On February 23, 2018, Respondent was arrested in New Jersey for mail fraud. When he sent the two emails to OCTC, he was under the custody of the U.S. Marshal.

[5] The court received a letter from Respondent on March 21, 2018. But because it did not meet filing requirements, the letter was not filed and is not considered part of the record of this proceeding.

- 3 -

EXHIBIT C  PAGE 106

Respondent is culpable as charged and, therefore, violated a statute, rule or court order that would warrant the imposition of discipline.  (Rule 5.85(F)(1)(d).)

### Case No. 17-O-04140 (Casas Matter)

Count 1 – Respondent willfully violated rule 4-100(A) of the Rules of Professional Conduct (failure to maintain client funds in trust account) by failing to maintain a balance of $360,000 on behalf of Patricia Casas, Issac Cassas, and their lienholders in a client trust account.

Count 2 – Respondent willfully violated section 6106 (moral turpitude, dishonesty, or corruption) by intentionally misappropriating client funds of $359,942.15 between February 23 and June 20, 2017, that the clients and their lienholders were entitled to receive.

Count 3 – Respondent willfully violated rule 4-100(B)(3) of the Rules of Professional Conduct (failure to render accounts of client funds) by failing to provide an accounting regarding the $600,000 settlement funds upon termination of employment on March 30, 2017.

Count 4 – Respondent willfully violated rule 4-100(B)(4) of the Rules of Professional Conduct (failure to promptly pay funds to client) by failing, upon the clients' request, to promptly pay any portion of the $360,000 to Patricia Casas, Issac Cassas, or their lienholders.

### Case No. 17-O-04198 (Pimentel Matter)

Count 5 – Respondent willfully violated rule 4-100(A) of the Rules of Professional Conduct by failing to maintain a balance of $742,500 on behalf of Rodney A. Pimentel and his lienholders in a client trust account.

Count 6 – Respondent willfully violated section 6106 by intentionally misappropriating client funds of $742,442.15 between February 24 and June 20, 2017, that the client and his lienholders were entitled to receive.

- 4 -

EXHIBIT C  PAGE 107

Count 7 – Respondent willfully violated rule 4-100(B)(3) of the Rules of Professional Conduct by failing to provide an accounting regarding the $1.35 million settlement funds upon the client's multiple demands between April and June 2017.

Count 8 – Respondent willfully violated rule 4-100(B)(4) of the Rules of Professional Conduct by failing, upon the client's multiple requests, to promptly pay any portion of the $742,500 to Pimentel or his lienholders.

**Case No. 17-O-04754 (Nguyen Matter)**

Count 9 – Respondent willfully violated rule 4-100(A) of the Rules of Professional Conduct by failing to maintain a balance of $2.315 million on behalf of Josephine Nguyen and her lienholders in a client trust account.

Count 10 – Respondent willfully violated section 6106 by intentionally misappropriating client funds of $2,314,942.15 between August 29, 2016, and June 20, 2017, that the client and her lienholders were entitled to receive.

Count 11 – Respondent willfully violated rule 4-100(B)(3) of the Rules of Professional Conduct by failing to provide an accounting regarding the $3.9 million settlement funds upon termination of employment on June 22, 2017.

Count 12 – Respondent willfully violated rule 4-100(B)(4) of the Rules of Professional Conduct by failing, upon the client's request on June 22, 2017, to promptly pay any portion of the $2.315 million to Nguyen, her new attorney, or her lienholders.

**Disbarment Is Recommended**

Based on the above, the court concludes that the requirements of rule 5.85(F) have been satisfied and Respondent's disbarment is recommended. In particular:

(1) The NDC was properly served on Respondent under rule 5.25.

- 5 -

EXHIBIT C  PAGE 108

(2) Respondent had actual notice of this proceeding and had adequate notice of the trial

date prior to the entry of his default.

(3) The default was properly entered under rule 5.81.

(4) The factual allegations in the NDC, deemed admitted by the entry of the default,

support a finding that Respondent violated a statute, rule or court order that would warrant the

imposition of discipline.

(5) Despite adequate notice and opportunity, Respondent failed to appear for the trial of

this disciplinary proceeding.

As set forth in the Rules of Procedure of the State Bar, the court recommends his

disbarment.

## RECOMMENDATIONS

**Disbarment**

The court recommends that Respondent **Philip James Layfield**, State Bar number

204836, be disbarred from the practice of law in the State of California and that his name be

stricken from the roll of attorneys.

**Restitution**

The court also recommends that Respondent be ordered to make restitution to the

following payees:

(1)  Patricia Casas and Issac Cassas in the amount of $359,942.15 plus 10 percent
     interest per year from March 30, 2017;

(2)  Rodney A. Pimentel in the amount of $742,442.15 plus 10 percent interest per year
     from June 20, 2017; and

(3)  Josephine Nguyen in the amount of $2,314,942.15 plus 10 percent interest per year
     from June 20, 2017.

Any restitution owed to the Client Security Fund is enforceable as provided in

Business and Professions Code section 6140.5, subdivisions (c) and (d).

- 6 -

EXHIBIT C  PAGE 109

**California Rules of Court, Rule 9.20**

    The court also recommends that Respondent be ordered to comply with the requirements of California Rules of Court, rule 9.20, and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order in this proceeding.

**Costs**

    The court further recommends that costs be awarded to the State Bar in accordance with Business and Professions Code section 6086.10, such costs being enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.

**ORDER OF INVOLUNTARY INACTIVE ENROLLMENT**

    In accordance with Business and Professions Code section 6007, subdivision (c)(4), the court orders that **Philip James Layfield**, State Bar number 204836, be involuntarily enrolled as an inactive member of the State Bar of California, effective three calendar days after the service of this decision and order.  (Rule 5.111(D).)

Dated: May _17_, 2018

Yvette D. Roland
Judge of the State Bar Court

- 7 -

EXHIBIT C  PAGE 110

## CERTIFICATE OF SERVICE

[Rules Proc. of State Bar; Rule 5.27(B); Code Civ. Proc., § 1013a(4)]

I am a Court Specialist of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on May 18, 2018, I deposited a true copy of the following document(s):

DECISION AND ORDER OF INVOLUNTARY INACTIVE ENROLLMENT

in a sealed envelope for collection and mailing on that date as follows:

☒ by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

PHILIP JAMES LAYFIELD              PHILIP JAMES LAYFIELD
2720 HOMESTEAD RD STE 200          382 NE 191ST STREET
PARK CITY, UT  84098 - 4887        SUITE 42308
                                   MIAMI, FL  33179

☒ by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

Eli D. Morgenstern, Enforcement, Los Angeles

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on May 18, 2018.

Angela Carpenter
Court Specialist
State Bar Court

EXHIBIT C  PAGE 111

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re

PHILIP JAMES LAYFIELD,

        Debtor.

Case No: 2:18-bk-15829-BR

Chapter 7

Assigned to: Hon. Neil Bason

DECLARATION OF CHERYL KAUFMAN
IN OPPOSITION TO DEBTOR'S MOTION
TO DISMISS

I, Cheryl Kaufman, DECLARE:

1.     I am over the age of eighteen and suffer under no disabilities. I am competent to make this affidavit, which is based on personal knowledge.

2.     I serve as the President and Chief Executive Officer of Alliance Legal Solutions, LLC ("Alliance"). Alliance is a company organized under the laws of Delaware and based in Charlotte, North Carolina.

3.     Alliance provides financial services and financing to law firms.

4.     In late 2016, Layfield & Barrett, APC, a law firm structured as a for-profit corporation and based in the State of California (the "**Debtor Law Firm**"), sought financing from Alliance to assist in managing its law firm operations. Alliance was approached by Philip Layfield ("**Layfield**" or "**Debtor**"), who purported to be a partner and primary shareholder of Debtor Law Firm, holding a 90% interest in the firm. Layfield claimed that Joseph Barrett was the second minority partner in

1

DECLARATION OF CHERYL KAUFMAN IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS

1    Debtor Law Firm. (Collectively, Debtor Law Firm and Layfield are referred to as "**Debtors**").

2    5.    On or about December 7, 2016, Alliance and Debtors entered into a business loan

3    agreement, by which Alliance extended a one hundred and eighty thousand dollar ($180,000) loan to

4    Debtor Law Firm, pursuant to the terms and conditions of that agreement. A copy of the December

5    7, 2016 loan agreement is attached hereto and incorporated by reference herein as <u>Exhibit A</u>.

6    

7    6.    On or about December 29, 2016, Alliance and Debtors entered into a second business

8    loan agreement, by which Alliance extended additional financing to Debtor Law Firm in the amount

9    of one hundred and eighty thousand dollar ($180,000), pursuant to the terms and conditions of that

10    agreement. A copy of the December 29, 2016 loan agreement is attached hereto and incorporated by

11    reference herein as <u>Exhibit B</u>. (Collectively, the December 7, 2016 loan agreement and the December

12    29, 2016 loan agreements are referred to as the "**Alliance Loan Agreements.**" The financing of these

13    agreements collectively is referred to as the "**Loan.**").

14    

15    7.    Pursuant to the terms of the Alliance Loan Agreements, Debtor Law Firm

16    unconditionally agreed to repay Alliance the principal amount of the Loan along with closing costs,

17    fees, and all accrued interest. Debtor Law Firm agreed to pay Alliance a monthly interest payment

18    according to a formula set forth in the Alliance Loan Agreements, until such time as Debtor Law Firm

19    had fulfilled its obligations to Alliance.

20    

21    8.    Debtor Law Firm agreed to repay Alliance a specified portion of the Loan principal

22    amount based on the resolution (whether by settlement, judgment, or otherwise) of certain designated

23    cases ("**Designated Cases**"). Debtor Law Firm agreed, *inter alia*, to provide Alliance with updates

24    on those Designated Cases every sixty days. If any of the Designated Cases were lost, dismissed or

25    otherwise resolved, Debtor Law Firm was required to provide notice to Alliance within seven (7) days.

26    

27    

28    

2

DECLARATION OF CHERYL KAUFMAN IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS

9.      Debtor Law Firm agreed that its failure to adhere to these and other obligations as set forth in the Alliance Loan Agreements would constitute an act of default, giving rise to certain rights and remedies for Alliance.

10.     Layfield signed the business financing loan applications and the Alliance Loan Agreements on behalf of Debtor Law Firm as its authorized representative.

11.     Layfield also signed both Alliance Loan Agreements in his individual capacity as a personal guarantor for the financing extended to Debtor Law Firm under the Alliance Loan Agreements.   On December 29, 2016, Layfield contemporaneously executed a separate personal guaranty in which he similarly and unconditionally promised to personally guarantee all obligations of Debtor Law Firm under both Alliance Loan Agreements (the **"Personal Guaranty"**).  A copy of the Personal Guaranty is attached hereto and incorporated by reference herein as Exhibit C.

12.     Pursuant to the terms of the Alliance Loan Agreements and the Personal Guaranty, Layfield agreed to pay all amounts owed to Alliance by Debtor Law Firm, including any outstanding loan amount, unpaid interest, and all fees associated with collection of funds.  Layfield agreed that if Debtor Law Firm failed to perform in any manner, he would personally repay Alliance through any and all personal assets and/or future earnings.

13.     As collateral for the loan, Layfield granted to Alliance a security interest in all of his personal assets and property, including attorneys' fees, as described further in the Alliance Loan Agreements and the Personal Guaranty.  Layfield acknowledged in the Alliance Loan Agreements that his guarantee was an inducement to Alliance in providing Debtor Law Firm with funds.

14.     Based upon these representations, Alliance advanced funds to Debtor Law Firm pursuant to the Alliance Loan Agreements.  Alliance provided funds to Debtor Law Firm from its accounts in North Carolina, at the direction of Debtor Law Firm and Layfield.

3

DECLARATION OF CHERYL KAUFMAN IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS

15.    Article I of the Loan Agreement permitted Alliance "to file[] a UCC lien against all attorney fee receivables, and all other assets ..." Accordingly, on March 6, 2017, Alliance perfected its security interest by filing with the Secretary of State for California a UCC Financing Statement with respect to both Debtor Law Firm and Layfield. The UCC statement covered, *inter alia*, all accounts receivables, including attorneys' fees, whether now owned or hereafter acquired.

16.    On December 7, 2016, contemporaneously with execution of the first loan agreement, and based upon the representations made by Layfield, Alliance advanced funds to Debtor Law Firm. The total loan amount associated with the December 7, 2016 loan agreement was one hundred and eighty thousand dollars ($180,000), which included one hundred and fifty thousand dollars ($150,000) in principal, along with thirty thousand dollars ($30,000) in various fees and closing costs that were rolled into the total loan amount.

17.    On December 29, 2016, contemporaneously with execution of the first loan agreement, and based upon the representations made by Layfield, Alliance advanced additional funds to Debtor Law Firm. The total loan amount associated with the December 29, 2016 loan agreement was an additional one hundred and eighty thousand dollars ($180,000), which included one hundred and fifty thousand dollars ($150,000) in principal, along with thirty thousand dollars ($30,000) in various fees and closing costs that were rolled into the total loan amount. Combined, these two loans amounted to total outstanding loan amount of three hundred and sixty thousand dollars ($360,000) ("**Total Loan Amount**").

18.    During the first six months of the agreements, from January through July 2017, Debtors timely made their monthly payments under the Alliance Loan Agreements. Pursuant to the terms of the Alliance Loan Agreement, the monthly payments were comprised only of interest, based upon a formula set forth in the Alliance Loan Agreements. The amounts were based upon the outstanding Total Loan Amount and therefore would decrease as the overall Loan obligations decreased.

4

DECLARATION OF CHERYL KAUFMAN IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS

19.    Debtors missed their August 1, 2017 monthly interest payment and thereafter stopped making payments under the Alliance Loan Agreements.  They have not made a payment to Alliance since July 3, 2017.

20.    Debtors made four payments towards the three hundred and sixty thousand dollar ($360,000) outstanding Total Loan Amount.  On March 9, 2017, Debtors made a one hundred thousand dollar ($100,000) payment.  On March 21, 2017, Debtors made a fifty thousand dollar ($50,000) payment towards principal.  On June 1, 2017, Debtors made a fourteen thousand dollar ($14,000) payment.  On June 20, 2017, Debtors made a forty five thousand dollar ($45,000) payment. In total, the four principal payments amounted to two hundred and nine thousand dollars ($209,000). Crediting these amounts towards the Total Loan Amount, Debtors have a remaining loan balance of one hundred and fifty one thousand dollars.  Debtors also have an unpaid accumulated interest balance of three thousand four hundred and seven dollars and ninety three cents ($3,407.93).  Therefore, the total outstanding amount owed by Debtors to Alliance is one hundred and fifty four thousand, four hundred and seven dollars and ninety three cents ($154,407.93).

21.    Attached hereto and incorporated herein as <u>Exhibit D</u> is a true and accurate copy of the Debt Summary of the loan obligation of Debtor Law Firm kept and maintained by Alliance in the regular course of its business.

22.    The amount owed under the Alliance Loan Agreements as described herein and on <u>Exhibit D</u> remains due and outstanding.

23.    Neither Debtor Law Firm nor Layfield has repaid the full amount owed to Alliance under the Alliance Loan Agreements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and would so testify if called as a witness.

5

DECLARATION OF CHERYL KAUFMAN IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS

1    Executed on this the 5ᵗʰ day of October 2018, in Charlotte, North Carolina.



CHERYL KAUFMAN, President and CEO
Plaintiff Alliance Legal Solutions, LLC

6

DECLARATION OF CHERYL KAUFMAN IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS

EXHIBIT D  PAGE  117

# EXHIBIT A



17505 West Catawba Avenue Suite 200
Cornellus, NC 28031
**www.alliancelegalsolutions.com**
Phone (877) 584-9044  Fax (866) 262-7402

## FAX - CONFIDENTIAL

| To: Phil Layfield | From: Michelle Mills |
|---|---|
| Fax: 0000000000 | Date: December 5, 2016 |
| Re: Funding | Pages: 10 |

I have attached our proposed Loan Agreement and the corresponding Exhibit A.  Please review and if approved, execute the documents provided and return to Alliance for final approval. Once approved, we will send funds to your bank account via direct deposit or mail a check as you select.

INSTRUCTIONS FOR MANAGING PARTNER

1. Confirm your official Law Firm name and the entity type listed on page 1 are correct and <u>exactly</u> as filed with the state in your organizational documents
2. Please sign and initial where designated on Loan Agreement
3. Please sign where designated on Exhibit A
4. Provide all bank account information for Monthly Fee payments and repayment drafts.
5. Email the executed contract (ALL PAGES OF BOTH DOCUMENTS) back to contracts@alliancefundings.com or fax to (866) 262-7402.
6. Good luck with all of your pursuits!

Sincerely,

*Michelle Mills*

Michelle Mills

Manager, Alliance Legal Solutions, LLC
(877) 584-9044

EXHIBIT D  PAGE  119

## LOAN AGREEMENT
## MONTHLY FEE
### (Contract Number: 2384)

THIS LOAN AGREEMENT is entered into on the below date, between Layfield & Barrett, APC (hereinafter 'Debtor'), located in Irvine, California and Alliance Legal Solutions, LLC, a Delaware Limited Liability Company (hereinafter 'Creditor'), with its principal place of business at 17505 West Catawba Avenue, Suite 200 Cornelius, NC 28031.

HEREINAFTER, Creditor and Debtor are collectively referred to as 'Parties' and singularly as 'Creditor' and 'Debtor' respectively; and

WHEREAS, Debtor is a business engaged in the practice of law, representing clients in legal matters, claims, cases and/or lawsuits (collectively referred to in this contract as 'Case' or 'Cases'); and

WHEREAS, Debtor seeks to obtain Law Firm financing, whether to finance certain Case costs and/or Law Firm's operations or otherwise, and seeks to secure any financing that is obtained with all of the Debtor's anticipated fee receivables and actual fee receivables; and

WHEREAS, Debtor agrees that it may receive a monetary benefit related to the funds loaned because by improving its cash flow, Debtor may be able to improve firm operations and profits or invest money in an existing Case(s) which may improve the ultimate value of such Case(s); and

WHEREAS, Debtor agrees that the Creditor is extending financing to the Debtor generally against all of Debtor's fee receivables and assets; and

WHEREAS, Debtor understands that while in some circumstances Case(s) may be presented to Creditor and listed on the Repayment Schedule of this Agreement, this is specifically done in order to afford Debtor sufficient time and resources to repay the loan while pursuing its Cases and in order to establish mutual expectations between Debtor and Creditor about the timeframe for repayment of this financing; and

WHEREAS, Creditor has agreed that Debtor and Creditor will select specific Case(s) in Debtor's portfolio that will create a repayment schedule for the Law Firm financing based on the receipt of the attorney fees which may arise from the settlement, judgment or resolution of specific Case(s) in Debtor's portfolio and that such Case(s) are listed in the Repayment Schedule provided in Exhibit A of this Agreement; and

WHEREAS, Debtor has been advised that Creditor is a provider of funds of last resort and that other lenders/investors may be less expensive; and

WHEREAS, after diligent effort by Debtor, Debtor has been unable to secure funding elsewhere; and

WHEREAS, Debtor has authorized Phil Layfield to sign this Agreement on behalf of the firm; and

WHEREAS, Debtor recognizes this Agreement is a business-to-business loan, and further acknowledges that Creditor may make a substantial profit on this Agreement; and

WHEREAS, the Parties agree to the following terms and conditions under which this Agreement shall be performed;

Alliance Legal Solutions, LLC Loan Agreement (Monthly Fee)

Debtor Initials PL_____

Page 1 of 10

NOW, THEREFORE, in consideration of these promises, the Parties hereto agree as follows:

### ARTICLE I:  LOAN TERMS

In consideration for the loan made, the Debtor hereby agrees to reimburse Creditor for the total loan amount, ('Total Loan Amount' or 'Loan Amount') based on the funds extended to the Debtor (also identified as 'Loan Amount' or 'Cash Amount'), interest and a one-time processing and closing fee ('Closing Fee'). A repayment schedule ('Repayment Schedule' also referred to as 'Exhibit A') identifies particular Case(s) in Debtor's portfolio and Debtor is obligated to repay the portion of the Total Loan Amount attributed to those Case(s) as set forth on the schedule at the time the Case(s) resolves, with terms more specifically set forth below. In addition, the Debtor will pay a monthly fee ('Monthly Fee') on the aggregate unpaid Total Loan Amount(s).

Debtor has an absolute obligation to repay the Total Loan Amount no later than 3 years from the date that Creditor sends funds to Debtor. The actual status of individual Case(s) identified within the Repayment Schedule does not extend the due date for repayment beyond 3 years from the date the Debtor receives funds from Creditor. Any remaining balance of the Total Loan Amount will be called due in full exactly three years from the date that the Debtor receives funds. Notwithstanding the 3-year term, all Case(s) listed in the Repayment Schedule must be paid when they resolve, with specific obligations as set forth in more detail below.

<u>Monthly Fee</u>

The Monthly Fee due for each unpaid Case will be calculated on a daily basis based by multiplying by one-thirtieth (1/30) of the monthly interest rate ('Monthly Interest Rate') percentage by the outstanding balance of the Total Loan Amount plus Monthly Fee due Creditor on the previous day for 30 days, regardless of the number of days in that month. In the event that the Loan was made during the prior month, the Monthly Fee will be prorated. At the start of each month, the Monthly Fee accrued in the previous month will be paid automatically to Creditor through direct bank account draft utilizing the bank account provided by Debtor. All bank drafts for Monthly Fees shall be drafted on the 1st day of the month following the month that fees accrued. If the 1st falls on a weekend or bank holiday, such funds shall be drafted the next business day. The final Monthly Fee shall be paid at the time of the loan payoff. It is Debtor's responsibility to maintain sufficient funds in this account to meet Debtor's obligations at the time of the monthly auto-draft. It is Debtor's responsibility to inform Creditor if there is a change in bank account information to be used for the auto-draft. Creditor will not offer special arrangements to change auto-draft date or amount due.

Debtor's responsibility to pay the Monthly Fee to Creditor is absolute and shall not require notification, reminders or management by Creditor. For convenience to Debtor, Creditor accepts Monthly Fee through auto-draft from the bank account provided to Creditor by Debtor. It is Debtor's responsibility to keep funds in Debtor's account to pay the Monthly Fee and to notify Creditor if Debtor changes its bank account used for auto-draft. In the event that Debtor's Monthly Fee is not paid to Creditor, whether due to account closing, failure to provide Creditor information of a changed account, insufficient funds or otherwise, Creditor will notify Debtor by electronic mail or by phone. It is the Debtor's responsibility to correct any non-payment of the Monthly Fee within 7 days of the Creditor's notification to Debtor of the non-payment. If Debtor does not cure the non-payment or reach a mutually acceptable solution with the Creditor within 7 days of notification, Creditor has the right to declare the Debtor in default ('Default') of the Agreement. Such Default shall be deemed sufficient grounds for Creditor to call the Total Loan Amount due, at Creditor's option. Default remedies are set forth below in Article IX: Default and Remedies.

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____

Additionally, in the event that Debtor's Monthly Fee is not received by Creditor upon Creditor's monthly auto-draft of Debtor's account, Debtor shall be charged a $100.00 fee, regardless of whether the failure is due to insufficient funds in the account, account closing or otherwise.

Loan Repayment

As any Case listed in the Exhibit A is resolved, whether through settlement, judgment at trial, appealed after verdict, lost at trial, lost through a change in representation or concluded through any other resolution, Debtor must repay to Creditor at least that portion of the Total Loan Amount shown on the Exhibit A that is assigned to that particular Case. Repayment of the portion of the Total Loan Amount attributed to any of the Debtor's Case(s) set forth in the Exhibit A along with associated unpaid Monthly Fees becomes due and shall be paid to Creditor within seven (7) calendar days of the date that Debtor receives the proceeds ('Case Proceeds') from the settlement, judgment or other resolution of such Case ('Due Date'). Debtor may not delay repayment to Creditor or use attorney fees or expense reimbursement entitled to the Debtor and arising out of the Case Proceeds for any purpose except to repay Creditor until Creditor is fully repaid for the Total Loan Amount attributed to that Case. Debtor is obligated to repay the Total Loan Amount attributed to the Case even if that amount is more than the legal fees received by Debtor on that particular Case. Debtor's failure to make payment to Creditor for the portion of the Total Loan Amount of any of Debtor's Cases provided in Exhibit A, within seven (7) calendar days of the date that Debtor receives the Case Proceeds shall be considered a Default of this contract. In the event of Default, Creditor has the option to pursue any and all other measures necessary to protect Creditor's financial interest as set forth in Article IX: Default and Remedies, below.

For purposes of this Agreement, in the event that any Case listed in the Exhibit A is lost, whether at trial or summary judgment hearing, dismissed with prejudice, appealed, ceases to be pursued, if the attorney client relationship is terminated, if the client cannot be located by the Debtor for more than 2 months, or if for any other reason fees cannot be recovered before or through trial ('Lost Case'), then Debtor shall report such fact to Creditor immediately, but in no event later than seven (7) calendar days from the date of the action creating a Lost Case. For any such Lost Case, Debtor must repay that portion of the Loan Amount to Creditor. Failure to make such report shall be considered a Default of the contract and shall entitle Creditor to take action as set forth in Article IX: Default and Remedies, below. In the event of a Lost Case, if Debtor reports such loss within the required amount of time, Creditor can elect to allow Debtor new terms to repay the Total Loan Amount attributed to the Lost Case either through a repayment plan contract, or through a replacement of the Lost Case listed in the Exhibit A ('Replacement Case'). Creditor requires execution of the replacement terms ('Replacement Contract') within seven (7) calendar days of the event giving rise to the Lost Case. Creditor shall have the right to select Replacement Case(s) or repayment terms and demand immediate repayment in the event that Creditor and Debtor do not reach an agreement.

Both Debtor and Creditor agree that the Debtor's obligation to repay the loan through the payment of the partial assignment of Attorney Fees on the Case(s) is absolute, and is not contingent on the settlement of any of the Case(s). Debtor agrees that the purpose of the Case(s) listed on Exhibit A is only to establish a Repayment Schedule that the Debtor believes is reasonable. When the last of the Case(s) listed on Exhibit A is settled or otherwise completed, the entire remaining balance will be due to Creditor.

3 Year Loan Term

Debtor understands that the financing has a term of 3 years ('Loan Term') and requires that The Debtor repay the Total Loan Amount within 3 years from the date the funds are sent to Debtor. This term is fixed and applies regardless of the timing of the resolution of the Cases listed in the Repayment

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials R̲_̲_̲_̲_̲_̲

Schedule. Because it is Debtor's obligation to repay Creditor at the end of the Loan Term, Debtor is advised to regularly assess the status of the Cases in the Repayment Schedule and to use alternate fees to repay the portion of the Loan Amount attributed to those Cases that may not resolve during the 3 year Loan Term.

In the event that the Debtor does not repay the Total Loan Amount within the Loan Term, Debtor agrees that Debtor will be subject to a penalty rate ('Penalty Rate') of 3% of the Total Loan Amount outstanding, drafted monthly, until the Debtor repays the Total Loan Amount. This Penalty Rate will accrue starting on the first day after the Loan Term expiration date (3 years after Creditor Sends funds to Debtor). Notwithstanding the enforcement of the Penalty Rate, Creditor may find the Debtor in Default and pursue all remedies as set forth in Article IX: Default and Remedies, below,

Case Status Updates
Debtor agrees to provide status updates ('Status Updates') to the Case(s) listed in the Exhibit A every 60 days. Status updates must include the docket number once a Case is filed and substantive data of the most recent actions in the pursuit of the Case as well as any information about circumstances that have potential to affect the success or value of the Case. As a courtesy reminder, Creditor sends electronic mail status update requests approximately 50 days after the last update is received and Debtor is encouraged to respond promptly to avoid risk of default. In the event that Debtor fails to provide a status update within 75 days of the last update, the Debtor will be found in Default of contract terms. Debtor agrees that these terms constitute sufficient warning and such default shall be sufficient grounds for Creditor to call the loan due immediately or take any action set forth in Article IX: Default and Remedies, below.

Other Provisions
In the event that there is a dispute between the Debtor and the Creditor regarding the terms of this Agreement or the amount due, then Debtor agrees to hold the funds in Trust within Debtor's Trust Account until the dispute is resolved. Debtor also agrees that Creditor has the right to request the Debtor to deposit the funds into the trust account of another attorney pending the resolution of the dispute, and Debtor agrees to transfer such funds within seven (7) calendar days of Creditor's request.

Debtor and Creditor agree that Creditor is providing financing through a loan to Debtor. This financing is a loan between two businesses and the Debtor will owe the Creditor until funds and all related costs and interest are repaid. While Debtor and Creditor agree that the loan is initially secured based on Debtor's anticipated attorney fees on the Case(s) set forth on the Exhibit A, this loan is secured by Debtor with all of Debtor's attorney fees and assets as collateral.

Debtor and Guarantor(s) hereby agree to pay all amounts due to Creditor including but not limited to Total Loan Amount, Interest and all of Creditor's fees and costs associated with collection.

Guarantor agrees that if Debtor fails to perform Guarantor will personally repay Creditor form any and all assets or future earnings.

Debtor and Debtor's client(s) retain control of the Case(s), and all decisions regarding legal strategy shall remain with the Debtor and Debtor's client(s). Creditor shall have no influence over the Case(s).

Debtor agrees that Creditor may take any steps necessary to protect its financial interest under the terms of this Agreement including, but not limited to filing a UCC lien against all attorney fee receivables, and all other assets of the Debtor and/or against all assets of the Guarantor(s) and notifying other potential creditors or lenders of Creditor's interest. Creditor's failure to take any action to file notice of lien through UCC or otherwise provide notification of its financial interest in Debtor's assets

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials PL_____

Page 4 of 10

EXHIBIT D  PAGE  123

or receivables shall not negate any of Debtor's or Guarantor(s)' obligations to Creditor or Creditor's right to do so in the future.

## ARTICLE II: GRANT OF SECURITY INTEREST

For valuable consideration, Debtor hereby grants to Creditor a Security Interest in all of the assets and property of Debtor, described as follows (collectively, the 'Collateral'):

All assets, fees, fee receivables, deposit accounts, contract rights, chattel paper, (whether electronic or tangible) instruments, promissory notes, general intangibles, payment intangibles, software, letter of credit rights, and other rights to payment of every kind now existing or at any time hereafter arising.

For valuable consideration, Guarantor hereby grants to Creditor a Security Interest in all of the assets and property of Guarantor, described as follows (collectively, the 'Collateral'):

All assets, attorney fees, fee receivables, deposit accounts, contract rights, chattel paper, (whether electronic or tangible) instruments, promissory notes, general intangibles, payment intangibles, letter of credit rights, life insurance proceeds, and other rights to payment of every kind now existing or at any time hereafter arising.

## ARTICLE III: BANKRUPTCY

By signing this Agreement Debtor affirms that neither the entity nor its principals are currently or have ever been involved in a bankruptcy filing and that no such filing has been or is being contemplated.  In the event the Debtor is involved in a bankruptcy proceeding prior to the payoff of all funds owed to satisfy this Agreement, the Debtor agrees absolutely, irrevocably and without condition that it will be in default of this Agreement and that Creditor shall have the right to pursue the Guarantor(s) through the Personal Guaranty as set forth in Article IV, below.

## ARTICLE IV: PERSONAL GUARANTY

To induce Creditor to finance Debtor under the terms of this Agreement, Phil Layfield as Personal Guarantor(s), unconditionally guarantees to the Creditor the timely payment and performance of all liabilities and obligations of Debtor to Creditor. In the event of Debtor default, Guarantor(s) agrees to make immediate payment to Creditor of the Total Loan Amount, any associated Monthly Fees due, and the cost of collection efforts and legal action that Creditor employs to protect its interest.

## ARTICLE V: NON-CIRCUMVENTION AGREEMENT AND RIGHT TO ASSIGNMENT

Debtor affirms that it does not have any debt beyond that amount disclosed to Creditor in the Law Firm Finance Application. Debtor further affirms that it has not borrowed against, sold or assigned its interest in any case(s) in its portfolio, whether listed in the repayment schedule or otherwise, except those that were disclosed to Creditor specifically within the Law Firm Finance Application.

Debtor agrees that upon receiving this financing, it may not take on any additional debt against any of the Law Firm's receivables and Debtor may not assign fees in an individual Case or Case(s) unless Creditor provides permission in writing.  This restriction applies regardless of whether intended debt is against an individual case or against Debtor's fee receivables generally.  Debtor may not seek additional financing without first communicating this intent to Creditor.

Should the Debtor seek additional financing, Debtor may apply for additional financing with Creditor or if Debtor is seeking financing from another source, Debtor must first notify Creditor and obtain express

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _PL_ _____

Page 5 of 10

EXHIBIT D  PAGE  124

written consent of Creditor before seeking or obtaining other financing. Creditor will approve all requests that are based on a buyout of Creditor's position for a full repayment of the Total Loan Amount outstanding plus any unpaid interest where this payoff is made directly to Creditor by the new lender. For circumstances where Debtor seeks to avoid a Total Loan Amount repayment, Debtor must communicate with Creditor to find a mutually acceptable solution, and provided that Debtor's collateral is found to be sufficient to Creditor after a full review, Debtor and Creditor will execute a new Agreement sufficient to Creditor.

**Debtor understands that receiving additional financing and taking on additional debt against the Law Firm's receivables or an individual Case(s) or assigning an interest in a fee in one or more Case(s) without approval from Creditor shall constitute Default of this Agreement, triggering any and all remedies Creditor chooses as set forth in Article IX: Default and Remedies.**

If Debtor seeks to sell or exchange any interest or shares in the Law Firm, accept any form of equity investment, or otherwise dilute Debtor's percentage interest in attorney fees, Debtor must provide Creditor with information of the change in the Law Firm ownership and any related entity name change. The Debtor has the obligation to disclose all debt owed to Creditor to any investor or purchaser of shares and all debt owed to Creditor is assumed by any purchaser or newly created Law Firm.

Creditor expressly reserves the right to assign its interest in this loan to any individual, corporation, or any other entity.

### ARTICLE VI: ACCURACY OF INFORMATION AND REPRESENTATIONS

Debtor understands that the information submitted to Creditor through Creditor's Application and through all documents provided during the application and underwriting process are considered material and are used by Creditor for the purpose of making a lending decision to extend financing to Debtor. Debtor and Guarantor(s) warrant and represent that, to the best of their knowledge, all information supplied to Creditor for the purpose of obtaining this financing shall be complete, true and correct and shall not omit to state, or incorrectly state any facts or provide information that is materially misleading. If Creditor determines that Debtor or Guarantor(s) have in any way misrepresented information to the Creditor, this would be considered a Default of this Agreement and potentially loan fraud and Creditor shall have the right to pursue any and all other measures necessary to protect Creditor's financial interest as set forth in Article IX: Default and Remedies, below and would have the right to involve law enforcement and licensing authorities as Creditor deems appropriate.

### ARTICLE VII: CHOICE OF LAW AND ARBITRATION AGREEMENT

Creditor and Debtor and Guarantor(s) agree that this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina in all respects, including matters of construction, validity and performance; shall inure to the benefit of Creditor, and to Creditor's heirs, executors, administrators and assigns and to any other holder who derives from Creditor title to or an interest in this Agreement; and shall be binding upon Debtor and Guarantor(s) and upon Debtor's and Guarantors' heirs, executors, administrators and assigns. Debtor and Guarantor(s) irrevocably warrant and agree that venue for any issue connected to and/or arising out of this Agreement is in the State of North Carolina and Debtor and Guarantor(s) hereby unconditionally submit themselves to the jurisdiction of the State of North Carolina and the courts of Mecklenburg County, North Carolina.

Either Creditor or Debtor may request that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, be settled by Binding Arbitration in accordance with the rules of the American Arbitration Association in Mecklenburg County, North Carolina, and pursuant to the laws of the State of North Carolina. The Parties agree that if either Party opts for such Arbitration both Parties

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____

Page 6 of 10

will be bound to settle the dispute through Arbitration. Class arbitrations are specifically not permitted by this Agreement.

Debtor and Guarantor further stipulate, warrant, and agree that in the event Debtor Defaults under any term of this Agreement and/or Creditor finds it necessary to employ the services of an attorney in order to protect Creditor's interest, enforce any term of this Agreement, and/or recover any amount due herein, Debtor is responsible for any and all costs of collection, litigation and reasonable attorney's fees.

## ARTICLE VIII: PREPAYMENT OF LOAN WITHOUT PENALTY

The Debtor will retain the option to repay the entire Loan Amount, unpaid Interest and any other Fees to Creditor at any time prior to the Due Date as set forth in Article I of this Agreement without any prepayment penalty by using the same payment formula as if the remaining Case(s) listed in the Exhibit A had resolved and repayment was due.

## ARTICLE IX: DEFAULT AND REMEDIES

Debtor understands that it is solely the responsibility of the Debtor to comply with it's obligations under the terms of this Agreement. If Debtor does not perform under any of the Articles of this Agreement, Creditor will provide notice to Debtor of the non-performance by electronic mail at the address Debtor provided. Additionally, Creditor, at its option, may make additional attempts to contact Debtor about the non-performance as a courtesy.

**Once Creditor sends notice to Debtor of the non-performance through electronic mail, Debtor shall have seven (7) calendar days, inclusive of the day of notification, to communicate with Creditor and find a mutually agreeable option to cure the non-performance. If after seven (7) calendar days, Debtor has not remedied the non-performance, Creditor may declare this Agreement in default ('Default') and Creditor has the right to call the Total Loan Amount and any unpaid Interest due ('Call Due') and demand full payment for the Total Loan Amount outstanding along with any unpaid interest or fees. All monies due and unpaid after this time will be charged a default penalty ('Default Penalty') which shall be charged to Debtor at 3% per month of the Total Loan and unpaid interest and default penalties outstanding. The Default Penalty is charged in addition to the Monthly Fee.**

Debtor shall further be responsible for payment of any and all expenses related to managing a non-performing account, collection fees or legal fees and costs incurred by the Creditor in an attempt to protect its rights. Creditor has the right to conduct an on-site audit of Debtor to review all Case(s) referenced in the Exhibit A, all other cases and fee receivables in Debtor's portfolio and all of Debtor's assets.

Debtor agrees to the Default Penalty in the event of Default.

## ARTICLE X: ENTIRE AGREEMENT AND UNDERSTANDING

This Agreement constitutes the entire Agreement between the parties and there are no representations, warranties, covenants or obligations except as set forth herein. Both Parties agree that a faxed copy of this document is considered original. This Agreement supersedes all prior and contemporaneous agreements, understandings, negotiations, or discussions, written or oral, of the parties hereto, relating to any transaction contemplated by this Agreement; however, this Agreement does not supersede any previously executed Agreement(s) between Debtor and Creditor. This Agreement shall be binding on, and inure the benefit of, the parties hereto and their successors and assigns. The Debtor and Guarantor(s) agree that they have read and understand this Agreement and all of its terms and have researched the applicable state laws and are thereby affirming their acceptance and are signing without

duress.  The Debtor and Guarantor(s) acknowledge that they have relied on their own judgment in executing this document. Debtor acknowledges that the terms of this Agreement have been drafted and negotiated by both the Debtor and the Creditor, and that all questions have been answered to the Debtor's and Guarantor(s)' satisfaction.

In the event one or more of the covenants, terms or conditions of this Agreement or Exhibit A shall for any reason be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of any other covenant, term or condition of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers.

Alliance Legal Solutions, LLC – Creditor (a Delaware Limited Liability Company)

By: _____          Date: _____
Michelle Mills - as representative

Layfield & Barrett, APC
By: _____          Date: Dec 7, 2016 _____
Phil Layfield representing Layfield & Barrett, APC Debtor

**Personal Guarantor(s)**
By Philip Layfield (Dec 7, 2016) _____          Date: Dec 7, 2016 _____
Phil Layfield- Individual

By: _____          Date: _____

_____ (Print Name)- Individual

**Loan Agreement**
**Exhibit A**
Contract ID: 2384
December 5, 2016

This Exhibit A shall become part of the LOAN AGREEMENT, entered into on the above date between Layfield & Barrett, APC (hereinafter 'Debtor'), and Alliance Legal Solutions, LLC, a Delaware Limited Liability Company (hereinafter 'Creditor'), with its principal place of business at 17505 West Catawba Avenue, Suite 200 Cornelius, NC 28031.'

| Plaintiff/Case | Total Loan Amount | Cash Amount to Debtor | Closing Fee | Monthly Interest Rate | Monthly Fee (to be drafted Monthly) |
|---|---|---|---|---|---|
| Darden v. The Goodyear Tire and Rubber Company et al - 2384-1001 | $60,000.00 | $50,000.00 | $10,000.00 | 1.99% | $1,205.56 |
| Fowler/Chin/Darden of the Darden v. Goodyear et al matter - 2384-1002 | $42,000.00 | $35,000.00 | $7,000.00 | 1.99% | $843.89 |
| Estate of Garcia v. Rodriguez - 2384-1003 | $42,000.00 | $35,000.00 | $7,000.00 | 1.99% | $843.89 |
| Sanchez v. San Bernardino City Unified - 2384-1004 | $18,000.00 | $15,000.00 | $3,000.00 | 1.99% | $361.67 |
| Bastidas v. Townsel - 2384-1005 | $18,000.00 | $15,000.00 | $3,000.00 | 1.99% | $361.67 |
| TOTALS | $180,000.00 | $150,000.00 | $30,000.00 | | $3,616.67 |

Loan Detail Acknowledgement

By: _Phillip Layfield (Dec 7, 2016)_____
Phil Layfield as signer for Layfield & Barrett, APC and as Personal Guarantor.


By: _____
Alliance Legal Solutions

EXHIBIT D  PAGE  128

## Payment Information

Below, please provide bank account information. **We will send your funds to this account and also withdraw monthly fees from this account.** Funds are sent by direct deposit to your bank account through ACH transfer. This is NOT a wire transfer. Please note that accuracy is essential for timely transfers.

**Note:** **Failure to provide correct information will delay fund delivery. Please double check your account information before submitting. We recommend you attach a copy of a voided check.**

Bank Name: _____

ABA Number : _____
(This is the 9 digit number found on your checks prior to your account number)

Acct Number: _____

Exact Name on Account: _____
We only fund BUSINESS ACCOUNTS (please be sure to provide the name exactly as it appears on your check and bank statements).

Account type: Checking or savings? _____

Below, please indicate how you would like to receive your funds

_____  **By Direct Deposit (overnight) to Account Above: ($25 fee). Please note this is not a wire transfer**

_____  **Check via US Mail (no fee)**

　Law Firm Name on Bank Account: _____ Phone number:_____
　Address: _____ City: _____ State _____ Zip: _____

**Secondary Bank Account.** Please provide information on a secondary bank account that Alliance may use to draft Monthly Fees in the event that there is a problem with drafting from the first account provided.
Bank Name: _____

ABA Number : _____
(This is the 9 digit number found on your checks prior to your account number)

Acct Number: _____

Exact Name on Account: _____
We only fund BUSINESS ACCOUNTS (please be sure to provide the name exactly as it appears on your check and bank statements)

Account type: Checking or savings? _____

By: _____
　　Phil Layfield (Dec 7, 2016)
　　Phil Layfield – On behalf of Debtor

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____                                 Page 10 of 10



# Alliance Legal Services funding agreement

Adobe Sign Document History                    12/07/2016

| Created: | 12/07/2016 |
|---|---|
| By: | Todd Wakefield (T.wakefield@layfieldbarrett.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASPnd0vunuocWNMnXTsbMilAGov9irhSy |

## "Alliance Legal Services funding agreement" History

📄 Document created by Todd Wakefield (T.wakefield@layfieldbarrett.com)
   12/07/2016 - 11:42:56 AM PST- IP address: 50.232.165.96

📧 Document emailed to Philip Layfield (p@layfieldbarrett.com) for signature
   12/07/2016 - 11:46:13 AM PST

📄 Document viewed by Philip Layfield (p@layfieldbarrett.com)
   12/07/2016 - 11:46:32 AM PST- IP address: 66.87.65.9

✍ Document e-signed by Philip Layfield (p@layfieldbarrett.com)
   Signature Date: 12/07/2016 - 11:47:53 AM PST - Time Source: server- IP address: 66.87.65.9

✅ Signed document emailed to Todd Wakefield (T.wakefield@layfieldbarrett.com) and Philip Layfield
   (p@layfieldbarrett.com)
   12/07/2016 - 11:47:53 AM PST

  Adobe Sign

EXHIBIT D  PAGE  130

# EXHIBIT B



# ALLIANCE LEGAL SOLUTIONS

17505 West Catawba Avenue Suite 200
Cornelius, NC 28031
**www.alliancelegalsolutions.com**
Phone (877) 584-9044  Fax (866) 262-7402

## FAX - CONFIDENTIAL

| To:  Phil Layfield | From: Michelle Mills |
|---|---|
| Fax: 0000000000 | Date: December 29, 2016 |
| Re: Funding | Pages: 10 |

I have attached our proposed Loan Agreement and the corresponding Exhibit A.  Please review and if approved, execute the documents provided and return to Alliance for final approval. Once approved, we will send funds to your bank account via direct deposit or mail a check as you select.

### INSTRUCTIONS FOR MANAGING PARTNER

1. Confirm your official Law Firm name and the entity type listed on page 1 are correct and <u>exactly</u> as filed with the state in your organizational documents
2. Please sign and initial where designated on Loan Agreement
3. Please sign where designated on Exhibit A
4. Provide all bank account information for Monthly Fee payments and repayment drafts.
5. Email the executed contract (ALL PAGES OF BOTH DOCUMENTS) back to contracts@alliancefundings.com or fax to (866) 262-7402.
6. Good luck with all of your pursuits!

Sincerely,

*Michelle Mills*

Michelle Mills

Manager, Alliance Legal Solutions, LLC
(877) 584-9044

### LOAN AGREEMENT
### MONTHLY FEE
### (Contract Number: 2384)

THIS LOAN AGREEMENT is entered into on the below date, between Layfield & Barrett, APC (hereinafter 'Debtor'), located in Irvine, California and Alliance Legal Solutions, LLC, a Delaware Limited Liability Company (hereinafter 'Creditor'), with its principal place of business at 17505 West Catawba Avenue, Suite 200 Cornelius, NC 28031.

HEREINAFTER, Creditor and Debtor are collectively referred to as 'Parties' and singularly as 'Creditor' and 'Debtor' respectively; and

WHEREAS, Debtor is a business engaged in the practice of law, representing clients in legal matters, claims, cases and/or lawsuits (collectively referred to in this contract as 'Case' or 'Cases'); and

WHEREAS, Debtor seeks to obtain Law Firm financing, whether to finance certain Case costs and/or Law Firm's operations or otherwise, and seeks to secure any financing that is obtained with all of the Debtor's anticipated fee receivables and actual fee receivables; and

WHEREAS, Debtor agrees that it may receive a monetary benefit related to the funds loaned because by improving its cash flow, Debtor may be able to improve firm operations and profits or invest money in an existing Case(s) which may improve the ultimate value of such Case(s); and

WHEREAS, Debtor agrees that the Creditor is extending financing to the Debtor generally against all of Debtor's fee receivables and assets: and

WHEREAS, Debtor understands that while in some circumstances Case(s) may be presented to Creditor and listed on the Repayment Schedule of this Agreement, this is specifically done in order to afford Debtor sufficient time and resources to repay the loan while pursuing its Cases and in order to establish mutual expectations between Debtor and Creditor about the timeframe for repayment of this financing; and

WHEREAS, Creditor has agreed that Debtor and Creditor will select specific Case(s) in Debtor's portfolio that will create a repayment schedule for the Law Firm financing based on the receipt of the attorney fees which may arise from the settlement, judgment or resolution of specific Case(s) in Debtor's portfolio and that such Case(s) are listed in the Repayment Schedule provided in Exhibit A of this Agreement; and

WHEREAS, Debtor has been advised that Creditor is a provider of funds of last resort and that other lenders/investors may be less expensive; and

WHEREAS, after diligent effort by Debtor, Debtor has been unable to secure funding elsewhere; and

WHEREAS, Debtor has authorized Phil Layfield to sign this Agreement on behalf of the firm; and

WHEREAS, Debtor recognizes this Agreement is a business-to-business loan, and further acknowledges that Creditor may make a substantial profit on this Agreement; and

WHEREAS, the Parties agree to the following terms and conditions under which this Agreement shall be performed;

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _PL_____

NOW, THEREFORE, in consideration of these promises, the Parties hereto agree as follows:

## ARTICLE I:  LOAN TERMS

In consideration for the loan made, the Debtor hereby agrees to reimburse Creditor for the total loan amount, ('Total Loan Amount' or 'Loan Amount') based on the funds extended to the Debtor (also identified as 'Loan Amount' or 'Cash Amount'), Interest and a one-time processing and closing fee ('Closing Fee'). A repayment schedule ('Repayment Schedule' also referred to as 'Exhibit A') identifies particular Case(s) in Debtor's portfolio and Debtor is obligated to repay the portion of the Total Loan Amount attributed to those Case(s) as set forth on the schedule at the time the Case(s) resolves, with terms more specifically set forth below. In addition, the Debtor will pay a monthly fee ('Monthly Fee') on the aggregate unpaid Total Loan Amount(s).

Debtor has an absolute obligation to repay the Total Loan Amount no later than 3 years from the date that Creditor sends funds to Debtor.  The actual status of individual Case(s) identified within the Repayment Schedule does not extend the due date for repayment beyond 3 years from the date the Debtor receives funds from Creditor.  Any remaining balance of the Total Loan Amount will be called due in full exactly three years from the date that the Debtor receives funds.  Notwithstanding the 3 year term, all Case(s) listed in the Repayment Schedule must be paid when they resolve, with specific obligations as set forth in more detail below.

<u>Monthly Fee</u>

The Monthly Fee due for each unpaid Case will be calculated on a daily basis based by multiplying by one-thirtieth (1/30) of the monthly interest rate ('Monthly Interest Rate') percentage for the outstanding balance of the Total Loan Amount plus Monthly Fee due Creditor on the previous day for 30 days, regardless of the number of days in that month. In the event that the Loan was made during the prior month, the Monthly Fee will be prorated. At the start of each month, the Monthly Fee accrued in the previous month will be paid automatically to Creditor through direct bank account draft utilizing the bank account provided by Debtor. All bank drafts for Monthly Fees shall be drafted on the 1st day of the month following the month that fees accrued. If the 1st falls on a weekend or bank holiday, such funds shall be drafted the next business day. The final Monthly Fee shall be paid at the time of the loan payoff. It is Debtor's responsibility to maintain sufficient funds in this account to meet Debtor's obligations at the time of the monthly auto-draft. It is Debtor's responsibility to inform Creditor if there is a change in bank account information to be used for the auto-draft. Creditor will not offer special arrangements to change auto-draft date or amount due.

Debtor's responsibility to pay the Monthly Fee to Creditor is absolute and shall not require notification, reminders or management by Creditor.  For convenience to Debtor, Creditor accepts Monthly Fee through auto-draft from the bank account provided to Creditor by Debtor.  It is Debtor's responsibility to keep funds in Debtor's account to pay the Monthly Fee and to notify Creditor if Debtor changes its bank account used for auto-draft. In the event that Debtor's Monthly Fee is not paid to Creditor, whether due to account closing, failure to provide Creditor information of a changed account, insufficient funds or otherwise, Creditor will notify Debtor by electronic mail or by phone.  It is the Debtor's responsibility to correct any non-payment of the Monthly Fee within 7 days of the Creditor's notification to Debtor of the non-payment. If Debtor does not cure the non-payment or reach a mutually acceptable solution with the Creditor within 7 days of notification, Creditor has the right to declare the Debtor in default ('Default') of the Agreement.  Such Default shall be deemed sufficient grounds for Creditor to call the Total Loan Amount due, at Creditor's option.  Default remedies are set forth below in Article IX: Default and Remedies.

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____                                                                    Page 2 of 10

Additionally, in the event that Debtor's Monthly Fee is not received by Creditor upon Creditor's monthly auto-draft of Debtor's account, Debtor shall be charged a $100.00 fee, regardless of whether the failure is due to insufficient funds in the account, account closing or otherwise.

## Loan Repayment

As any Case listed in the Exhibit A is resolved, whether through settlement, judgment at trial, appealed after verdict, lost at trial, lost through a change in representation or concluded through any other resolution, Debtor must repay to Creditor at least that portion of the Total Loan Amount shown on the Exhibit A that is assigned to that particular Case. Repayment of the portion of the Total Loan Amount attributed to any of the Debtor's Case(s) set forth in the Exhibit A along with associated unpaid Monthly Fees becomes due and shall be paid to Creditor within seven (7) calendar days of the date that Debtor receives the proceeds ('Case Proceeds') from the settlement, judgment or other resolution of such Case ('Due Date'). Debtor may not delay repayment to Creditor or use attorney fees or expense reimbursement entitled to the Debtor and arising out of the Case Proceeds for any purpose except to repay Creditor until Creditor is fully repaid for the Total Loan Amount attributed to that Case. Debtor is obligated to repay the Total Loan Amount attributed to the Case even if that amount is more than the legal fees received by Debtor on that particular Case. Debtor's failure to make payment to Creditor for the portion of the Total Loan Amount of any of Debtor's Cases provided in Exhibit A, within seven (7) calendar days of the date that Debtor receives the Case Proceeds shall be considered a Default of this contract. In the event of Default, Creditor has the option to pursue any and all other measures necessary to protect Creditor's financial interest as set forth in Article IX; Default and Remedies, below.

For purposes of this Agreement, in the event that any Case listed in the Exhibit A is lost, whether at trial or summary judgment hearing, dismissed with prejudice, appealed, ceases to be pursued, if the attorney client relationship is terminated, if the client cannot be located by the Debtor for more than 2 months, or if for any other reason fees cannot be recovered before or through trial ('Lost Case'), then Debtor shall report such fact to Creditor immediately, but in no event later than seven (7) calendar days from the date of the action creating a Lost Case. For any such Lost Case, Debtor must repay that portion of the Loan Amount to Creditor. Failure to make such report shall be considered a Default of the contract and shall entitle Creditor to take action as set forth in Article IX: Default and Remedies, below. In the event of a Lost Case, if Debtor reports such loss within the required amount of time, Creditor can elect to allow Debtor new terms to repay the Total Loan Amount attributed to the Lost Case either through a repayment plan contract, or through a replacement of the Lost Case listed in the Exhibit A ('Replacement Case'). Creditor requires execution of the replacement terms ('Replacement Contract') within seven (7) calendar days of the event giving rise to the Lost Case. Creditor shall have the right to select Replacement Case(s) or repayment terms and demand immediate repayment in the event that Creditor and Debtor do not reach an agreement.

Both Debtor and Creditor agree that the Debtor's obligation to repay the loan through the payment of the partial assignment of Attorney Fees on the Case(s) is absolute, and is not contingent on the settlement of any of the Case(s). Debtor agrees that the purpose of the Case(s) listed on Exhibit A is only to establish a Repayment Schedule that the Debtor believes is reasonable. When the last of the Case(s) listed on Exhibit A is settled or otherwise completed, the entire remaining balance will be due to Creditor.

## 3 Year Loan Term

Debtor understands that the financing has a term of 3 years ('Loan Term') and requires that The Debtor repay the Total Loan Amount within 3 years from the date the funds are sent to Debtor. This term is fixed and applies regardless of the timing of the resolution of the Cases listed in the Repayment

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____                                         Page 3 of 10

Schedule. Because it is Debtor's obligation to repay Creditor at the end of the Loan Term, Debtor is advised to regularly assess the status of the Cases in the Repayment Schedule and to use alternate fees to repay the portion of the Loan Amount attributed to those Cases that may not resolve during the 3 year Loan Term.

In the event that the Debtor does not repay the Total Loan Amount within the Loan Term, Debtor agrees that Debtor will be subject to a penalty rate ('Penalty Rate') of 3% of the Total Loan Amount outstanding, drafted monthly, until the Debtor repays the Total Loan Amount. This Penalty Rate will accrue starting on the first day after the Loan Term expiration date (3 years after Creditor Sends funds to Debtor). Notwithstanding the enforcement of the Penalty Rate, Creditor may find the Debtor in Default and pursue all remedies as set forth in Article IX: Default and Remedies, below.

Case Status Updates
Debtor agrees to provide status updates ('Status Updates') to the Case(s) listed in the Exhibit A every 60 days. Status updates must include the docket number once a Case is filed and substantive data of the most recent actions in the pursuit of the Case as well as any information about circumstances that have potential to affect the success or value of the Case. As a courtesy reminder, Creditor sends electronic mail status update requests approximately 50 days after the last update is received and Debtor is encouraged to respond promptly to avoid risk of default. In the event that Debtor fails to provide a status update within 75 days of the last update, the Debtor will be found in Default of contract terms. Debtor agrees that these terms constitute sufficient warning and such default shall be sufficient grounds for Creditor to call the loan due immediately or take any action set forth in Article IX: Default and Remedies, below.

Other Provisions
In the event that there is a dispute between the Debtor and the Creditor regarding the terms of this Agreement or the amount due, then Debtor agrees to hold the funds in Trust within Debtor's Trust Account until the dispute is resolved. Debtor also agrees that Creditor has the right to request the Debtor to deposit the funds into the trust account of another attorney pending the resolution of the dispute, and Debtor agrees to transfer such funds within seven (7) calendar days of Creditor's request.

Debtor and Creditor agree that Creditor is providing financing through a loan to Debtor. This financing is a loan between two businesses and the Debtor will owe the Creditor until funds and all related costs and interest are repaid. While Debtor and Creditor agree that the loan is initially secured based on Debtor's anticipated attorney fees on the Case(s) set forth on the Exhibit A, this loan is secured by Debtor with all of Debtor's attorney fees and assets as collateral.

Debtor and Guarantor(s) hereby agree to pay all amounts due to Creditor including but not limited to Total Loan Amount, Interest and all of Creditor's fees and costs associated with collection.

Guarantor agrees that if Debtor fails to perform Guarantor will personally repay Creditor form any and all assets or future earnings.

Debtor and Debtor's client(s) retain control of the Case(s), and all decisions regarding legal strategy shall remain with the Debtor and Debtor's client(s). Creditor shall have no influence over the Case(s).

Debtor agrees that Creditor may take any steps necessary to protect its financial interest under the terms of this Agreement including, but not limited to filing a UCC lien against all attorney fee receivables, and all other assets of the Debtor and/or against all assets of the Guarantor(s) and notifying other potential creditors or lenders of Creditor's interest. Creditor's failure to take any action to file notice of lien through UCC or otherwise provide notification of its financial interest in Debtor's assets

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____                                          Page 4 of 10

EXHIBIT D  PAGE  136

or receivables shall not negate any of Debtor's or Guarantor(s)' obligations to Creditor or Creditor's right to do so in the future.

## ARTICLE II: GRANT OF SECURITY INTEREST

For valuable consideration, Debtor hereby grants to Creditor a Security Interest in all of the assets and property of Debtor, described as follows (collectively, the 'Collateral'):

All assets, fees, fee receivables, deposit accounts, contract rights, chattel paper, (whether electronic or tangible) instruments, promissory notes, general intangibles, payment intangibles, software, letter of credit rights, and other rights to payment of every kind now existing or at any time hereafter arising.

For valuable consideration, Guarantor hereby grants to Creditor a Security Interest in all of the assets and property of Guarantor, described as follows (collectively, the 'Collateral'):

All assets, attorney fees, fee receivables, deposit accounts, contract rights, chattel paper, (whether electronic or tangible) instruments, promissory notes, general intangibles, payment intangibles, letter of credit rights, life insurance proceeds, and other rights to payment of every kind now existing or at any time hereafter arising.

## ARTICLE III: BANKRUPTCY

By signing this Agreement Debtor affirms that neither the entity nor its principals are currently or have ever been involved in a bankruptcy filing and that no such filing has been or is being contemplated. In the event the Debtor is involved in a bankruptcy proceeding prior to the payoff of all funds owed to satisfy this Agreement, the Debtor agrees absolutely, irrevocably and without condition that it will be in default of this Agreement and that Creditor shall have the right to pursue the Guarantor(s) through the Personal Guaranty as set forth in Article IV, below.

## ARTICLE IV: PERSONAL GUARANTY

To induce Creditor to finance Debtor under the terms of this Agreement, Phil Layfield as Personal Guarantor(s), unconditionally guarantees to the Creditor the timely payment and performance of all liabilities and obligations of Debtor to Creditor. In the event of Debtor default, Guarantor(s) agrees to make immediate payment to Creditor of the Total Loan Amount, any associated Monthly Fees due, and the cost of collection efforts and legal action that Creditor employs to protect its interest.

## ARTICLE V: NON-CIRCUMVENTION AGREEMENT AND RIGHT TO ASSIGNMENT

Debtor affirms that it does not have any debt beyond that amount disclosed to Creditor in the Law Firm Finance Application. Debtor further affirms that it has not borrowed against, sold or assigned its interest in any case(s) in its portfolio, whether listed in the repayment schedule or otherwise, except those that were disclosed to Creditor specifically within the Law Firm Finance Application.

Debtor agrees that upon receiving this financing, it may not take on any additional debt against any of the Law Firm's receivables and Debtor may not assign fees in an individual Case or Case(s) unless Creditor provides permission in writing. This restriction applies regardless of whether intended debt is against an individual case or against Debtor's fee receivables generally. Debtor may not seek additional financing without first communicating this intent to Creditor.

Should the Debtor seek additional financing, Debtor may apply for additional financing with Creditor or if Debtor is seeking financing from another source, Debtor must first notify Creditor and obtain express

*Alliance Legal Solutions, LLC Loan Agreement (Monthly Fee)*

Debtor Initials _____                                          Page 5 of 10

written consent of Creditor before seeking or obtaining other financing.  Creditor will approve all requests that are based on a buyout of Creditor's position for a full repayment of the Total Loan Amount outstanding plus any unpaid interest where this payoff is made directly to Creditor by the new lender. For circumstances where Debtor seeks to avoid a Total Loan Amount repayment, Debtor must communicate with Creditor to find a mutually acceptable solution, and provided that Debtor's collateral is found to be sufficient to Creditor after a full review, Debtor and Creditor will execute a new Agreement sufficient to Creditor.

**Debtor understands that receiving additional financing and taking on additional debt against the Law Firm's receivables or an Individual Case(s) or assigning an interest in a fee in one or more Case(s) without approval from Creditor shall constitute Default of this Agreement, triggering any and all remedies Creditor chooses as set forth in Article IX: Default and Remedies.**

If Debtor seeks to sell or exchange any interest or shares in the Law Firm, accept any form of equity investment, or otherwise dilute Debtor's percentage interest in attorney fees, Debtor must provide Creditor with information of the change in the Law Firm ownership and any related entity name change. The Debtor has the obligation to disclose all debt owed to Creditor to any investor or purchaser of shares and all debt owed to Creditor is assumed by any purchaser or newly created Law Firm.

Creditor expressly reserves the right to assign its interest in this loan to any individual, corporation, or any other entity.

### ARTICLE VI: ACCURACY OF INFORMATION AND REPRESENTATIONS

Debtor understands that the information submitted to Creditor through Creditor's Application and through all documents provided during the application and underwriting process are considered material and are used by Creditor for the purpose of making a lending decision to extend financing to Debtor.  Debtor and Guarantor(s) warrant and represent that, to the best of their knowledge, all information supplied to Creditor for the purpose of obtaining this financing shall be complete, true and correct and shall not omit to state, or incorrectly state any facts or provide information that is materially misleading. If Creditor determines that Debtor or Guarantor(s) have in any way misrepresented information to the Creditor, this would be considered a Default of this Agreement and potentially loan fraud and Creditor shall have the right to pursue any and all other measures necessary to protect Creditor's financial interest as set forth in Article IX: Default and Remedies, below and would have the right to involve law enforcement and licensing authorities as Creditor deems appropriate.

### ARTICLE VII: CHOICE OF LAW AND ARBITRATION AGREEMENT

Creditor and Debtor and Guarantor(s) agree that this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina in all respects, including matters of construction, validity and performance; shall inure to the benefit of Creditor, and to Creditor's heirs, executors, administrators and assigns and to any other holder who derives from Creditor title to or an interest in this Agreement; and shall be binding upon Debtor and Guarantor(s) and upon Debtor's and Guarantors' heirs, executors, administrators and assigns. Debtor and Guarantor(s) irrevocably warrant and agree that venue for any issue connected to and/or arising out of this Agreement is in the State of North Carolina and Debtor and Guarantor(s) hereby unconditionally submit themselves to the jurisdiction of the State of North Carolina and the courts of Mecklenburg County, North Carolina.

Either Creditor or Debtor may request that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, be settled by Binding Arbitration in accordance with the rules of the American Arbitration Association in Mecklenburg County, North Carolina, and pursuant to the laws of the State of North Carolina.  The Parties agree that if either Party opts for such Arbitration both Parties

will be bound to settle the dispute through Arbitration. Class arbitrations are specifically not permitted by this Agreement.

Debtor and Guarantor further stipulate, warrant, and agree that in the event Debtor Defaults under any term of this Agreement and/or Creditor finds it necessary to employ the services of an attorney in order to protect Creditor's interest, enforce any term of this Agreement, and/or recover any amount due herein, Debtor is responsible for any and all costs of collection, litigation and reasonable attorney's fees.

### ARTICLE VIII: PREPAYMENT OF LOAN WITHOUT PENALTY

The Debtor will retain the option to repay the entire Loan Amount, unpaid interest and any other Fees to Creditor at any time prior to the Due Date as set forth in Article I of this Agreement without any prepayment penalty by using the same payment formula as if the remaining Case(s) listed in the Exhibit A had resolved and repayment was due.

### ARTICLE IX: DEFAULT AND REMEDIES

Debtor understands that it is solely the responsibility of the Debtor to comply with it's obligations under the terms of this Agreement. If Debtor does not perform under any of the Articles of this Agreement, Creditor will provide notice to Debtor of the non-performance by electronic mail at the address Debtor provided. Additionally, Creditor, at its option, may make additional attempts to contact Debtor about the non-performance as a courtesy.

**Once Creditor sends notice to Debtor of the non-performance through electronic mail, Debtor shall have seven (7) calendar days, inclusive of the day of notification, to communicate with Creditor and find a mutually agreeable option to cure the non-performance. If after seven (7) calendar days, Debtor has not remedied the non-performance, Creditor may declare this Agreement in default ('Default') and Creditor has the right to call the Total Loan Amount and any unpaid interest due ('Call Due') and demand full payment for the Total Loan Amount outstanding along with any unpaid interest or fees. All monies due and unpaid after this time will be charged a default penalty ('Default Penalty') which shall be charged to Debtor at 3% per month of the Total Loan and unpaid interest and default penalties outstanding. The Default Penalty is charged in addition to the Monthly Fee.**

Debtor shall further be responsible for payment of any and all expenses related to managing a non-performing account, collection fees or legal fees and costs incurred by the Creditor in an attempt to protect its rights. Creditor has the right to conduct an on-site audit of Debtor to review all Case(s) referenced in the Exhibit A, all other cases and fee receivables in Debtor's portfolio and all of Debtor's assets.

Debtor agrees to the Default Penalty in the event of Default.

### ARTICLE X: ENTIRE AGREEMENT AND UNDERSTANDING

This Agreement constitutes the entire Agreement between the parties and there are no representations, warranties, covenants or obligations except as set forth herein. Both Parties agree that a faxed copy of this document is considered original. This Agreement supersedes all prior and contemporaneous agreements, understandings, negotiations, or discussions, written or oral, of the parties hereto, relating to any transaction contemplated by this Agreement; however, this Agreement does not supersede any previously executed Agreement(s) between Debtor and Creditor. This Agreement shall be binding on, and inure the benefit of, the parties hereto and their successors and assigns. The Debtor and Guarantor(s) agree that they have read and understand this Agreement and all of its terms and have researched the applicable state laws and are thereby affirming their acceptance and are signing without

duress.  The Debtor and Guarantor(s) acknowledge that they have relied on their own judgment in executing this document. Debtor acknowledges that the terms of this Agreement have been drafted and negotiated by both the Debtor and the Creditor, and that all questions have been answered to the Debtor's and Guarantor(s)' satisfaction.

In the event one or more of the covenants, terms or conditions of this Agreement or Exhibit A shall for any reason be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of any other covenant, term or condition of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers.

Alliance Legal Solutions, LLC – Creditor (a Delaware Limited Liability Company)

By: _____          Date: _____
Michelle Mills - as representative


Layfield & Barrett, APC
By: _____          Date:  Dec 29, 2016
Phil Layfield representing Layfield & Barrett, APC Debtor        _____

**Personal Guarantor(s)**

By: _____          Date:  Dec 29, 2016
Phil Layfield- Individual                                      _____

By: _____          Date: _____

_____ (Print Name)- Individual


Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

EXHIBIT D  PAGE  140

## Loan Agreement
## Exhibit A

Contract ID: 2384

December 29, 2016

This Exhibit A shall become part of the LOAN AGREEMENT, entered into on the above date between Layfield & Barrett, APC (hereinafter 'Debtor'), and Alliance Legal Solutions, LLC, a Delaware Limited Liability Company (hereinafter 'Creditor'), with its principal place of business at 17505 West Catawba Avenue, Suite 200 Cornelius, NC 28031.'

| Plaintiff /Case | Total Loan Amount | Cash Amount to Debtor | Closing Fee | Monthly Interest Rate | Monthly Fee (to be drafted Monthly) |
|---|---|---|---|---|---|
| Cearly/ (5) Pimental - Cearley v. Galindo OR (5) Pimental WHICHEVER SHOULD PRODUCE ATTORNEY FEES FIRST - 2384-1006 | $9,600.00 | $8,000.00 | $1,600.00 | 1.99% | $192.89 |
| Modeso/(7) Pimental - Modeso LLC v. Arias Ozzello Gignac LLP OR (7) Pimental WHICHEVER SHOULD PRODUCE ATTORNEY FEES FIRST - 2384-1009 | $36,000.00 | $30,000.00 | $6,000.00 | 1.99% | $723.33 |
| Dee/(6) Pimental - Dee v. Workers Compensation Insurance OR (6)Pimental WHICHEVER SHOULD PRODUCE ATTORNEY FEES FIRST - 2384-1011 | $14,400.00 | $12,000.00 | $2,400.00 | 1.99% | $289.33 |
| (2) Bastides/Pimental -(2) Bastidas OR Pimental WHICHEVER SHOULD PRODUCE FEES FIRST - 2384-1015 | $21,600.00 | $18,000.00 | $3,600.00 | 1.99% | $434.00 |
| (8) Pimental - 2384-1016 | $60,000.00 | $50,000.00 | $10,000.00 | 1.99% | $1,205.56 |
| (2) Sanchez/ (3) Pimental - (2) Sanchez OR (3)Pimental - WHICHEVER SHOULD PRODUCE ATTORNEY FEES FIRST - 2384-1017 | $6,000.00 | $5,000.00 | $1,000.00 | 1.99% | $120.56 |
| (2) estate of Garcia/ (2) Pimental - (2) estate of Garcia v. Rodriguez OR (2)Pimental WHICHEVER SHOULD PRODUCE ATTORNEY FEES FIRST - 2384-1018 | $12,000.00 | $10,000.00 | $2,000.00 | 1.99% | $241.11 |
| Appellate via (4) Pimental case - 2384-1019 | $20,400.00 | $17,000.00 | $3,400.00 | 1.99% | $409.89 |
| TOTALS | $180,000.00 | $150,000.00 | $30,000.00 | | $3,616.67 |

Loan Detail Acknowledgement

By: _____
Phil Layfield (Dec 29, 2016)

Phil Layfield as signer for Layfield & Barrett, APC and as Personal Guarantor.

By: _____
Alliance Legal Solutions

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials  PL _____

Page 9 of 10

## Payment Information

Below, please provide bank account information.  **We will send your funds to this account and also withdraw monthly fees from this account.**  Funds are sent by direct deposit to your bank account through ACH transfer.  This is NOT a wire transfer. Please note that accuracy is essential for timely transfers.

**Note:  Failure to provide correct information will delay fund delivery. Please double check your account information before submitting. We recommend you attach a copy of a voided check.**

Bank Name: _____

ABA Number : _____
(This is the 9 digit number found on your checks prior to your account number)

Acct Number: _____

Exact Name on Account: _____
We only fund BUSINESS ACCOUNTS (please be sure to provide the name exactly as it appears on your check and bank statements)

Account type: Checking or savings? _____

Below, please indicate how you would like to receive your funds

_____ **By Direct Deposit (overnight) to Account Above: ($25 fee).  Please note this is not a wire transfer**

_____ **Check via US Mail (no fee)**

Law Firm Name on Bank Account: _____ Phone number:_____
Address: _____ City: _____ State _____ Zip: _____

**Secondary Bank Account. Please** provide information on a secondary bank account that Alliance may use to draft Monthly Fees in the event that there is a problem with drafting from the first account provided.

Bank Name: _____

ABA Number : _____
(This is the 9 digit number found on your checks prior to your account number)

Acct Number: _____

Exact Name on Account: _____
We only fund BUSINESS ACCOUNTS (please be sure to provide the name exactly as it appears on your check and bank statements)

Account type: Checking or savings? _____

By: _____
    Phil Layfield – On behalf of Debtor

Alliance Legal Solutions, LLC  Loan Agreement (Monthly Fee)

Debtor Initials _____                                    Page 10 of 10

EXHIBIT D  PAGE  142

# Alliance funding agreement

Adobe Sign Document History                               12/29/2016

| | |
|---|---|
| Created: | 12/29/2016 |
| By: | Todd Wakefield (T.wakefield@layfieldbarrett.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAcZcHOML8SRSeAr4St4JA4wf_UoEcvMT0 |

## "Alliance funding agreement" History

Document created by Todd Wakefield (T.wakefield@layfieldbarrett.com)
12/29/2016 - 8:38:12 AM PST- IP address: 107.191.0.140

Document emailed to Philip Layfield (p@layfieldbarrett.com) for signature
12/29/2016 - 8:41:21 AM PST

Document viewed by Philip Layfield (p@layfieldbarrett.com)
12/29/2016 - 8:46:00 AM PST- IP address: 68.225.252.76

Document e-signed by Philip Layfield (p@layfieldbarrett.com)
Signature Date: 12/29/2016 - 8:47:28 AM PST - Time Source: server- IP address: 68.225.252.76

Signed document emailed to Todd Wakefield (T.wakefield@layfieldbarrett.com) and Philip Layfield
(p@layfieldbarrett.com)
12/29/2016 - 8:47:28 AM PST


Adobe Sign

# EXHIBIT C

## GUARANTY
## (READ BEFORE SIGNING)

THIS GUARANTY AGREEMENT dated December 29, 2016, sets forth the agreement of the undersigned (the "Guarantor") to guarantee to **ALLIANCE LEGAL SOLUTIONS, LLC**, a Delaware Limited Liability Company, with offices and a principal place of business in Mecklenburg County, North Carolina ("Lender"), the indebtedness of **Layfield & Barrett, APC**("Borrower").    Guarantor acknowledges that Guarantor has requested Lender to extend credit to Borrower and Lender has extended credit and/or may in the future extend credit by reason of such request and in reliance upon this Guaranty.

NOW, THEREFORE, in consideration of such credit extended or to be extended, the foregoing premises, the mutual promises and covenants herein expressed and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.  Guaranty of Payment.    Guarantor, jointly and severally with any other present or future guarantor, hereby unconditionally guarantees to Lender the timely payment of all amounts due to Lender, with interest and any other charges which may accrue thereon or in connection therewith before or after any maturity thereof, pursuant to that certain promissory note or promissory notes (each a "Loan Note"), and Commercial Loan and Security Agreement ("Loan and Security Agreement") dated 12/7/16 executed by Borrower for $180,000.00 and 12/29/16 executed by Borrower for $180,000.00 ("Loan"), and any other documents entered into by Borrower in connection with the, Loan, including, without limitation, any sums which may be advanced from time to time by Lender to protect Lender's interests thereunder and any other liability or obligation between Lender and Borrower (the "Obligations"). The Loan Notes, the Loan and Security Agreement, and all other documents evidencing, securing, governing or otherwise relating to the Loan and the Obligations, are collectively referred to herein as the "Loan Documents".

All payments by Guarantor hereunder shall be paid in lawful money of the United States of America.

2.    Obligations Unconditional.    The obligations of Guarantor hereunder are absolute and unconditional and not subject to any defense or any right of setoff, counterclaim or recoupment arising out of any breach by Borrower or Lender of any obligation to Guarantor, or out of any indebtedness or liability at any time owing to Guarantor by Borrower or Lender.  Guarantor will not suspend or discontinue any payments provided for hereunder in connection with his guaranty of the Obligations for any cause.

3. Events of Default. Each of the following shall be an "Event of Default" hereunder:

(a)    Failure by Guarantor to pay any amounts required to be paid hereunder when due;

(b)    Failure by Guarantor to comply with any other provision hereunder;

BTM:651128v1

EXHIBIT D  PAGE  145

(c)    The voluntary initiation by Guarantor of any proceeding under any federal or state law relating to bankruptcy, insolvency, arrangement, reorganization, readjustment of debt or any other form of debtor relief, or the initiation against Guarantor of any such proceeding, or any assignment by Guarantor for the benefit of creditors or the entry by Guarantor into an agreement of composition with creditors or the failure generally by Guarantor to pay his debts as they become due; or

(d)    An "Event of Default" by Borrower under the Loan and Security Agreement; or

(e)    The death of Guarantor.

4.  Remedies on Default.  Whenever any Event of Default hereunder shall have occurred, Lender or its assigns may take such actions as Lender or its assigns deems appropriate, including, but not limited to, the following:

(a)    Accelerate and declare as immediately due and payable by Borrower and Guarantor an amount equal to the Obligations.  An Event of Default hereunder shall constitute an Event of Default under each of the Loan Documents.

(b)    Pursue any available remedy against Guarantor at law or in equity to enforce the payment of any amounts due by Guarantor hereunder.

5.  Subordination.  Any indebtedness, fee or other obligation of Borrower to Guarantor now or hereafter existing, together with any interest thereon, shall be, and each such indebtedness, fee or other obligation is hereby deferred, postponed and subordinated to the Obligations.

6.  Waiver of Rights.  Guarantor expressly waives:  (a) notice of acceptance of this Guaranty by the Lender and all extensions of credit to Borrower by the Lender; (b) presentment and demand for payment of any of the Obligations; (c) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the Obligations or with respect to any security therefor; (d) notice of the Lender obtaining, amending, substituting for, releasing, waiving or modifying any security interest, liens or encumbrances now or hereafter securing the Obligations, or the Lender's subordinating, compromising, discharging or releasing such security interests, liens or encumbrances; (e) demand for payment under this Guaranty; and (f) any right to assert against the Lender, as a defense, counterclaim, set-off, or cross-claim any defense (legal or equitable) set-off, counterclaim or claim which Guarantor may now or hereafter have against the Lender or Borrower.

7.  Primary Liability of Guarantor.  This Guaranty is a guaranty of payment, not of collection. Guarantor agrees that this Guaranty may be enforced by the Lender without the necessity at any time of resorting to or exhausting any other security or collateral and without the necessity at any time of having recourse to the Obligations through foreclosure proceedings under the Loan Documents or otherwise, and Guarantor hereby waives any right to require the Lender to proceed against Borrower or to require the Lender to pursue any other remedy or enforce any other right, including any and all rights under Section 26-7 through Section 26-9 of the North Carolina General Statutes.  Guarantor further agrees that nothing contained herein shall prevent the Lender from suing on the Loan Notes and Loan and Security Agreement or foreclosing any of the Loan Documents or from exercising any other rights available to it under the Loan Documents, or any other instrument of security if neither Borrower nor Guarantor timely perform the obligations of Borrower thereunder, and the exercise of any of the aforesaid rights and the completion of any foreclosure or other proceedings shall not constitute a discharge of any of Guarantor's obligations hereunder; it being the purpose and intent of Guarantor that Guarantor's obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.  Neither Guarantor's

2

obligations under this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release, or limitation of the liability of Borrower or by reason of Borrower's bankruptcy or insolvency.

8. Security Interests. As security for the prompt satisfaction of all Obligations, Guarantor assigns to Lender all of his, her or its right, title and interest in and to, and grants to Lender a first lien upon and security interest in, wherever located, whether now owned or subsequently acquired, together with all replacements, attachments, accessions, alterations, accessories, products and proceeds (including, without limitation, insurance proceeds) thereof in all of the following whether now or hereafter acquired: (i) Accounts; (ii) Cash Proceeds; (iii) Equipment; (iv) Chattel Paper (including all Tangible Chattel Paper); (v) General Intangibles (including without limitation tax refund claims, equipment manufacturer's warranties, and equipment leases); (vi) Instruments; (vii) Documents; (viii) Contract Rights; (ix) Letter of Credit Rights; (x) Receivables; (xi) Investment Property; (xii) Records pertaining to any Collateral; together with all Proceeds of any of the foregoing, all as defined in North Carolina Uniform Commercial Code, Section 25-9-101 et seq.

9. Term of Guaranty; Warranties and Covenants. This Guaranty shall continue in full force and effect until the Obligations are fully paid, performed and discharged. This Guaranty covers the Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by the Lender in stages or installments. Guarantor warrants and represents to the Lender: (a) that this Guaranty is binding upon and enforceable against Guarantor, in accordance with its terms; (b) that the execution and delivery of this Guaranty does not violate or constitute a breach of any agreement to which Guarantor is a party or of any applicable laws; (c) that there is no litigation, claim, action or proceeding pending, or, to the best knowledge of Guarantor, threatened against Guarantor which would materially adversely affect the financial condition of Guarantor or the ability to fulfill the obligations hereunder.

10. Further Representations and Warranties. Guarantor further represents to the Lender that Guarantor has knowledge of Borrower's financial condition and affairs and represents and agrees that Guarantor will keep so informed while this Guaranty is in force. Guarantor agrees that the Lender will have no obligation to investigate the financial condition or affairs of Borrower for the benefit of Guarantor nor to advise Guarantor of any fact respecting, or change in, the financial condition or affairs of Borrower which might come to the knowledge of the Lender at any time, whether or not the Lender knows or believes or has reason to know or believe that any such fact or change is unknown to Guarantor or might (or does) materially increase the risk of Guarantor as guarantor or might (or would) affect the willingness of Guarantor to continue as guarantor with respect to the Obligations.

11. Additional Liability of Guarantor. If Guarantor is or becomes liable for any indebtedness owing by the Borrower to the Lender by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or reduced hereby but shall have all and the same force and effect it would have had if this Guaranty had not been existing, and Guarantor's liability hereunder shall not be in any manner impaired or reduced thereby.

12. Cumulative Rights. All rights of the Lender hereunder or otherwise arising under any documents executed in connection with or as security for the Obligations are separate and cumulative and may be pursued separately, successively or concurrently, or not pursued, without affecting or limiting any other right of the Lender and without affecting or impairing the liability of Guarantor.

13. Pronouns, Captions; Severability. The pronouns used in this instrument shall be construed as masculine, feminine or neuter, as the occasion may require. Captions are for reference only and in no

3

way limit the terms of this Guaranty. Invalidation of any one or more of the provisions of this Guaranty shall in no way affect any of the other provisions hereof, which shall remain in full force and effect.

14. **Lender Assigns**. This Guaranty is intended for and shall inure to the benefit of the Lender and each and every person who shall from time to time be or become the owner or holder of any of the Obligations, and each and every reference herein to the "Lender" shall include and refer to each and every successor or assignee of the Lender at any time holding or owning any part of or interest in any part of the Obligations. This Guaranty shall be transferable and negotiable with the same force and effect, and to the same extent, that the Obligations are transferable and negotiable, it being understood and stipulated that upon assignment or transfer by the Lender of any of the Obligations, the legal holder or owner of said Obligations (or a part thereof or interest therein thus transferred or assigned by the Lender) shall (except as otherwise stipulated by the Lender in its assignment) have and may exercise all of the rights granted to the Lender under this Guaranty to the extent of that part of or interest in the Obligations thus assigned or transferred to said person. Guarantor expressly waives notice of transfer or assignment of the Obligations, or any part thereof, or of the rights of the Lender hereunder. Failure to give notice will not affect the liabilities of Guarantor hereunder.

15. **Application of Payments**. The Lender may apply any payments received by it from any source against that portion of the Obligations (principal, interest, court costs, attorneys' fees or other) in such priority and fashion as it may deem appropriate.

16. **Governing Law and Jurisdiction**. This Guaranty shall be deemed to be a contract made under, and for all purposes shall be construed in accordance with, the internal laws and judicial decisions of the State of North Carolina. Guarantor and the Lender agree that any dispute arising out of this Guaranty shall be subject to the exclusive jurisdiction of the state courts sitting in Forsyth County, North Carolina. For that purpose, Guarantor hereby submits to the exclusive jurisdiction of the state courts of North Carolina sitting in Forsyth County. Guarantor further agrees to accept service of process out of the aforementioned court in any such dispute by registered or certified mail (or by such other method of service permitted by law) addressed to Guarantor.

17. **Waiver of Subrogation**. Notwithstanding anything to the contrary contained herein: (a) Guarantor shall not have any right of subrogation in or under any of the Loan Documents or to participate in any way therein, or in any right, title or interest in and to any security or right of recourse for the Obligations, or any right to reimbursement, exoneration, contribution, indemnification or any similar rights, until the Obligations have been fully and finally paid, and (b) if Guarantor is or becomes an "insider" (as defined in Section 101 of the United States Bankruptcy Code) with respect to Borrower, then Guarantor hereby irrevocably and absolutely waives any and all rights of contribution, indemnification, reimbursement or any similar rights against Borrower with respect to this Guaranty (including any right of subrogation, except to the extent of collateral held by Lender), whether such rights arise under an express or implied contract or by operation of law. It is the intention of the parties that Guarantor shall not be deemed to be a "creditor" (as defined in Section 101 of the United States Bankruptcy Code) of Borrower by reason of the existence of this Guaranty in the event that Borrower or Guarantor becomes a debtor in any proceeding under the United States Bankruptcy Code. This waiver is given to induce Lender to make the Loan to Borrower.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the day and year first above written.

GUARANTOR:

Philip Layfield (Dec 29, 2016)

Name: Philip Layfield

4

# Guaranty

Adobe Sign Document History                                    12/29/2016

| | |
|---|---|
| Created: | 12/29/2016 |
| By: | Todd Wakefield (T.wakefield@layfieldbarrett.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-3b2RnZ_7IxwCPEOb2iLaeJ-MyA2Ih3Z |

## "Guaranty" History

- Document created by Todd Wakefield (T.wakefield@layfieldbarrett.com)
  12/29/2016 - 9:10:41 AM PST- IP address: 107.191.0.140

- Document emailed to Philip Layfield (p@layfieldbarrett.com) for signature
  12/29/2016 - 9:11:06 AM PST

- Document viewed by Philip Layfield (p@layfieldbarrett.com)
  12/29/2016 - 9:14:58 AM PST- IP address: 68.225.252.76

- Document e-signed by Philip Layfield (p@layfieldbarrett.com)
  Signature Date: 12/29/2016 - 9:15:32 AM PST - Time Source: server- IP address: 68.225.252.76

- Signed document emailed to Todd Wakefield (T.wakefield@layfieldbarrett.com) and Philip Layfield
  (p@layfieldbarrett.com)
  12/29/2016 - 9:15:32 AM PST



L&B
LAYFIELD
BARRETT
Adobe Sign

EXHIBIT D  PAGE  149

# EXHIBIT D



# ALLIANCE LEGAL SOLUTIONS

**Financial Strength**

501 South Sharon Amity, Suite 350
Charlotte, NC  28211
www.alliancelegalsolutions.com
Phone (877) 584-9044   Fax (888) 577-1580

| Client | Layfield & Barrett APC |
|---|---|
| Contract ID | 2384 |
| Outstanding Principal/Closing Fees | $151,000.00 |
| Default Called | 6/26/17 |
| Unpaid Interest/Penalties | $3,407.93 |
| Total Due as of 10/5/18 | $154,407.93 |

Please feel free to contact me if you have any questions or require additional information.

Susan Wagner

Litigation Manager
Alliance Legal Solutions
704-800-6781
swagner@alliancefundings.com

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 600, Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*):  **WELLGEN STANDARD, LLC'S RESPONSE TO ALLEGED DEBTOR PHILIP JAMES LAYFIELD'S MOTION TO DISMISS INVOLUNTARY CASE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On (*date*) **October 11, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **October 11, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (<u>state method for each person or entity served</u>):**  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **October 11, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Neil Bason, 255 E. Temple Street, Los Angeles, CA  90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 11, 2018 | Kelly Adele | *Kelly Adele* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
0.0

**F 9013-3.1.PROOF.SERVICE**

**VIA U.S. MAIL & EMAIL**
Philip J. Layfield
c/o Maximum Legal Holdings, LLC
8 The Green, Suite 6426
Dover, DE 19901
Email: phil@maximum.global

**Electronic Mail Notice List**
Wesley H Avery (TR) wes@averytrustee.com,
C117@ecfcbis.com;lucy@averytrustee.com;alexandria@averytrustee.com
Beth Gaschen bgaschen@wgllp.com,
kadele@wgllp.com;vrosales@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com
Jeffrey I Golden jgolden@wgllp.com, kadele@wgllp.com;vrosales@lwgfllp.com;cbmeeker@gmail.com
Malhar S Pagay mpagay@pszjlaw.com, mpagay@pszjlaw.com
Faye C Rasch frasch@wgllp.com, kadele@wgllp.com;tziemann@wgllp.com
Jeffrey L Sumpter jsumpter@epiqtrustee.com, jsumpter@cbiz.com
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
Dennis J Wickham wickham@scmv.com, nazari@scmv.com