WEILAND GOLDEN GOODRICH LLP
Jeffrey I. Golden, State Bar No. 133040
jgolden@wgllp.com
Faye Rasch, State Bar No. 253838
frasch@wgllp.com
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002

BRADLEY ARANT BOULT CUMMINGS LLP
Roger G. Jones (admitted *pro hac vice*)
1600 Division Street
Suite 700
Nashville TN  37219
615-252-2323
rjones@bradley.com

Attorneys for Wellgen Standard, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>PHILIP JAMES LAYFIELD,<br><br>        Debtor. | ) Case No. 2:18-bk-15829-NB<br>)<br>) Chapter 7<br>)<br>) Hon. Neil W. Bason<br>)<br>) **WELLGEN STANDARD,**<br>) **LLC'S OBEJCTION TO ALLEGED**<br>) **DEBTOR'S MOTION TO**<br>) **CONVERT CASE UNDER 11**<br>) **U.S.C.§§ 706(A) OR 1112(A)**<br><br>DATE: December 6, 2018<br>TIME: 10:00 A.M.<br>CTRM: 1545<br>      255 E. Temple Street<br>      Los Angeles, California 90012 |

1         TO THE HONORABLE NEIL W. BASON, UNITED STATES

2    BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES

3    TRUSTEE, THE DEBTOR AND PARTIES IN INTEREST:

4         Wellgen Standard, LLC ("Wellgen"), successor in interest to Advocate Capital,

5    Inc. ("Advocate"), hereby objects to the Motion to Convert Case Under 11 U.S.C.

6    §§ 706(a) or 1112(a) (the "Motion to Convert") filed by the alleged debtor, Mr. Philip

7    Layfield ("Mr. Layfield").

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

## I.    **PROCEDURAL BACKGROUND**

On May 21, 2018, Wellgen, Alliance Legal Solutions, LLC ("Alliance"), and Richard M. Pachulski, Chapter 11 Trustee of Layfield & Barrett, APC (the "L&B Trustee") filed an involuntary petition (the "Involuntary Petition") against the alleged debtor, Mr. Philip James Layfield ("Layfield").  On May 23, 2018, Wellgen moved for the appointment of an interim trustee pursuant to 11 U.S.C. § 303(g).  (Docket No. 5)  On May 30, 2018, this Court granted Wellgen's motion, and Mr. Wesley H. Avery was appointed the interim trustee (the "Interim Trustee").  (Docket Nos. 13 and 15.)  Although an order for relief has not yet been entered, Mr. Layfield filed the Motion to Convert in the event that an order for relief is entered.

## II.    **ARGUMENT**

Mr. Layfield's Motion to Convert seeks to convert this Chapter 7 case to one under Chapter 11 based on 11 U.S.C. §§ 706 and 1112(a).  Mr. Layfield's reliance on Section 1112(a) is puzzling since, by its terms, Section 1112(a) provides for the conversion of a Chapter 11 case to one under Chapter 7.  Section 1112(a) provides no basis for this Court to convert this Chapter 7 case to one under Chapter 11.  Section 706(a) provides that a debtor may convert a case under Chapter 7 to one under Chapter 11 or Chapter 13, if the case was not previously converted to Chapter 7.

A debtor's right to convert under Section 706(a) is not absolute.  In *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007), the Supreme Court explained:

> Nothing in the text of either § 706 or § 1307(c) (or the legislative history of either provision) limits the authority of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available

1

to the typical debtor.  On the contrary, the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate "to prevent an abuse of process" described in § 105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors.

Indeed, as the Solicitor General has argued in his brief *amicus curiae*, even if § 105(a) had not been enacted, the inherent power of every federal court to sanction "abusive litigation practices," might well provide an adequate justification for a prompt, rather than a delayed, ruling on an unmeritorious attempt to qualify as a debtor under Chapter 13.

549 U.S. at 375-76, 127 S.Ct. at 1111-1112 (*quoting Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)) (internal citations omitted).

Although the Supreme Court's decision in *Marrama* involved the conversion of a case from Chapter 7 to Chapter 13, the decision is equally applicable to the conversion of a Chapter 7 case to one under Chapter 11.  *In re Levesque*, 473 B.R. 331 (9th Cir. BAP 2012) ("While the [debtor's] motion to convert requested a conversion from chapter 7 to chapter 11, rather than to chapter 13, the language of § 706(a) applies the same whether the chosen chapter for conversion is chapter 11 or chapter 13. Consequently, there is no dispute between the parties as to the application of § 706(a), as interpreted by *Marrama*, in this appeal.").

In the instant case, Mr. Layfield's Motion to Convert must be denied because it would merely postpone the allowance of equivalent relief and because it has been filed in bad faith.  Under 11 U.S.C. § 1112(b)(1) cause exists to convert where, as here, the debtor is acting in bad faith.  See, e.g., *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir.1994); *In re Bowers Investment Company, LLC*, 553 B.R. 762, 768 (Bankr.

2

D. Ak. 2016).    The test for determining bad faith is "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." *Marsch*, 36 F.3d at 828; *Bowers Investment*, 553 B.R. at 768.  Here, there can be no question that Mr. Layfield is acting in bad faith.  Mr. Layfield cannot possibly reorganize and is simply pursuing a personal vendetta against various parties most of whom are his creditors.  Mr. Layfield has no knowledge of the Bankruptcy Code, no knowledge of a Chapter 11 debtor's obligations to creditors and no knowledge of the tools available under the Bankruptcy Code to recover assets for creditors.  When asked about preferences and fraudulent conveyance, Mr. Layfield responded that he would learn.  (Transcript of Deposition of Philip Layfield, Docket No. 142  ("Layfield Dep.") at pp. 245, Line 3-246, Line 21.)  Mr. Layfield does not intend to engage any professionals and, even if he wished to engage professionals, he has no funds to do so.  (Layfield Dep. at pp. 237, Line 9-238, Line 18.)

Mr. Layfield obviously has no prospects to reorganize.  Mr. Layfield has been indicted for fraud and other crimes and his criminal trial is scheduled for February 26, 2019.  Even if Mr. Layfield is not convicted, he has been disbarred and cannot practice law.  Mr. Layfield has no business to reorganize and has represented that he has few, if any, assets other than what he describes as "litigation claims."  (Docket 93, p. 8.)  At his recent deposition, Mr. Layfield testified that he is employed as a truck driver, his income last month was less than $2,000, and that he has no money to fund a Chapter 11.  ((Layfield Dep. at pp. 204, Lines 1-11, 237, Line 9-238, Line 18.)

Mr. Layfield admits that, were this case converted to Chapter 11, the case would consist of nothing more that the pursuit of his "litigation claims" and the distribution of any recoveries.  The "litigation claims" to which Mr. Layfield refers are frivolous

3

1
2
3
4
5
6
7
8

claims against a plethora of parties, basically alleging that his indictment, incarceration and upcoming trial are the result of some grand criminal conspiracy among his creditors and others, rather than due to the fact that he misappropriated millions of dollars of his clients' funds.  Mr. Layfield is simply harassing his creditors rather than trying to recover assets for their benefit.  When asked why these litigation claims could not be pursued by a Chapter 7 trustee, Mr. Layfield responded that the claims belong to him and no one other than him should make decisions regarding these litigation claims.

9
10
11
12
13
14
15
16
17
18
19

Since the filing of this involuntary petition and the appointment of the Trustee, Mr. Layfield has filed these so-called litigation claims in blatant violation of the automatic stay.  First, Mr. Layfield also filed an Adversary Proceeding in this Court alleging that various actions taken by the Chapter 11 Trustee for Layfield & Barrett, APC ("L&B"), which were approved by this Court after notice and hearing and without objection from Mr. Layfield, constituted tortious interference and that various parties wrongfully targeted him for criminal prosecution.  *Layfield v. Pachulski, et al.,* 2:18-ap-01315-NB (Bankr. C.D. Cal. 2018).  This Adversary Proceeding will accomplish nothing more than to cause L&B's bankruptcy estate to incur additional administrative expenses and reduce any recovery for L&B's creditors.

20
21
22
23
24
25
26
27
28

Second, as this Court is aware, Wellgen previously filed an action against Maximum Legal Holdings, LLC, Maximum Legal Services, LLC and various other defendants in the United States District Court for the Middle District of Tennessee. *Wellgen Standard, LLC v. Maximum Legal Holdings, LLC, et al.*, 3:18-cv-00275 (M.D. Tenn. 2018) (the "Tenn. Action").  Although not a party to the Tenn. Action, on October 18, 2018, Mr. Layfield filed an Answer, Counter-Claim and Cross-Claim. (Tenn. Action, Docket No. 43.)  Mr. Layfield claimed that he is the "successor-in-

4

interest" to Maximum Legal Holdings, LLC and Maximum Legal Services, LLC, and, therefore, a "defendant" in this action.  Mr. Layfield offered no explanation or support for the claim that he is the "successor in interest" to the Maximum Legal entities or how that would make him a defendant in this action.   Mr. Layfield Answer, Counter-Claim and Cross-Claim, a copy of which is attached hereto as <u>Exhibit A</u>, contains a plethora of frivolous allegations and claims blaming others for his indictment and incarceration including, but not limited to, his claim that numerous parties engaged in a grand criminal conspiracy designed to have him indicted and incarcerated.[1]

Both the Adversary Proceeding and the Answer, Counter-Claim and Cross-Claim were filed in blatant violation of the automatic stay.  Under 11 U.S.C. § 323(b) and 541, Mr. Layfield lacked standing to file the Answer, Counter-Claim and Cross-Claim in the Tenn. Action and the Adversary Proceeding.  Moreover, any claims that Mr. Layfield may have are property of the bankruptcy estate and Mr. Layfield's filings constitute a blatant violation of the automatic stay provided for in 11 U.S.C. § 362(a)(3).  Mr. Layfield's actions since the filing of the Involuntary Petition evidence nothing less than utter contempt for the Bankruptcy Code and for L&B's clients whose funds he misappropriated.

Were this Court to somehow decide to grant Mr. Layfield's Motion to Convert, this Court would be required to simultaneously appoint a Chapter 11 trustee.  This Court may order the appointment of a Chapter 11 trustee concurrently with the conversion of this case to Chapter 11 without further notice or hearing.  *See, e.g., In re*

---

[1] This Court may take judicial notice of the Answer, Counter-Claim and Cross-Claim pursuant to Fed. R. Evid. 201.

WELLGEN STANDARD, LLC'S OBJECTION TO MOTION TO CONVERT CASE
UNDER 11 U.S.C. §§ 706(A) OR 1112(A)

*Bibo, Inc.,* 76 F.3d 256, 258 (9th Cir. 1996) (bankruptcy judge may appoint a Chapter 11 trustee *sua sponte*).  Under the Amended Order and Terms Re Defendant Philip James Layfield's Release on Bond entered by the District Court in Mr. Layfield's criminal case, a copy of which is attached hereto as <u>Exhibit B</u>, Mr. Layfield is prohibited from acting as a fiduciary.[2]  Mr. Layfield concedes that he cannot act as a fiduciary without modification of that order, and that if this case is converted, he will seek to have the order modified.  (Layfield Dep. at pp. 227, Line 23-228-, Line 16.)

The appointment of a Chapter 11 trustee would also be mandatory under 11 U.S.C. § 1104(a)(1).  Section 1104 provides that the court ***shall*** order the appointment of trustee for cause including fraud, dishonesty and/or gross mismanagement.  Where cause is established, the appointment of a Chapter 11 trustee is mandatory.  *Id*.  Here, cause exists as a matter of law.  The California State Bar Court found that Mr. Layfield willfully misappropriated client funds totaling approximately $3,400,000 in the aggregate.  (*See* Decision and Order of Involuntary Inactive Enrollment entered by the California State Bar Court on May 18, 2018, a copy of which is attached as <u>Exhibit C</u> to Request for Judicial Notice of Petitioning Creditor, Richard M. Pachulski, filed in this case (Docket No. 83).

The decision of the California State Bar Court is binding on Mr. Layfield.  Mr. Layfield had 60 days to file a petition for review of the State Bar Court Order with the California Supreme Court.  *See* Cal. Bus. & Prof. Code § 6083(a).  Mr. Layfield did not file such a petition, and, therefore, the State Bar Court's decision is final, enforceable

---

[2] This Court may take judicial notice of the order pursuant to Fed. R. Evid. 201.

WELLGEN STANDARD, LLC'S OBJECTION TO MOTION TO CONVERT CASE
UNDER 11 U.S.C. §§ 706(A) OR 1112(A)

and entitled to *res judicata* effect.  *See* Cal. Bus. & Prof. Code § 6084(a); *Shalant v. State Bar of California*, 699 Fed.Appx. 724 (9th Cir. 2017).  In *Shalant*, the Ninth Circuit explained held:

> The district court properly dismissed Shalant's action as barred by the doctrine of res judicata because Shalant's equal protection claim was raised in a prior California State Bar Court proceeding that resulted in a final judgment on the merits. See Cal. Bus. & Prof. Code § 6084(a) ("When no petition to review or to reverse or modify has been filed by either party within the time allowed therefor ... the decision or order of the State Bar Court shall be final and enforceable."); *Wehrli v. County of Orange*, 175 F.3d 692, 694 (9th Cir. 1999) (according preclusive effect to administrative proceedings "where judicial review of the administrative adjudication was available but unused"); *see also Holcombe v. Hosmer*, 477 F.3d 1094, 1097 (9th Cir. 2007) (federal courts must apply state law regarding res judicata to state court judgments); *DKN Holdings LLC v. Faerber*, 61 Cal.4th 813, 189 Cal.Rptr.3d 809, 352 P.3d 378, 382 n.1, & 386-87 (2015) (setting forth requirements for *res judicata*, or claim preclusion, defining primary rights doctrine, and discussing privity).

*Id.*

The California State Bar Court found that Mr. Layfield willfully misappropriated funds from L&B's trust accounts (State Bar Court order at pp. 4-6).  Under the doctrine of issue preclusion, Mr. Layfield may not relitigate that issue.  Under California law, a default judgment bars the defendant from relitigating issues raised in the complaint (a) where the defendant was personally served or had actual knowledge of the existence of the litigation, and (b) the court makes an express finding upon the allegations in the complaint for which preclusion is sought.  In re *Harmon*, 250 F.3d 1240, 1247-1248 (9th Cir. 2001).  In the instant case, since Mr. Layfield appeared and filed an answer, there is no dispute that Mr. Layfield was served or had actual

7

knowledge of the proceedings in the State Bar Court.  (State Bar Court Order at p. 2.)

The California State Bar Court made an express finding that Mr. Layfield intentionally

misappropriated funds from Layfield & Barrett, APC's trust accounts.  (State Bar Court

Order at pp 4-6.)  Mr. Layfield cannot relitigate that finding.

Mr. Layfield's pending criminal case renders it impossible for Mr. Layfield to

perform the duties of a Chapter 11 debtor.  For example, during his recent deposition,

Mr. Layfield exercised his Fifth Amendment privilege and refused to produce the

following documents:

> 4.    All Documents related to your misappropriation and/or disposition of Josephine Nguyen's funds;
>
> 5.    All Documents related to your misappropriation and/or disposition of Rodney A. Pimentel's funds;
>
> 6.    All Documents related to your misappropriation and/or disposition of Patricia and Isaac Casas' funds;
>
> 7.    All Documents related to your disposition of any and all funds you received from US Claims OPCO, LLC;
>
> 8.    All Documents related to Communications between you and any creditor including, but not limited to, demands or other requests for payment during the period January 1, 2017 to present;
>
> 9.    All Documents related to claims asserted against you during the period January 1, 2017 to present;
>
> 10.    All Documents related to debts you paid during the period January 1, 2017 to present;
>
> 11.    All Documents related to complaints filed against you with the California State Bar alleging that the complainant had not received settlement or other amounts owed to them;
>
> 12.    All Documents related to funds you, your affiliates and/or your insiders received from Layfield & Barrett, APC during the period January 1, 2017 to present; …

8

(Layfield Dep. at pp. 42, Line 1-43, Line 12, 74, Line 9-76, Line 21 and Ex. 1.)   Mr. Layfield also refused to produce any bank records other than those related to an account he opened in Delaware a few months ago.  (*Id.*)  Layfield Dep. at p. 74.)   Because of his reliance on the Fifth Amendment, Mr. Layfield will not be able to prepare statements and schedules or testify at the 341 meeting, let alone act as a fiduciary.

A Chapter 11 trustee would also be required because Mr. Layfield has blatant conflicts of interest.  *See, e.g., In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 113 (S.D.N.Y. 2008) (appointment of trustee required where debtor suffers from material conflicts, and cannot be counted on to conduct independent investigations of questionable transactions in which debtor was involved); *In re PRS Ins. Group, Inc.*, 274 B.R. 381, 389 (Bankr. D. Del. 2001) (appointment of trustee appropriate under § 1104(a)(2) where causes of action against insiders are a significant asset of this estate and there are no business operations requiring current management).   Mr. Layfield cannot possibly investigate transactions in which he was involved when he has asserted the Fifth Amendment with respect to those transactions.   When asked whether he would be able to investigate the transfers Mr. Layfield has made, and the misconduct he has engaged in, Mr. Layfield refused to answer the question claiming that the Bankruptcy Code did not require him to conduct such an investigation.  (Layfield Dep. at p. 229, Lines 5-12.)   When asked whether someone should be looking out for Mr. Layfield's creditors, rather than Mr. Layfield, Mr. Layfield responded that this Court and the US Trustee's office would do that.  (Layfield Dep. at p. 242, Lines 10-16.)

Mr. Layfield transferred at least $1,000,000 from L&B to himself shortly before its collapse and his flight to Costa Rica in June 2017.  Between August 30, 2016, and

WELLGEN STANDARD, LLC'S OBJECTION TO MOTION TO CONVERT CASE
UNDER 11 U.S.C. §§ 706(A) OR 1112(A)

December 12, 2016, Mr. Layfield transferred first from L&B's trust account to an L&B operating account and then to his personal USAA bank account the aggregate amount of $685,000.    (Affidavit of Mark E. Speidel (the "Speidel Aff."), a copy of which is attached as Exhibit E to Request for Judicial Notice of Petitioning Creditor, Richard M. Pachulski filed in this case (Docket No. 83)).    Between October 16, 2016, and February 28, 2017, Mr. Layfield wired from L&B's trust account directly to Mr. Layfield's personal USAA account, the aggregate amount of $317,500.    *Id*.    Mr. Layfield cannot possibly be trusted to investigate these and other transfers or account for these assets.

Since conversion of this case to Chapter 11 would require the immediate appointment of a Chapter 11 trustee, and, according to Mr. Layfield, he has no assets other than the litigation claims discussed above, there is simply no basis whatsoever for this case to proceed as a Chapter 11 case.    Conversion of this case to Chapter 11 would merely postpone the inevitable at the expense of Mr. Layfield's creditors.

## III.    **CONCLUSION**

For the reasons set forth above, Wellgen prays that this Court deny Mr. Layfield's Motion to Convert and grant such further relief as it deems just and proper.


Dated:  December 3, 2018          WEILAND GOLDEN GOODRICH LLP

10

By:    /S/ JEFFREY GOLDEN
       Jeffrey I. Golden
       Attorneys for Wellgen Standard,
       LLC


BRADLEY ARANT BOULT CUMMINGS LLP

By:    /S/ROGER G. JONES
       Roger G. Jones
       Attorneys for Wellgen Standard,
       LLC

WELLGEN STANDARD, LLC'S OBJECTION TO MOTION TO CONVERT CASE
UNDER 11 U.S.C. §§ 706(A) OR 1112(A)

RECEIVED
in Clerk's Office

OCT 1 8 2018

U.S. District Court
Middle District of TN

1
Philip J. Layfield
c/o Maximum Legal Holdings, LLC
2    8 The Green
Suite 6426
3    Dover, Delaware 19901
Telephone: (302) 401-6804
4    phil@maximum.global

5

6                    UNITED STATES BANKRUPTCY COURT

7                 FOR THE MIDDLE DISTRICT OF TENNESSEE

8                           NASHVILLE DIVISION

9

| | |
|---|---|
| 10  Wellgen Standard, LLC, | Case No.: 3:18-cv-00275 |
| 11       Plaintiff | |
| | Assigned to: Hon. William L. Campbell, Jr. |
| 12           vs. | |
| 13  Maximum Legal Holdings, LLC, Maximum | **ANSWER, COUNTER-CLAIM, AND CROSS-** |
| Legal, LLC, Maximum Legal Services, LLC, | **CLAIM** |
| 14  Maximum Legal Staffing, LLC, Maximum | |
| Legal (Florida), PLLC, Maximum Legal | |
| (Utah), LLC, Maximum Legal (Arizona), | |
| 15  LLC, Joseph Martin Barrett and Todd | |
| Wakefield | |
| 16 | |
| 17       Defendants | |

18   Philip Layfield, an individual

19       Counterclaim Plaintiff,

20           vs.

21   Wellgen Standard, LLC,

22       Counterclaim Defendant

23   Philip Layfield, an individual

24       Cross-claim Plaintiff,

25           vs.

26   Advocate Capital, Inc., a Tennessee
corporation, Todd Wakefield, an individual,
27   Joseph M. Barrett, an individual, and
Gregory Allen Stuck, an individual,
28   Christopher Tyler Webster, an individual,
Jeffery Golden, an individual, Martin J. Brill,

1     an individual, Richard Horner, an individual,
    and John Does 1-50, inclusive,

2        Cross-Claim Defendants.

3

4        **DEFENDANT PHILIP LAYFIELD AS SUCCESSOR-IN-INTEREST TO**

5 **MAXIMUM LEGAL HOLINGS, LLC AND MAXIMUM LEGAL SERVICES, LLC**

6 **HEREBY RESPONDS TO PLAINTIFFS' COMPLAINT. THIS ANSWER,**

7 **COUNTERCLAIM AND CROSS-CLAIM IS FILED ON BEHALF OF PHILIP LAYFIELD**

8 **IN HIS INDIVIDUAL CAPACITY AS WELL AS ON BEHALF OF MAXIMUM LEGAL**

9 **HOLDINGS, LLC AND MAXIMUM LEGAL SERVICES, LLC AS THE SUCCESSOR-IN-**

10 **INTEREST.**

11

12 Layfield alleges for his Answer as to the Complaint by Wellgen as follows:

13

14                I.     **PARTIES**

15

16     1. The allegations of paragraph 1 constitute legal conclusions and therefore do not require a

17 response.

18     2. The allegations of paragraph 2 constitute legal conclusions and therefore do not require a

19 response.

20     3. The allegations of paragraph 3 constitute legal conclusions and therefore do not require a

21 response.

22     4. The allegations of paragraph 4 constitute legal conclusions and therefore do not require a

23 response.

24     5. The allegations of paragraph 5 constitute legal conclusions and therefore do not require a

25 response.

26     6. The allegations of paragraph 6 constitute legal conclusions and therefore do not require a

27 response.

28     7. The allegations of paragraph 7 constitute legal conclusions and therefore do not require a

response.

1    8.  The allegations of paragraph 8 constitute legal conclusions and therefore do not require a

2    response.

3    9.  The allegations of paragraph 9 constitute legal conclusions and therefore do not require a

4    response.

5    10.  The allegations of paragraph 10 constitute legal conclusions and therefore do not

6    require a response.

7    ## II.  JURISDICTION AND VENUE

8

9    11.  The allegations of paragraph 11 constitute legal conclusions and therefore do not

10   require a response.

11

12   12.  The allegations of paragraph 12 constitute legal conclusions and therefore do not

13   require a response.

14   13.  The allegations of paragraph 13 constitute legal conclusions and therefore do not

15   require a response.

16   14.  The allegations of paragraph 14 constitute legal conclusions and therefore do not

17   require a response.

18   15.  The allegations of paragraph 15 constitute legal conclusions and therefore do not

19   require a response.

20   ## III.  FACTUAL BACKGROUND

21   16.   Admit

22   17.   Admit

23   18.   Admit

24   19.  Admit

25   20.  Defendant is without sufficient knowledge or information to form a belief as to the

26   allegations contained in paragraph 20 and on that basis, denies this allegation.

27   21.  Defendant is without sufficient knowledge or information to form a belief as to the

28   allegations contained in paragraph 21 and on that basis, denies this allegation.

     22.   Defendant is without sufficient knowledge or information to form a belief as to the

1  allegations contained in paragraph 22 and on that basis, denies this allegation.

2  23. Defendant is without sufficient knowledge or information to form a belief as to the

3  allegations contained in paragraph 23 and on that basis, denies this allegation.

4  24. Defendant is without sufficient knowledge or information to form a belief as to the

5  allegations contained in paragraph 24 and on that basis, denies this allegation.

6  25. The allegations of paragraph 25 constitute legal conclusions and therefore do not

7  require a response.

8  26. The allegations of paragraph 26 constitute legal conclusions and therefore do not

9  require a response.

10  27. Defendant is without sufficient knowledge or information to form a belief as to the

11  allegations contained in paragraph 27 and on that basis, denies this allegation.

12  28. Defendant is without sufficient knowledge or information to form a belief as to the

13  allegations contained in paragraph 28 and on that basis, denies this allegation.

14  29. Defendant is without sufficient knowledge or information to form a belief as to the

15  allegations contained in paragraph 29 and on that basis, denies this allegation.

16  30. Defendant is without sufficient knowledge or information to form a belief as to the

17  allegations contained in paragraph 30 and on that basis, denies this allegation.

18  31. Admit

19  32. Defendant is without sufficient knowledge or information to form a belief as to the

20  allegations contained in paragraph 32 and on that basis, denies this allegation.

21  33. Defendant is without sufficient knowledge or information to form a belief as to the

22  allegations contained in paragraph 33 and on that basis, denies this allegation.

23  34. Defendant is without sufficient knowledge or information to form a belief as to the

24  allegations contained in paragraph 34 and on that basis, denies this allegation.

25  35. Defendant is without sufficient knowledge or information to form a belief as to the

26  allegations contained in paragraph 35 and on that basis, denies this allegation.

27  36. Defendant is without sufficient knowledge or information to form a belief as to the

28  allegations contained in paragraph 36 and on that basis, denies this allegation.

37. Defendant is without sufficient knowledge or information to form a belief as to the

1   allegations contained in paragraph 37 and on that basis, denies this allegation.

2       38.  Defendant is without sufficient knowledge or information to form a belief as to the

3   allegations contained in paragraph 38 and on that basis, denies this allegation.

4       39.  Defendant is without sufficient knowledge or information to form a belief as to the

5   allegations contained in paragraph 39 and on that basis, denies this allegation.

6       40. Defendant is without sufficient knowledge or information to form a belief as to the

7   allegations contained in paragraph 40 and on that basis, denies this allegation.

8       41.  Admit.

9       42.  Admit.

10      43.  Deny.

11      44.  Admit.

12      45.  Deny.  Wellgen has the ability to seek relief from stay, but refuses to do so in order to

13  sue defendants in an inconvenient forum.  As a result, Wellgen should be disallowed from later

    claiming that venue in Los Angeles is proper for any later proceeding.

14      46.  Defendant is without sufficient knowledge or information to form a belief as to the

15  allegations contained in paragraph 46 and on that basis, denies this allegation.

16      47. Defendant is without sufficient knowledge or information to form a belief as to the

17  allegations contained in paragraph 47 and on that basis, denies this allegation.

18      48.  Deny.

19      49.  Deny.

20      50.  Deny.

21      51.  Admit.

22      52.  Admit.

23      53.  Deny.

24      54.  Deny.

25      55.  Deny.

26      56.  Defendant is without sufficient knowledge or information to form a belief as to the

27  allegations contained in paragraph 56 and on that basis, denies this allegation.

        57.  Deny.

28

1      58.  Admit unless Mr. Wakefield fraudulently claims that he is the 100% owner as he has

2  previously done with respect to Maximum Legal (California), LLP.

3      59.  Defendant is without sufficient knowledge or information to form a belief as to the

4  allegations contained in paragraph 59 and on that basis, denies this allegation.

5      60.  Admit unless Mr. Wakefield fraudulently claims that he is the 100% owner as he has

6  previously done with respect to Maximum Legal (California), LLP.

7      61.  Defendant is without sufficient knowledge or information to form a belief as to the

8  allegations contained in paragraph 61 and on that basis, denies this allegation.

9      62.  Admit unless Mr. Wakefield fraudulently claims that he is the 100% owner as he has

10  previously done with respect to Maximum Legal (California), LLP.

11      63.  Defendant is without sufficient knowledge or information to form a belief as to the

allegations contained in paragraph 63 and on that basis, denies this allegation.

12      64.  Deny.

13      65.  Defendant is without sufficient knowledge or information to form a belief as to the

14  allegations contained in paragraph 65 and on that basis, denies this allegation.

15      66.  Admit to the extent Maximum Legal Services, LLC was active and not dissolved.

16      67.  Defendant is without sufficient knowledge or information to form a belief as to the

17  allegations contained in paragraph 67 and on that basis, denies this allegation.

18      68.  Defendant is without sufficient knowledge or information to form a belief as to the

19  allegations contained in paragraph 68 and on that basis, denies this allegation.

20      69.  Defendant is without sufficient knowledge or information to form a belief as to the

21  allegations contained in paragraph 69 and on that basis, denies this allegation.

22      70.  Defendant is without sufficient knowledge or information to form a belief as to the

23  allegations contained in paragraph 70 and on that basis, denies this allegation.

24      71.  Defendant is without sufficient knowledge or information to form a belief as to the

25  allegations contained in paragraph 71 and on that basis, denies this allegation.

26      72.  Defendant is without sufficient knowledge or information to form a belief as to the

27  allegations contained in paragraph 72 and on that basis, denies this allegation.

28      73.  Defendant is without sufficient knowledge or information to form a belief as to the

1    allegations contained in paragraph 73 and on that basis, denies this allegation.

2    74.  Admit except to the extent the actions are alleged to have been taken pursuant to a

3    fraudulent scheme, which they were not.

4    75.  Deny.

5    76.  Defendant admits that Wakefield and Barrett devised a fraudulent scheme to harm

6    Advocate and Layfield, but it is not the fraudulent scheme as articulated in Wellgen's instant

7    complaint.

8    77.  Deny.  This matter is subject to a separate lawsuit currently pending in the United

9    States Bankruptcy Court for the Central District of California.

     78.  Deny.

10   79.  Defendant is without sufficient knowledge or information to form a belief as to the

11   allegations contained in paragraph 79 and on that basis, denies this allegation.

12   80.  Admit.

13   81.  Admit.

14   82.  Defendant is without sufficient knowledge or information to form a belief as to the

15   allegations contained in paragraph 82 and on that basis, denies this allegation.

16   83.  Admit.  Because of the actions taken by Barrett and Wakefield against L&B by falsely

17   telling clients that Layfield had abandoned L&B, L&B's clients begin aggressively terminated any

18   and all client relationships.

19   84.  Admit.

20   85.  Deny.

21   86.  Admit.

22   87.  Admit.

23   88.  Admit.

24   89.  Admit.

25   90.  Deny.  The case was converted on October 18, 2017.

26   91.  Deny.  Wellgen may seek relief from stay, but chooses not to and thus has failed to join

27   an indispensable party.

     92.  Admit.

28

1    93.  Deny.  This judgment is void as a matter of law because Mr. Layfield was never served

2    and thus the United States District Court never obtained personal jurisdiction over Mr. Layfield.

3    94.  Deny.  Because the judgment is void as a matter of law, it cannot be assigned.

### IV.  COUNT-1-BREACH OF CONTRACT

(Mr. Barrett and Mr. Wakefield)

6    95.  Defendant is without sufficient knowledge or information to form a belief as to the

7    allegations contained in paragraph 95 and on that basis, denies this allegation.

8    96.  Defendant is without sufficient knowledge or information to form a belief as to the

9    allegations contained in paragraph 96 and on that basis, denies this allegation.

10    97.  Defendant is without sufficient knowledge or information to form a belief as to the

allegations contained in paragraph 97 and on that basis, denies this allegation.

11
12    98.  Defendant is without sufficient knowledge or information to form a belief as to the

allegations contained in paragraph 98 and on that basis, denies this allegation.

13

### V.  COUNT II-BREACH OF CONTRACT

14

(Maximum Legal Entities)

15    99.  Defendant is without sufficient knowledge or information to form a belief as to the

16    allegations contained in paragraph 99 and on that basis, denies this allegation.

17    100.  Defendant is without sufficient knowledge or information to form a belief as to the

18    allegations contained in paragraph 100 and on that basis, denies this allegation.

19    101.  Deny.

20    102.  Deny.

### SEPARATE AFFIRMATIVE  DEFENSES

### AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

24    103.  Defendant alleges that the Complaint fails to state facts sufficient to constitute a cause

25    of action against the Defendant.

### AFFIRMATIVE DEFENSE

### (Denial of Damages)

28    104.  Defendant denies that Plaintiff has been damaged in any sum or sums, or otherwise, or

1    at all, by reason of any act or omission by Defendant.

2                          **AFFIRMATIVE DEFENSE**

3                          **(Good Faith Immunity)**

4        105.   Defendant pleads that he acted without malice and with good faith at all relevant times

5    and therefore enjoys good faith immunity from suit.

6                          **AFFIRMATIVE DEFENSE**

7                          **(Statute of Limitations)**

8        106.   The Complaint and each cause of action therein is barred by the applicable statutes of

9    limitation.

10                         **AFFIRMATIVE DEFENSE**

11                         **(Reckless and Wanton)**

12       107.   Defendant alleges that at all time mentioned in the Complaint, Plaintiff acted in a

13   careless, reckless, wanton and negligent manner in our about the matters set forth in the Complain,

14   that such careless, reckless, wanton and negligent conduct proximately contributed to the injuries

15   and damages, if any, sustained or claimed by Plaintiff, that as a consequence, Plaintiff's claims are

16   barred.  The reckless conduct, includes but is not limited to the failure of Plaintiff to ensure that

17   L&B had adequate funding, failure to insist on a budget before for the L&B trustee before insisting

18   the trustee liquidate L&B, the failure of Plaintiff to diligently refer out cases valued in the millions

19   of dollars and thus be able to satisfy its' own creditors and Plaintiff's waste of resources, thus

     forcing L&B and MLC it to liquidate rather than reorganize.

20                         **AFFIRMATIVE DEFENSE**

21                         **(Negligence)**

22       108.   Defendant alleges Plaintiff's claims are barrred because Plaintiff failed to exercise

23   reasonable and ordinary care, caution, or prudence in handling its affairs in relation to the L&B

24   account both prior to and upon ceding complete control of L&B to Pachulski.  Any damages

25   alleged (the existence of which damage Defendants deny) were proximately caused and contributed

26   to by Plaintiff's own negligence, or by some other third party over whom Defendants exercised no

27   control, including Todd Wakefield, Joseph Barrett, Mark Aveis, Mark Speidel, Juan Dominguez,

28   Jeffrey Golden, Advocate Capital, and others.

1

**AFFIRMATIVE DEFENSE**

2

**(Consent)**

3      109.  Plaintiff acknowledged, ratified, consented to, and/or acquiesced in the alleged acts or

4  omissions, if any, of this Defendant, thus, barring Plaintiff's recovery.

5

6

**AFFIRMATIVE DEFENSE**

7

**(Failure to Mitigate)**

8      110.  Plaintiff failed to take reasonable efforts to mitigate their alleged damages, if any, and

9  recover should not be allowed for damages, if any, that Plaintiff should have foreseen and could

10  have avoided by reasonable effort.  This lawsuit is nothing more than a sham.

11

**AFFIRMATIVE DEFENSE**

12

**(Proximate Cause Lacking)**

13      111.  Defendant's alleged acts or omissions, if any, were not the proximate cause of any

14  injury suffered by Plaintiff.

15

**AFFIRMATIVE DEFENSE**

16

**(Estoppel)**

17      112.  Plaintiff's claims are barred by the defense of equitable estoppel.

18

**AFFIRMATIVE DEFENSE**

19

**(Unclean Hands)**

20      113.  Plaintiff's claims are barred by the doctrine of unclean hands.

21

**AFFIRMATIVE DEFENSE**

22

**(Laches)**

23      114.  Defendant alleges Plaintiff's claims are barred by the doctrine of laches.

24

**AFFIRMATIVE DEFENSE**

25

**(In Pari Delicto)**

26      115.  Defendant alleges Plaintiff's claims are barred by the doctrine of in pari delicto

27

**AFFIRMATIVE DEFENSE**

28

**(Ratification)**

1    116.  Defendant alleges Plaintiff's claims are barred by the doctrine of ratification

2                          **AFFIRMATIVE DEFENSE**

3                                **(Set-Off)**

4    117.  Defendant alleges Plaintiff's claims are barred or reduced by the doctrine of set-off.

5

6                          **AFFIRMATIVE DEFENSE**

7                         **(Consent and Approval)**

8    118.  Defendant alleges Plaintiff's claims are barred because Plaintiff consented to and

9    approved the acts and omissions as well as the subject transfers about which Plaintiff now

10   complains.

11                         **AFFIRMATIVE DEFENSE**

12                      **(Reservation of Defenses)**

13   119.    Defendant may have other separate and/or additional defenses of which he is not

14   aware and hereby reserves the right to assert such defenses by amendment of this answer.

15

16                          <u>**COUNTER-CLAIMS**</u>

17   Layfield alleges for his counterclaims against Wellgen as follows:

18

19   **I.    INTRODUCTION**

20   120.  Wellgen is an alter-ego of Advocate Capital, Inc. ("Advocate").  Advocate and

21   Wellgen share common ownership, office space and operations.  On information and belief

22   Advocate and Wellgen even share computer networks.

23   121.  During 2017, Wellgen and Advocate became aware that Layfield & Barrett ("L&B")

24   was experiencing cash flow shortages.  L&B repeatedly requested Advocate to increase its

25   borrowing capacity and on multiple occasions, Advocate refused.

26   122.  During the summer of 2017, Wellgen and Advocate become aware that L&B had

27   referred numerous cases to Maximum Legal, LLC ("ML") and its affiliated entities.  These referral

28   arrangements were of a standard form and were within the standard rates often paid to third-parties.

     Both Advocate and Wellgen were aware that L&B frequently referred cases to third-party firms as

1  well as third-party firms referring cases to L&B.

2  123.  In connection with the establishment of ML, ML agreed to pay arm's length referral

3  fees back to L&B in connection with cases being referred to ML by L&B.

4  124.  At the time of the referral arrangement, L&B had detailed financial projections

5  showing that current assets, which included accounts receivable, work-in-progress and liens on

6  cases that former L&B employees and/or other law firms had stolen from L&B would be sufficient

7  to satisfy L&B's creditors, which included Advocate, Wellgen, clients and other lienholders.

8  125.  Had L&B not been forced into bankruptcy by one of its competitors, and with the

9  assistance of Wakefield and Barrett, L&B would have and could have satisfied all of its obligations.

10  126.  Unbeknownst to Layfield, Barrett and Wakefield had devised a scheme to allege that

11  Layfield had abandoned L&B, stole millions of dollars and fled to Costa Rica with millions of

12  dollars in stolen client funds.  Barrett and Wakefield knew those allegations were false at the time

13  they made them and were solely designed to cause clients, attorneys and others to defect from L&B

    and fall into the hands of Maximum Legal (California), LLP.

14  127.  Because Maximum Legal (California), LLP ("MLC") was established for the sole

15  purpose of handling the California based cases for the ML structure, it was not initially apparent

16  that Wakefield and Barrett were attempting to steal all of the former L&B cases from ML, the

17  assets of ML and the employees of ML.

18  128.  Until Wakefield fraudulently filed a bankruptcy petition in July 2017 on behalf of

19  Maximum Legal (California), LLP claiming that he was the 100% owner of MLC, Layfield was

20  unaware of the scheme as devised by Wakefield and Barrett.

21  129.  The scheme operated as follows:  a.  Wakefield and Barrett would allege that Layfield

22  fled the country with millions of dollars in stolen client funds;  b.  Wakefield and Barrett would file

23  claim that Wakefield was the 100% owner of MLC despite knowing that Wakefield had agreed in

24  connection with his former position as General Counsel of L&B that he would only be a nominee

25  partner with .01% ownership with the remaining 99.99% owned by ML; c.  Wakefield and Barrett

26  would file a fictitious business name statement to establish Barrett Law as a d/b/a of MLC; d.

27  Wakefield and Barrett would make false criminal allegations against Layfield in order to force the

28  involuntary closure of L&B either through a state bar proceeding or involuntary bankruptcy; e.

1    upon forcing the involuntary closure of L&B, Wakefield and Barrett would cause all former

2    lucrative L&B clients to sign new engagements with MLC; f. by claiming that Layfield was

3    engaged in criminal activity, Barrett & Wakefield could avoid paying referral fees or lien claims to

4    L&B, thus obtaining millions of dollars in lucrative fees with no attached expenses; g. file a

5    chapter 11 bankruptcy, despite not having appropriate corporate authority and use that process to

6    avoid debts and further enrich themselves.

7          130. Ultimately, the scheme as devised by Wakefield and Barrett failed because despite

8    receiving over $500,000 from a former L&B client, Advocate placed a lien on those funds and

9    notified MLC of its intent to further lien all monies received by MLC. This action by Advocate

10   thwarted Wakefield and Barrett's scheme, but left MLC, its client (who were former L&B clients)

11   and L&B is disarray.

12         131. At the same time Advocate/Wellgen were causing MLC to implode on itself,

13   Advocate/Wellgen became increasingly aggressive with L&B. Despite having a workable plan to

14   pay off the entire debt owed from L&B, Advocate/Wellgen refused to cooperate with L&B to pay

15   down its debts. Rather, Advocate took the most aggressive and reckless stance possible and caused

16   a Trustee to become appointed over L&B. Prior to the appointment of the Trustee, Advocate failed

17   to demand a budget, plan or operational guidance. Within days of the Trustee being appointed for

18   L&B, the Trustee fired all L&B clients, compromised L&B's claims to attorney fees against those

19   fired clients and dismantled the entire L&B operation in what can only be described as a complete

20   evisceration of the law firm.

21         132. Advocate and Wellgen mistakenly thought they could recover the majority of their

22   advances to L&B by attempting to enforce a guarantee against Layfield.

23         133. Advocate sued Layfield under the guarantee in United States District Court in the

24   Central District of California ("USDCCA").

25         134. Advocate never personally served Layfield with the lawsuit and thus the USDCCA

26   never obtained jurisdiction over Layfield.

27         135. Advocate/Wellgen, its principals and its lawyers all knew that Layfield was in Costa

28   Rica for the entire month of September 2017. Despite this knowledge, they caused a process server

     to sign under penalty of perjury that Layfield had been personally served in Marina del Rey,

1    California.  Advocate/Wellgen, its principals and its lawyers then further suborned perjury by

2    causing a series of documents to be filed in the USDCCA under penalty of perjury in order to

3    obtain a default judgment against Layfield.

4         136.  Because Layfield was never served as fraudulently alleged by Advocate/Wellgen, the

5    judgment is void as a matter of law.

6         137.  After Wakefield and Barrett's scheme was thwarted by Advocate/Wellgen, Barrett

7    attempted to shift gears by disclaiming any involvement with MLC.  Barrett has gone so far as to

8    claim that during the summer of 2017 he was working on his own behalf rather than on behalf of

9    MLC and thus is entitled to attorney fees in his personal capacity for the work he performed on

10   behalf of L&B and MLC.

11        138.  Since September of 2017, both Wakefield and Barrett have failed to cooperate with

12   the MLC bankruptcy they filed, have refused to attend the 341 meeting of creditors and have

13   refused to provide any information to the MLC Trustee.

14        139. In furtherance of their scheme, Wakefield illegally entered the office of L&B and

15   destroyed computer data and deleted files.  Barrett similarly has made false reports to law

16   enforcement, filed false claims in connection with the MLC bankruptcy and Wakefield has filed

17   fraudulent declarations under penalty of perjury in various courts throughout the United States.

18        140.  Both Barrett and Wakefield have secretly collected large fees on cases formerly

19   handled by L&B and MLC.  Those fees should be used to pay former L&B client claims and other

20   creditors.

21        141.  Despite having had other clients who defaulted on their obligation, other clients

22   subject to State Bar disciplinary procedures, Advocate/Wellgen chose scorched earth and fraudulent

23   tactics to collect against Layfield and others.  Those tactics ultimately backfired and accelerated

     and exacerbated the losses.

24

25                        **First Counterclaim- Fraud**

26                          **(Against Wellgen)**

27        142.  Layfield incorporates by reference each of the foregoing allegations as though fully set

28   forth herein.

1      143.  Wellgen and Advocate, by and through their agent Jeffrey Golden, made

2  representations to the District Court that they knew were false, or had no reasonable basis for

3  believing to be true, and/or Wellgen and Advocate made the representations recklessly, without

4  regard for their truth.

5      144.  Wellgen and Advocate, by and through their agent and by and through their principals

6  made false representations with the intent that Defendants and others, including the District Court

7  would rely on the representations, and with the intent to thereby defraud Layfield, by:  (a) inducing

8  the District Court to endorse and approve a default judgment against Layfield, (b) utilize the

9  existence of a default judgment against Layfield to force Layfield into an Involuntary Bankruptcy,

10  (c) use the Involuntary Bankruptcy as a means and method to prevent Layfield from exposing the

11  criminal conduct of Wellgen and their agents, (d) and attempt to use the existence of a void

12  judgment to inflict further harm on Layfield.

13      145.  During the course of negotiating a payoff of the underlying loan, Wellgen and

14  Advocate claimed to be working with Layfield in good faith to structure a loan payoff in August of

15  2017.  The truth was that Wellgen and Advocate never planned on pursuing a structure to satisfy

16  the loan.  In fact, Wellgen and Advocate were planning the entire time to force L&B out of

17  business, strip Layfield of his ownership in L&B and ML and attempt to seize all of Layfield's

assets.

18      146.  After L&B's bankruptcy was converted into a debtor-in-possession, Advocate and

19  Wellgen led L&B's attorneys to believe that if L&B consented to the appointment of a Trustee, that

20  Wellgen and Advocate would pursue a reorganization of L&B in order to maximize the assets of

21  the L&B estate.  Instead, Wellgen and Advocate never intended to pursue a reorganization.  In fact,

22  Wellgen and Advocate secretly concealed their true intention, which was to immediately cease

23  operations and liquidate.  Wellgen and Advocate knew that L&B's lawyers would relay the

24  information regarding the potential for a reorganization as opposed to a liquidation of L&B and that

25  Layfield would rely on that information.

26      146.  Layfield reasonably relied upon the representations of Wellgen, Advocate and their

27  agents in generally approving the appointment of a Trustee.  However, the lawyer for L&B failed to

28  seek written approval of certain conditions of the reorganization plan.  Knowing that the L&B

1    lawyer failed to secure the appropriate conditions, Advocate and Wellgen lured that lawyer into

2    signing a consent under false pretenses.  Immediately upon obtaining the signature from L&B's

3    attorney, which Layfield did not expressly authorize, Wellgen and Advocate forced the firing of all

4    L&B clients and allowed all collateral to evaporate into thin air.

5        147.  As a proximate result of the reliance on these false representations, Layfield has been

6    injured.

7        148.  Layfield's reliance and others reliance on the false representations of Advocate,

8    Wellgen and their agents was a substantial factor in causing Layfield harm.

9        149.  Wellgen and Advocate's conduct described herein was intended to cause injury to

10   Layfield and intended to deprive him of money and property he was entitled to retain, or was

11   despicable conduct carried on by Wellgen and Advocate with a willful and conscious disregard for

12   Layfield's rights.  Wellgen and Advocate's conduct subjected Layfield to cruel and unjust hardship

13   in conscious disregard of the rights of Layfield, and constituted intentional misrepresentation,

14   deceit, or concealment of material facts known to Wellgen and Advocate with the intention to

15   deprive Layfield of property and/or legal rights, or otherwise cause injury, so as to constitute

16   malice, oppression, or fraud under California Civil Code section 3294, and thereby entitling

17   Layfield to punitive damages in an amount to punish or set an example of Wellgen and Advocate as

18   alter egos of each other.

**Second Counterclaim- Negligence**

**(Against Wellgen)**

20       150.  Layfield incorporates by reference each of the foregoing allegations as though fully set

21   forth herein.

22       151.  Wellgen and their alter ego Advocate failed to exercise reasonable care in deciding to

23   appoint a Chapter 11 Trustee without first obtaining a budget or understanding of how the Trustee

24   intended to administer the L&B estate.  Wellgen and Advocate also failed to develop a suitable plan

25   to handle the referral of high value cases and to ensure that L&B's assets did not disappear into the

26   hands of lawyers that never intended to honor L&B liens.

27       152.  Wellgen and Advocate failed to exercise reasonable care in decided to abruptly

28   liquidate the entire L&B business under the false pretense that Layfield criminally stole millions of

1   dollars and fled the country to avoid prosecution.  These improper statements, which were known

2   to be false at the time they were made or should have easily been known to be false caused the

3   value of the L&B assets to virtually evaporate into thin air.

4       153.  The actions and inactions of Wellgen and Advocate were a substantial factor in

5   causing Layfield's harm.

6       154.  As a direct and proximate result of the acts and omissions of Wellgen and Advocate,

7   Layfield was injured and suffered damages in an amount to be proven at trial.

8

9                              **Third Counterclaim- Declaratory Relief**

10                                    **(Against Wellgen)**

11      155.  Layfield incorporates by reference each of the foregoing allegations as though fully set

    forth herein.

12

13      156.  An actual and justiciable controversy now exists between Layfield and Wellgen

14   concerning whether Wellgen has a valid and enforceable judgment against Layfield.  Because

15   Layfield was never served and because a determination was never made on the actual merits of

    Layfield's claims, it must be determined whether Layfield was present in Marina del Rey,

16   California, at the residence of 118 Union Jack Mall, Marina Del Rey, California 90292 on the date

17   and time claimed by Wellgen.  Because Wellgen committed fraud in obtaining this judgment,

18   Layfield seeks a judicial determination of this fact.

19

20                                    **CROSS-CLAIMS**

21      Layfield alleges for his cross-complaint against Advocate Capital, Todd Wakefield, Joseph

22   M. Barrett, Gregory Allen Stuck, Christopher Tyler Webster, Jeffery Golden, Martin J. Brill, and

23   Richard Horner as follows:

24      157.  Layfield incorporates by reference each of the foregoing allegations as though fully set

25   forth herein.

26      158.   Cross-Defendant Advocate Capital, Inc. ("Advocate") is a Tennessee corporation

27   engaged in the business of lending money to plaintiff law firms at high interest rates.  Advocate knew

28   that Layfield did not abscond with millions of dollars for the purpose of fleeing the country.

1       159.  Cross-Defendant Todd Wakefield ("Wakefield") is a citizen of the United States and a

2   resident of Park City Utah.  Wakefield was the former General Counsel and Director of Litigation

3   for Layfield & Barrett (L&B), a member and Manager of Maximum Legal, LLC ("ML"), a 0.01%

4   partner of MLC, the Manager of Maximum Legal Staffing ("MLST"), the Manager of Maximum

5   Legal (Florida), PLLC, the Manager of Maximum Legal (Utah), LLC, and the Manager of Maximum

6   Legal (Arizona), LLC.  Wakefield no longer practices law.  Wakefield knew that Layfield did not

7   abscond with millions of dollars for the purpose of fleeing the country.

8       160.  Cross-Defendant Joseph M. Barrett ("Barrett") is a citizen of the United States and

9   resident of Redondo Beach, California.  Barrett was a shareholder and director of L&B, a shareholder

10   and director of Barrett Law, P.C., a member and manager of ML, and a supervising attorney and

11   indirect principal of MLC pursuant to California State Bar Rule 1-100(B)(1)(a) and Rule 3.170 et.

12   seq.  Barrett is currently an attorney at Affeld Grivakes, LLP in Los Angeles whose caseload consists

13   primarily of former L&B, ML and MLC clients.  Barrett knew that Layfield did not abscond with

    millions of dollars for the purpose of fleeing the country.

14       161.  Cross-Defendant Gregory Allen Stuck ("Stuck") is a citizen of the United States and

15   resident of Los Angeles, California.  Stuck is the son of a different Gregory Stuck who is a disbarred

16   lawyer from Ohio and who currently works for Wilshire Law Firm.  Stuck was the former Director

17   of Prelitigation for L&B, was the Director of Prelitigation for ML and is now the principal of Stuck

18   Law.  Stuck Law's client base consists primarily of former L&B and ML clients.

19       162.  Cross-Defendant Christopher Tyler Webster ("Webster") is a citizen of the United States

20   and resident of Park City, Utah.  Webster was the former Director of Marketing for L&B.  Webster

21   was set to become the Director of Marketing for ML,but was terminated for cause prior to that

22   position taking effect.  Webster stole sensitive computer data upon leaving his employ with L&B and

23   later took actions to destroy and/or alter L&B data.  Webster also assisted others in hacking into

24   computer networks in violation of numerous federal and state criminal statutes.

25       163. Cross-Defendant Jeffery Golden is a citizen of the United States and resident of Orange

26   County, California.  Golden regularly conducts business on behalf of clients located in the State of

27   Tennessee.

28       164.  Cross-Defendant Martin J. Brill is a citizen of the United States and resident of Los

1   Angeles, California.  Defendant Brill knew that Wakefield was not and could not have been the 100%

2   owner of MLC and assisted Wakefield in furthering his fraudulent scheme to harm Layfield.

3      165.  Cross-Defendant Richard Horner is a citizen of the United States and resident of Los

4   Angeles, California.

5      166.  The true names and capacities of the defendants named herein as John Does 1-50 are

6   unknown to Layfield, who therefore sues them under these fictitious names.  Layfield will amend the

7   complaint to add their true names and capacities when they become known.

8      167.  The coalition of firms and individuals who sought to profit from the financial difficulties

9   being experienced by L&B became part of the growing "Destroy Layfield Enterprise," a RICO

10  enterprise.  The Destroy Layfield Enterprise had many participants, grew over time and included (i.)

11  Joseph Barrett, Todd Wakefield, Gregory Stuck, Christopher Webster, Martin Brill, Jeffery Golden,

12  Advocate Capital, Richard Horner and Does 1-50.  These individuals and organizations embarked on

13  a series of false and misleading statements, which included sworn statements, surrounding the

14  operations, purpose, prospects, whereabouts, intentions, motivations and overall conduct of Layfield

15  and his professional, business and personal operations.  This pattern of false and misleading

16  information was designed to create a false impression that Layfield had abandoned the law firm he

17  founded (L&B), had ceased all operations at L&B, had abruptly ceased all operations at ML, had no

18  ownership or affiliation with MLC, was acting in an evasive and secretive manner regarding his

19  whereabouts, and had engaged in a scheme to steal millions of dollars from clients for the purpose of

20  fleeing the country to avoid prosecution.  All of these statements were false when made, were known

21  to be false and were designed to inflict as much harm on Layfield as humanly possible while the

22  participants profited from this wrongful activity.  In addition to the false statements, these participants

23  engaged in and/or assisted one another in concealing actual records which contradicted the false

24  statements, destroying or altering vital records.  The goal of this enterprise was to abscond with assets

25  that were rightfully the property of L&B, ML, MLC and Layfield without paying fair compensation,

26  destroy Layfield's ability to practice law, destroy Layfield business prospects, cause Layfield to be

27  criminally prosecuted and seize all of Layfield's assets and put Layfield and his family in the streets.

28  The participants in the enterprise coordinated their efforts, actively shared information with each

other, prepared documents in conjunction with each other, obtained computer data, used the federal

1    mails in furtherance of their scheme, used the federal wires in furtherance of their scheme, illegally

2    accessed protected computer and personal data and actively published false and misleading

3    information in blatant disregard of the truth.  This enterprise was successful in accomplishing its

4    goals.

5

6                    **First Cross-claim- Violation of 18 U.S.C. § 1962(C)**

7                    **(Layfield versus the "Destroy Layfield Enterprise")**

8

9        168.  Layfield incorporates by reference all preceding paragraphs, as if fully set forth herein.

10       169.  Cross-Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who

11   conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18

12   U.S.C. § 1962(c).

13       170.  The Destroy Layfield Enterprise is an association-in-fact within the meaning of 18

14   U.S.C. § 1961(4) consisting of (i) Cross-Defendants, including their employees and agents; and (ii)

15   unknown and unnamed co-conspirators as set forth.  *Supra.*  The Destroy Layfield Enterprise is an

16   ongoing organization that functions as a continuing unit.  The Destroy Layfield Enterprise was
     created and used as a tool to effectuate Cross-Defendants' pattern of racketeering activity.

17       171.  The Destroy Layfield Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and

18   consists of a group of "persons" associated together for the common purpose of:  (i) inflicting

19   economic, personal, professional, emotional and other harm on Layfield, (ii) to profit from the

20   ultimate demise of Layfield and his business associations, and (iii) destroying, mutilating, or

21   concealing records, documents or other evidence to prevent the use of such evidence to refute the

22   false narrative being perpetrated by the Destroy Layfield Enterprise.

23       172.  Cross-Defendants have conducted and participated in the affairs of the Destroy Layfield

24   Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and

25   1961(5), which includes perjury, suborning perjury, economic espionage, theft of trade secrets and

26   multiple instances of mail and wire fraud as described below.

27       173.  The Destroy Layfield Enterprise engaged in and affected interstate commerce, because,

28   *inter alia*, Layfield's business dealings and the Cross-Defendants engaged in business throughout the

1    United States, including but not limited to California, Utah, Arizona, Colorado, Florida, Tennessee,
2    Delaware, New York, New Jersey, North Carolina, New Mexico and Nevada.

3        174.    Cross-Defendants exerted control over the Destroy Layfield Enterprise, and Cross-
4    Defendants participated in or aided and abetted in the operation or management of the affairs of the
5    Destroy Layfield Enterpise.

6        175.    Within the Destroy Layfield Enterprise, there was a common communication network
7    by which co-conspirators shared information on a regular basis.  The Destroy Layfield Enterprise
8    used this common communication network for the purpose of enabling the participants to inflict
9    further harm on Layfield.

10        176.    Each participant in the Destroy Layfield Enterprise had a systematic linkage to each
11    other participant through corporate ties, contractual relationships, financial ties, social media, and the
12    continuing coordination of their activities.  Through the Destroy Layfield Enterprise, the Cross-
13    Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering
    the illegal scheme and their common purposes.

14        177.    The RICO Cross-Defendants used the mails and wires for the transmission, delivery, or
15    shipment of the following by the RICO Cross-Defendants that were reasonable foreseeably caused
16    to be sent as a result of Cross-Defendants' illegal scheme:

17        (a)    Contracts between Wakefield, Barrett and Brill regarding the filing of a fraudulent
18    bankruptcy petition;

19        (b)    Contracts between Advocate and Golden regarding Layfield;

20        (c) Wires between Barrett, Wakefield and Brill regarding the means and methods of inflicting
21    harm on Layfield;

22        (d) Payments between MLC, Wakefield, Barrett and Brill;

23        (e)    Wires between Wakefield, Webster, Stuck, Barrett regarding the means and methods of
24    inflicting harm on Layfield;

25        (f)    Wires between Advocate and Golden regarding the means and methods of harming
26    Layfield and falsifying a proof of service to engage in bankruptcy fraud;

27        (g)    Emails between each and every participant regarding the false narrative regarding
    Layfield;

28

178. The RICO Cross-Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

179. The RICO Cross-Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.

180. The RICO Cross-Defendants also communicated by U.S. Mail, by interstate facsimile, any by interstate electronic mail with various other affiliates, co-conspirators and other third-party entities in furtherance of the scheme.

181. The mail and wire transmissions described herein were made in furtherance of Cross-Defendants' scheme and common course of conduct to deceive the public, the courts and Layfield's clients and business associates about Layfield's alleged activities.

182. To achieve their common goals, the RICO Cross-Defendants hid from the public, the courts, clients and business associates the truth about the operation of Layfield's business activities, which included that even after Layfield temporarily relocated to Costa Rica, Layfield continued to perform legal services, continued to manage L&B's operations, continued to engaged professionals, continued to make payments to clients and vendors, continued to actively work cases and continued extraordinary efforts to get all clients and creditors fully compensated.

183. Cross-Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Layfield to be perceived as a criminal, fraudsters and one who couldn't be trusted for any purpose.

184. The pattern of racketeering activity alleged herein are separate and distinct from each other. Cross-Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting, aiding or abetting and conspiring in the affairs of the Destroy Layfield Enterprise.

185. Layfield has been injured in this property and business by reason of these violations. Cross-Defendants interefered with Layfield's current and prospective contractual relations, because Layfield lost employment and employment opportunities, his freedom, as well as contractual and contractual opportunities, as a result of Cross-Defendants' conduct.

186. Had members of the Destroy Layfield Enterprise not been complicit and had they revealed instead of concealed the truth regarding Layfield's intentions regarding his ongoing business

1   prospects and his desire to ensure all of his creditors were compensated fully, Layfield would not

2   have been injured in the severe manner he was.   Thus, Layfield's injuries were directly and

3   proximately caused by Cross-Defendants' racketeering activity, as described above.

4   187.  By virtue of these violations of 18 U.S.C § 1962(c), Cross-Defendants are liable to

5   Layfield for three times the damages Layfield has sustained, plus the cost of this suit, including

6   reasonable attorneys' fees.

7   ### Second Cross-claim- Violation of 18 U.S.C. § 1962(D)

8   ### By Conspiring to Violate 18 U.S.C. § 1962(C)

9   ### (Layfield versus the Destroy Layfield Enterprise)

10

11   188.  Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

12   189.  Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire

13   to violate any of the provisions of subsection (a), (b) or (c) of this section."

14   190.  Cross-Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. §

15   1962(c).   The object of this conspiracy has been and is to conduct or participate in, directly or

16   indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a

17   pattern of racketeering activity.

18   191.  As demonstrated in detail above, Cross-Defendants' co-conspirators have engaged in

19   numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including

20   multiple instances of mail fraud, wire fraud obstruction of justice, economic espionage and theft of

21   trade secrets.

22   192.    The nature of the above-described Cross-Defendants' co-conspirators' acts in

23   furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of

24   an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but also were

25   aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering

26   activity.  At all relevant times, all Cross-Defendants and all Cross-Defendants' co-conspirators were

27   aware of the essential nature and scope of the Destroy Layfield Enterprise and intended to participate

28   in it.

    193.  As a direct and proximate result of Cross-Defendants' overt acts and predicate acts in

1   furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) but were

2   also aware that their ongoing fraudulent acts have been and are part of an overall pattern of

3   racketeering activity.    At all relevant times, all Cross-Defendants and Cross-Defendants' co-

4   conspirators were aware of the essential nature and scope of the Destroy Layfield Enterprise and

5   intended to participate in it.

6       194.  As a direct and proximate result of Cross-Defendants' overt acts and predicate acts in

7   furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Layfield

8   has been and is continuing to be injured in his business or property, as set forth more fully above.

9       195.  Cross-Defendants have sought to and have engaged in the violations of the above federal

10  laws and the effects thereof detailed above are continuing and will continue unless injunctive relief

11  prohibiting Cross-Defendants' illegal acts constituting a pattern of racketeering activity is fashioned

    and imposed by the Court.

12

13                    **Third Cross-claim- Breach of Fiduciary Duty**

14                        **(Against Barrett & Wakefield)**

15      196.  Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

16      197.    Barrett and Wakefield were at all times alleged herein Managers of ML, Members of

17  ML and Members of MLC.

18      198.  As members and managers of ML and MLC, Wakefield and Barrett owed fiduciary

19  duties to Layfield, how was also a manager and member of ML and MLC.

20      199.  Barrett was a shareholder, officer and director of L&B.  Wakefield was an officer of

21  L&B in his role as General counsel.

22      200.  Wakefield acted as counsel to L&B, ML, MLC and Layfield in numerous instances.

23      201.  Barrett acted as counsel to L&B, ML and MLC in numerous instances.

24      202.  As members, managers and attorneys for ML and MLC, Barrett and Wakefield owed

25  fiduciary duty to Layfield to act at all times with the utmost care, honesty, undivided loyalty, and

26  fidelity in all their business dealings with Layfield.

27      203.  As a shareholder, officer and director of L&B, Barrett owed fiduciary duty to Layfield

28  to act at all times with the utmost care, honesty, undivided loyalty, and fidelity in all their business

1   dealings with Layfield.

2   204.  As counsel for L&B, ML MLC and Layfield, Barrett and Wakefield owed fiduciary

3   duty to Layfield to act at all times with the utmost care, honesty, undivided loyalty, and fidelity in all

4   their business dealings with Layfield.

5   205.  Wakefield and Barrett breached their fiduciary duties to Layfield by attempting to steal

6   the MLC entity from Layfield and ML without paying just compensation, engaging in a pattern of

7   racketeering activity as described above for the purpose of harming Layfield and by leading a

8   campaign of false and fraudulent information regarding Layfield and his business dealings.

9   206.  Wakefield and Barrett breached their fiduciary duties to Layfield by the acts of

10  misfeasance and malfeasance as described herein.

11  207.  As a proximate result of Wakefield and Barrett's breach of fiduciary duty, Layfield has

    been harmed as alleged in an amount to be proved at trial.

12

13                          **Fourth Cross-claim- Fraud**

14  **(Against Barrett, Wakefield, Brill, Golden, Advocate, Stuck, Horner and Does 1-50)**

15

16  208.  Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

17  209.  Barrett, Wakefield, Brill, Golden, Advocate and Stuck have suppressed and concealed

18  certain material facts for the purpose of harming Layfield.  They also engaged in a campaign of false

19  and misleading information as well as criminal acts for the purpose of effectuating their fraud scheme.

20  210.  In particular, Cross-Defendants devised a scheme to file a fictitious bankruptcy on

21  behalf of MLC, wrongfully claim ownership of MLC, force L&B into an involuntary bankruptcy,

22  cause all L&B clients and co-counsel and ML clients and co-counsel to terminate all relationships

23  with L&B and ML, cause a series of lawsuits to be filed against Layfield and obtain fraudulent

24  judgments, cause Layfield to come under investigation by law enforcement, cause Layfield's assets

25  to be frozen and seized, cause Layfield to become incarcerated, and prevent Layfield from being able

26  to assert affirmative claims against the Cross-Defendants by forcing Layfield into a fraudulent

27  involuntary bankruptcy.  The false statements made by these various Cross-Defendants, included but

28  was not limited to the following:

1    a. Barrett, Wakefield and Stuck stated that thye was unaware that Layfield was relocating to

2    Costa Rica, was unaware of client complaints at L&B, that Layfield had abandoned his clients and

3    L&B's operations, had absconded with millions of dollars, had fled the country and that none of them

4    had any knowledge of any financial difficulties ongoing at L&B.  Stuck told clients that L&B was

5    "closed" and that Layfield was being disbarred even though Stuck had no actual knowledge at the

6    time of any disciplinary proceedings.

7    b. Barrett stated that he was working in his individual capacity during the summer of 2017

8    as opposed to on behalf of ML, MLC or L&B for the sole purpose of improperly collected legal fees

9    on behalf of former L&B clients.

10    c. Barrett, Wakefield and Brill stated that Wakefield was the 100% owner of MLC even

11    though all of them knew that Wakefield was only a 0.01% owner.

12    d. Barrett, Wakefield and Brill made numerous false statements in bankruptcy filings relating

13    to the operations of L&B, the location of L&B client funds, the status of the L&B IT infrastructure

      and the status of their purported access to data.

14    e. Golden, Advocate and Horner told the United States District Court that they had served

15    Layfield in Marina del Rey on September 21, 2017 when they knew that Layfield was in Costa Rica.

16    Golden and Advocate caused numerous individuals to file documents under penalty of perjury

17    regarding the fictitious service of Layfield

18    f. Webster told numerous individuals that Layfield had absconded with millions of dollars in

19    cash, that he supposedly withdrew from bank accounts in New York during November 2016 and fled

20    to Bermuda to stash the phantom cash in secret bank accounts in Bermuda.  Webster knew this

21    information was false yet he continued to make these false statements to harm Layfield's business

22    interests and Layfield personally.

23    g. Cross-Defendants engaged in a widespread pattern of making false statements to numerous

24    parties for the sole purpose of depriving Layfield of his property rights.

25    h. Barrett and Wakefield concealed from Layfield that their true intention was to steal the

26    MLC entity from ML, which was majority owned by Layfield and profit handsomely from their false

27    statements.  Among those false statements, Wakefield and Barrett claimed that Wakefield was the

      100% owner of MLC when they both knew he was not.

28

1    i. Stuck and Webster concealed from Layfield that Stuck was illegally accessing the computer

2    networks and confidential client data of L&B, ML and MLC after Stuck and Webster's employment

3    was terminated.   Stuck and Webster illegally accessed this confidential data for the purpose of

4    effectuating their own fraud scheme to tell clients that L&B, ML and MLC were going out of

5    business.

6    211.  As a proximate result of Cross-Defendants intentional and fraudulent suppression of

7    true facts, Layfield has been harmed and has suffered damages, in an amount currently unascertained,

8    but according to proof at trial, but is at least in excess of $75,000.

9    212.   The aforementioned conduct of Cross-Defendants constitutes fraud, oppression,

10   misrepresentations, concealment, promises without the intent to perform, with the intent on part of

11   the Cross-Defendants of inducing reliance and thereby depriving Layfield of property and/or legal

12   rights or otherwise causing injury, and was despicable conduct that subjected Layfield to cruel and

13   unjust hardship in conscious disregard of Layfield's rights, so as to justify an award of exemplary

14   and punitive damages.

### Fifth Cross-claim- 18 U.S.C. § 1030(A)

15   **(Against Wakefield, Barrett, Webster, Stuck and Does 1-50)**

16

17   213. Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

18   214.  Layfield's computers, ML's computer, L&B's computers and MLC's computers (the

19   "Subject Computers") are involved in interstate and foreign commerce and communication, and are

20   protected computers under 18 U.S.C. § 1030(e)(2).

21   215.   On information and belief, Wakefield, Barrett, Webster and Stuck knowingly and

22   intentionally accessed the Subject Computers without authorization or in excess of authorization, and

23   thereby obtained and used valuable information from those computers in violation of 18 U.S.C. §

24   1030(a)(2)(C). Such information included, but was not limited to:  private, attorney client privileged

25   communications, confidential medical information, confidential client lists, trade secrets, marketing

26   plans, financial forecasts and attorney client privileged communications between Layfield and his

27   attorneys.  The information was used to advance the plan to harm Layfield, steal Layfield's clients

28   and contact clients of Layfield for the purpose of disrupting Layfield's relationships.

216.    Upon information and belief, Cross-Defendants deleted certain information, intentionally caused damage without authorization, to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A).

217.    Upon information and belief, Cross-Defendants intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).

218.    Cross-Defendants caused loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also caused damage affecting ten or more protected computers during a one-year period.

219.    Cross-Defendants and un-named co-conspirators caused damage and loss, including but not limited to the cost of investigating and responding to the unauthorized access and abuse of their computer networks, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, the loss of the value of Layfield's trade secrets, and the harm to Layfield's business as described above.  Layfield seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g).

**Sixth Cross-claim- 18 U.S.C. § 2701-12**

**(Against Wakefield, Barrett, Webster, Stuck and Does 1-50)**

220.    Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

221.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

222.    Cross-Defendants willfully and intentionally accessed without authorization a facility through which electronic communications service is provided, namely, the Subject Computers, including their email servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

223.    AS a result of these willful and intentional violations, Layfield has suffered damages and, as provided for in 18 U.S.C. §2707, seeks an award of the greater of the actual damages suffered or the statutory damages, punitive damages, attorneys' fees and other costs of this action, and

1    appropriate equitable relief.

2

3    **Seventh Cross-claim- Intentional Infliction of Emotional Distress**

4    **(Against All Cross-Defendants)**

5

6    224. Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

7    225. The above-described conduct of all parties caused Layfield to suffer severe emotional

8    distress.

9    226. The above-described conduct of all parties was outrageous.

10    227. The Cross-Defendants intended to cause Layfield emotional distress or they acted with

11    reckless disregard of the probability that Layfield would suffer emotional distress, knowing that

12    Layfield would suffer as a result of their conduct.

13    228. Cross-Defendants' conduct was a substantial factor in causing Layfield severe emotional

14    distress.

15    229. Layfield suffered an amount of damages to be proven at trial.

16    **PRAYER FOR RELIEF**

17    **WHEREFORE,** Defendant prays for judgment as follows:

18    A.    **On His Answer Against Wellgen**

19        1. That Plaintiff takes nothing by way of this Complaint;

20        2. That the Court dismiss with prejudice Plaintiff's Complaint and each purported cause of

21    action alleged therein;

22        3. That judgment be entered against Plaintiff and in favor of Defendant;

23        4. That the Court award Defendant the cost of suit and attorneys' fees (including time

24    Defendant has spent on this matter in pro se);

25    B.    **On His Counterclaims Against Wellgen**

26        5. That judgment be entered in Layfield's favor and against Wellgen on all of Layfield's

27    claims.

28        6. For a judicial declaration that Layfield was in Costa Rica on September 21, 2017 and

1    that Wellgen and its's agents falsely claimed otherwise.

2         7.  For actual damages, punitive damages, attorneys' fee, and costs of suit herein.

3

4    **C.    On His Cross-Claims Against Advocate Capital, Todd Wakefield, Joseph Barrett,**

5    **Gregory Stuck, Martin Brill, Jeffery Golden and Christopher Tyler Webster and Does 1-50**

6         8.  That judgment be entered in Layfield's favor against all Cross-Defendants on all

7    Layfield's claims.

8         9.  That statutory damages be entered in Layfield's favor against all Cross-Defendants on all

9    Layfield's claims requiring statutory damages.

10        10.  That treble damages be entered in Layfield's favor against all Cross-Defendants on all

11   of Layfield's RICO claims.

12        11.  That actual damages, punitive damages, attorneys' fee and costs of suit be awarded.

13        12.  That any other relief this court deems appropriate be awarded.

14

15

16   Dated: October 15, 2018

17                                            Philip Layfield in Pro Per and as Successor in

18                                            Interest to Maximum Legal Holdings, LLC and
                                             Maximum Legal Services, LLC

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

1

2    Defendant, Counterclaim Plaintiff and Cross-Claim Plaintiff hereby demands trial by jury on all

3    counts herein.

4

5    Dated: October 16, 2018

6                                                    _____
                                                     Philip Layfield in Pro Per and as Successor in
7                                                    Interest to Maximum Legal Holdings, LLC and
                                                     Maximum Legal Services, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

1

2   I hereby certify that a true and correct copy of the Answer, Counterclaim and Cross-Claims has
    been furnished to the below individuals via the Court's electronic filing system and/or by
3   depositing same in the United States Mail, postage prepaid, on October 16, 2018.

4   Roger G. Jones
    Brandley Arant
5   1600 Division Street, Suite 700
6   P.O. Box 340025
    Nashville, TN 37203
7
    Todd D. Wakefield
8   P.O. Box 983056
9   Park City, Utah 84098

10  Joseph Barrett
    Damion Robinson
11  c/o Affeld & Grivakes, LLP
    2049 Century Park East, Suite 2460
12  Los Angeles, California 90067

13

14

15                                           _Christine Layfield_ (signature)

16                                           Christine Layfield

17

18

19

20

21

22

23

24

25

26

27

28



RECEIVED
in Clerk's Office

OCT 1 8 2018

U.S. District Court
Middle District of TN

October 15, 2018

Nashville Clerk's Office
United States District Court
Middle District of Tennessee
801 Broadway, Room 800
Nashville, TN 37203

     RE:    Wellgen v. Maximum Legal et. al.  Case No.  3:18-cv-00275

Dear Filing Clerk:

Please find enclosed the following for filing:

    1.   Answer, Counterclaim and Cross-Claim

Sincerely,

Philip J. Layfield

**Philip J. Layfield**
**c/o Maximum Legal Holdings, LLC**
**8 The Green**
**Suite #6426**
**Dover, DE 19901**
**(302) 401-6804**



UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>PHILIP JAMES LAYFIELD,<br><br>        Defendant. | Case No.:  CR 18-124-MWF<br><br>**AMENDED** ORDER AND TERMS RE DEFENDANT PHILIP JAMES LAYFIELD'S RELEASE ON BOND |

    The Court has reviewed the Application for Reconsideration of Detention, filed May 23, 2018 [24]; the Memorandum of Law filed June 4, 2018 [33]; the Opposition to Application for Order of Detention, filed June 5, 2018 [34]; the Amended Opposition and Supplemental Opposition, filed June 14, 2018 [38 and 39]; the Supplemental Opposition, filed June 15 2018 [40]; the Reply, filed June 17, 2018 [41]; the Joint Statement Re Proposed Bond Conditions Following Hearing on Defendant's Application for Bail Review, filed June 20, 2018 [42]; Defendant's *Ex Parte* Application to Modify Conditions of Release and Declarations of Anthony M. Solis, James Layfield and Christine M. Layfield, filed July 13, 2018 [46]; and the Opposition to *Ex Parte* Application to Modify Conditions of Release, filed July 16, 2018 [54].

///

1

The Court has also considered the evidence and arguments presented at the bail review hearings held on June 6, June 18, 2018, and July 12, 2018.

This Order amends the Court's Order and Terms Re Defendant Philip James Layfield's Release on Bond, filed July 6, 2018 [44].

The Court GRANTS Defendant Philip James Layfield release on bond, under the following terms and conditions:

1. Appearance bond in the total amount of $350,000, as follows:

    a. Secured appearance bond with cash deposit in the amount of $100,000 from James Layfield;

    b. Secured appearance bond with cash deposit in the amount of $50,000 from Steve Massas;

    c. Secured appearance bond with Affidavit of Surety with Justification in the amount of $150,000, from David C. Layfield and Mary L. Layfield on the real property located at 115 Millers Run, Millsboro, Delaware 19966;

    d. An unsecured appearance bond in the amount of $50,000 from Defendant's wife, Christine M. Layfield.

2. In addition to the General Conditions of Release, the following conditions of release are imposed on Defendant:

    a. Submit to Pretrial Services Agency (PSA) supervision as directed by PSA;

    b. Surrender all passports and travel documents to PSA prior to release, including a declaration stating that Defendant has not sought and will not seek another passport;

    c. Defendant's wife, Christine Layfield, shall surrender her and their minor child's passports to PSA prior to Defendant's release, and Christine Layfield shall submit a declaration that she has not

2

1    sought and will not seek another passport for herself or for their

2    child;

3    d. Defendant's travel shall be restricted to the Central District of

4       California and the District of Delaware, unless prior permission is

5       granted by PSA and the Court to travel to a specific other location;

6    e. Defendant shall not enter any port of entry or departure, airport,

7       etc., except for prior PSA- and Court-approved travel;

8    f. Defendant shall reside as approved by PSA and shall not relocate

9       without prior permission from PSA;

10   g. Defendant shall maintain or actively seek employment and provide

11      proof to PSA; all employment must be approved by PSA and the

12      Court.  Defendant shall not engage in any employment where he

13      acts or is called upon to act as a fiduciary for the funds of another

14      person or entity, including attorney-client trust accounts;

15   h. Defendant shall avoid all contact, directly or indirectly, including

16      by electronic means, with any person who is a known victim or

17      witness in the subject investigation or prosecution, or any client or

18      former client of Layfield & Barrett APC, Maximum Legal, with

19      which Defendant was or is associated, or any client or former

20      client of any lawyer or firm that was associated with Defendant or

21      any of the former firms with which Defendant was associated;

22   i. Defendant shall not possess any firearms, ammunition, destructive

23      devices, or other dangerous weapons.  In order to determine

24      compliance, Defendant must submit to a search of his person

25      and/or property by PSA in conjunction with the U.S. Marshal;

26   j. Defendant shall not possess any identification, mail matter, access

27      device, or any identification-related material other than in his own

28      legal or true name without prior permission from PSA;

3

k.  Defendant shall not sell, transfer, or give away any asset valued at $1,000 or more without notifying and obtaining permission from the Court;

l.  Defendant shall participate in a Location Monitoring Program and abide by all the requirements of the program under the direction of PSA, which will include a Location Monitoring bracelet. Defendant must pay all or part of the costs of the program based on Defendant's ability to pay as determined by PSA, and Defendant is financially responsible for any lost or damaged equipment; and

m. Defendant is restricted to his residence at all times except for medical needs or treatment, attorney visits, or court appearances, which must be preapproved by PSA, or employment, which must be preapproved by PSA and the Court.

3. A Release Order and Bond form shall be prepared consistent with this Amended Order.

Dated:  July 17, 2018

_____
MICHAEL W. FITZGERALD
United States District Judge

4

EXHIBIT B  PAGE  49

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 600, Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*):  **WELLGEN STANDARD, LLC'S OBJECTION TO ALLEGED DEBTOR'S MOTION TO CONVERT CASE UNDER 11 U.S.C. SECTIONS 706(A) OR 1112(A)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.   On (*date*) **December 4, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.   SERVED BY UNITED STATES MAIL**:
On (*date*) **December 4, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:**  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **December 4, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Neil Bason, 255 E. Temple Street, Los Angeles, CA  90012

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 4, 2018 | Kelly Adele | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
0.0

**F 9013-3.1.PROOF.SERVICE**

**VIA EMAIL**
Philip J. Layfield
c/o Maximum Legal Holdings, LLC
8 The Green, Suite 6426
Dover, DE 19901
Email: phil@maximum.global

**Electronic Mail Notice List**
Wesley H Avery (TR) wes@averytrustee.com,
C117@ecfcbis.com;lucy@averytrustee.com;alexandria@averytrustee.com
Beth Gaschen bgaschen@wgllp.com,
kadele@wgllp.com;vrosales@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com
Jeffrey I Golden jgolden@wgllp.com, kadele@wgllp.com;vrosales@lwgfllp.com;cbmeeker@gmail.com
Yana G Henriks yhenriks@law-mh.com, rmcmurray@law-mh.com
Malhar S Pagay mpagay@pszjlaw.com, mpagay@pszjlaw.com
Faye C Rasch frasch@wgllp.com, kadele@wgllp.com;tziemann@wgllp.com
Jeffrey L Sumpter jsumpter@epiqtrustee.com, jsumpter@cbiz.com
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
Dennis J Wickham wickham@scmv.com, nazari@scmv.com